IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | Case No. 24-80617 |
| | ) | (Chapter 11) |
| C M HEAVY MACHINERY, LLC | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

## DISCLOSURE STATEMENT FOR CHAPTER 11 PLAN
## OF REORGANIZATION OF C M HEAVY MACHINERY, LLC

Comes now C M Heavy Machinery, LLC ("CMHM," the "Debtor," or the "Plan Proponent"), by and through undersigned counsel, pursuant to Section 1125 of Title 11 of the United States Code, and provides the following disclosure statement (the "Disclosure Statement") correlative to its plan of reorganization (the "Plan"):

THIS DISCLOSURE STATEMENT IS DESIGNED TO PROVIDE ADEQUATE INFORMATION TO ENABLE HOLDERS OF CLAIMS AGAINST THE DEBTOR TO MAKE AN INFORMED JUDGMENT ON WHETHER TO ACCEPT OR REJECT THE PLAN. ALL HOLDERS OF CLAIMS ARE HEREBY ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, WHICH IS ANNEXED HERETO AS EXHIBIT "A" AND OTHER DOCUMENTS REFERENCED AS FILED WITH THE COURT BEFORE OR CONCURRENTLY WITH THE FILING OF THIS DISCLOSURE STATEMENT. FURTHERMORE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT. SUBSEQUENT TO THE DATE HEREOF, THERE CAN BE NO ASSURANCE THAT: (A) THE INFORMATION AND REPRESENTATIONS CONTAINED HEREIN WILL CONTINUE TO BE MATERIALLY ACCURATE; AND (B) THIS DISCLOSURE STATEMENT CONTAINS ALL MATERIAL INFORMATION.

ALL HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE MATTERS DESCRIBED IN THIS DISCLOSURE STATEMENT AS A WHOLE PRIOR TO VOTING ON THE PLAN. IN MAKING A DECISION TO ACCEPT OR REJECT THE PLAN, EACH CREDITOR MUST RELY ON ITS OWN EXAMINATION OF THE DEBTOR AS DESCRIBED IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.

NO PARTY IS AUTHORIZED BY THE PLAN PROPONENT TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATIONS WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE STATEMENT. NO

1

REPRESENTATIONS OR INFORMATION CONCERNING THE DEBTOR, ITS FUTURE BUSINESS OPERATIONS OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE DEBTOR. ANY INFORMATION OR REPRESENTATIONS GIVEN TO OBTAIN YOUR ACCEPTANCE OR REJECTION OF THE PLAN WHICH ARE DIFFERENT FROM OR INCONSISTENT WITH THE INFORMATION OR REPRESENTATIONS CONTAINED HEREIN AND IN THE PLAN SHOULD NOT BE RELIED UPON BY ANY CREDITOR IN VOTING ON THE PLAN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016(b) OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NONBANKRUPTCY LAW. PERSONS OR ENTITIES HOLDING OR TRADING IN, OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, OR SECURITIES OF, THE DEBTOR, IF ANY, SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION, NOR HAS SUCH COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN. WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS AND OTHER PENDING OR THREATENED ACTIONS, THE DISCLOSURE STATEMENT AND PLAN AND THE INFORMATION CONTAINED THEREIN SHALL NOT BE CONSTRUED AS AN ADMISSION OR STIPULATION, BUT RATHER AS STATEMENTS MADE IN SETTLEMENT NEGOTIATIONS GOVERNED BY RULE 408 OF THE FEDERAL RULES OF EVIDENCE AND ANY OTHER RULE OR STATUTE OF SIMILAR IMPORT. THIS DISCLOSURE STATEMENT AND PLAN SHALL NEITHER BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE SECURED CREDITORS OR ANY OTHER PARTY NOR BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN. EACH CREDITOR SHOULD, THEREFORE, CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE SOLICITATION, THE PLAN OR THE TRANSACTIONS CONTEMPLATED THEREBY.

This Disclosure Statement and the Plan annexed hereto as Exhibit "A" are being furnished by the Plan Proponent to holders of Claims pursuant to Section 1125 of the Bankruptcy Code, to permit creditors the opportunity to either accept or reject the Plan (and the transactions contemplated thereby, as disclosed herein), as necessary. Capitalized terms in this Disclosure Statement, to the extent not otherwise defined herein, shall have the same definition that is assigned to capitalized terms in the Plan.

## I.      Introduction, History of Debtor, and Discussion of Assets and Liabilities

Formed in 2007, CMHM is—as titularly suggested—in the business of furnishing heavy machinery and equipment to job sites nationwide. The Debtor has long focused on the sale, rental, and strategic deployment of worksite assets, servicing the oil industry and other economic sectors

2

that stand to benefit from the use of high quality equipment accompanied by even higher quality service.

While the Debtor did seek bankruptcy protection, and thereby commenced this case, on August 8, 2024, the story of CMHM is not one of a beleaguered business or an entity that struggled to right-size operations and margins in a competitive environment. The Debtor's rendezvous with Chapter 11, rather, is directly correlative to two catastrophic events exacting a harsh but nonrepeating economic toll on CMHM: (i) a loss of over $12 million worth of oil mats to fire in North Carolina; and (ii) the theft of corporate funds by two individuals with access to the Debtor's books and records.

The loss occasioned by fire proved particularly perilous to CMHM, with an insurer declining to promptly pay the replacement value of the assets (despite a valid policy being in place). The ensuing domino reaction was both predictable and unfortunate: with property lost and insurance proceeds withheld, the Debtor lacked funds to make payments on debt correlative to the acquisition of the burned mats, causing a secured creditor to then seek recourse against CMHM's other assets. This case was filed on the eve of a state court hearing where the Debtor stood to potentially lose most—if not all—of its property to a collection action.

From the outset, the focus of this bankruptcy has been allowing CMHM time to pursue an insurance claim, the proceeds of which can be used to pay creditors. But this case has, too, afforded the Debtor an opportunity to focus on more central operational imperfections, inviting occasion for CMHM to undertake the hard work of cleaning up books and records that are facially unreliable either by reason of the malfeasance of embezzling actors or, at minimum, the nonfeasance of former agents charged with accounting tasks. This holistic review has, too, given CMHM a meaningful opportunity to focus on staffing needs on a go-forward basis and examine the optimal means of monetizing the hard assets held by the entity.

Those assets—alongside their "soft" counterparts—are chronicled on the schedules filed in this case. The Debtor entered bankruptcy with over $100,000.00 in cash and soon saw that number nearly double as an insurance claim (unrelated to the aforementioned fire) was collected upon. CMHM also came into Chapter 11 with more than $1.3 million in accounts receivable, though many such obligations have been recognized as doubtful from the outset and at least one of the correlative obligations has actually been likely discharged by virtue of a counterparty's own insolvency proceedings.

The Debtor's schedules, perhaps more importantly, list $2,453,500.00 in inventory and an additional $749,500.00 in equipment (excluding office equipment). These assets—with a combined value of $3,203,000.00—are the items at the heart of the Debtor's business. A company in the business of selling and renting heavy equipment, not surprisingly, needs a hefty load of heavy equipment, and in this inventory and equipment stockpile may be found the core of CMHM's functionality.

The schedules also highlight more than $1.3 million in real property, $550,000.00 in legal actions correlative to the theft claims mentioned *supra*, and the foregoing insurance claim for more than $12.5 million. *En toto*, CMHM entered Chapter 11 with more than $19 million of

3

assets, including more than $6.5 million in assets separate and distinct from the insurance claim correlative to the loss of oil mats.

Against these assets, CMHM scheduled just under $5.5 million in liabilities, the overwhelming majority of which come in the form of a secured bank obligation for approximately $4.5 million. Trade debts round out most of the remaining obligations recognized at the time of filing, though the Internal Revenue Service has since docketed an oversized proof of claim in this case, almost entirely premised upon estimated tax obligations for years in which a return is yet to be filed. This tax-centric claim is under active review by the Debtor, which is working to soon formally employ a tax professional to help with the filing of tardy returns and, in so doing, also aid in the hopefully-significant mitigation of this claim.

The Plan being filed herewith is one that calls for the payment of all claims, in full, through a strategic balancing of (i) pursuit of the foregoing insurance claim; (ii) ongoing business operations; and (iii) the methodical liquidation of equipment and machinery in a staggered fashion. Transparently, the Debtor is hopeful the proceeds of the insurance claim will prove sufficient to retire all obligations. Equally, however, CMHM recognizes that creditors ought not be asked to simply wait idly as that claim is pursued, so the Debtor has carefully assembled a mechanism where tranches of assets will be liquidated in market-efficient mechanisms over time—in fixed sums and at fixed temporal intervals—so as to give creditors assurance of repayment even if the insurance claim sputters for any reason.

A fire sale disposition of the Debtor's hard assets would deprive creditors of the full value thereof whilst simultaneously euthanizing a local business that carries value as a going concern. A careful sale of certain assets, at reasoned intervals and in palpable-but-manageable sums, will permit a greater recovery of monies while also allowing time for the insurance claim to mature. Meanwhile, and not unironically, the Debtor's hard assets remain insured, so continued operational utilization will invite opportunities for CMHM to be infused with ordinary business income while not causing creditors to experience undue risk.

Though the Plan contains liquidation-centric provisions, the proposal is, fundamentally, a plan of reorganization. CMHM believes all creditors can be paid in full through the Plan and believes the Plan represents the best possible outcome for all parties in interest.

## II.     The Chapter 11 Confirmation Process

The Chapter 11 confirmation process is governed, in large part, by Title 11 of the United States Code (the "Bankruptcy Code"). Under the Bankruptcy Code, to be confirmed, the Plan must be accepted by at least one (1) class of creditors whose claims against the Debtor will be "impaired" under the Plan. Claimants who are scheduled to receive full payment on their claims without modification or changes to their right to payment are deemed to have accepted the Plan and do not vote. Only creditors whose claims are "impaired" or their right to payment terms is modified or changed are entitled to vote in favor of accepting or rejecting the Plan. A class of claims is "impaired" if the amount to be paid to the class provides the claimants in that class with less than full payment of the allowed claims in that class or the terms for repayment are extended beyond the contractual due date or some other contractual terms are changed. Acceptance by such class requires that at least one-half of the creditors in the class who cast accepting votes on

4

the Plan, and hold at least two-thirds of the total dollar amount of the claims in that class casting votes on the Plan. A class of claims that is likely to receive nothing under the Plan is not entitled to vote thereon and, to the contrary, is presumed to have rejected the Plan.

As indicated in the instructions accompanying the ballot (the "Ballot"), which is the form on which you may cast your vote to accept or reject the Plan, the Ballot must be delivered to the Plan Proponent's counsel in time to ensure that your Ballot will be received by the due date. Ballots received after the due date may not be counted.

Pursuant to Federal Rule of Bankruptcy Procedure 3017, a Ballot shall be mailed only to "creditors and equity security holders entitled to vote on the plan." The Plan consists of two classes of claims entitled to vote on the Plan, and thus those classes will receive ballots. All other classes of claims are presumed to have rejected the Plan.

## III.        Additional Information About the Debtor and Its Business

Pursuant to Local Rule 3017-1, CMHM, in addition to providing the information set forth elsewhere herein, observes as follows:

**Business Reliance**. The Debtor is not reliant on any one customer or supplier in carrying out CMHM's business. Broad, market-centric trends may positively—or adversely—impact the Debtor's business on a forward-looking basis, especially with the Debtor's work being closely correlative to activities in the oil industry. It is not reasonably believed these market-centric exposures are idiosyncratic to the debtor or any greater than those occasioned by other actors in comparable industries.

**Profit and Loss Analysis**. The Debtor is still in the process of triaging historic financial records (of both a recent and older vintage), being mindful of such records' corruption by unsavory actors. As such, CMHM is not including herein any recent statements of profit and loss, out of an abiding concern that such may prove inaccurate or misleading. The Debtor does note, however, that for the fiscal year 2021, CMHM had a gross profit of $2,070,338 on $9,378,156 of receipts. The prior year, CMHM had a gross profit of $2,623,253 on $6,236,032 in receipts. And in 2019, CMHM had a gross profit of $4,074,236 on $14,097,151 in gross receipts. Financial conditions are, of course, markedly changed from these prior years, and the Debtor notes that it has not realized a statistically-meaningful gross profit during the past several months of operations. It is not realistic to expect the Debtor will be able to realize comparable profits in the near term.

**Key Management.** The Debtor is helmed by Clint Meadors ("Mr. Meadors"), whose initials grace the company's name. During the course of this bankruptcy case, Mr. Meadors has commenced drawing a net salary of $5,000.00 per month for his work, in lieu of taking owner draws (which, previously, were in a substantively similar sum). Mr. Meadors will be retained by the Debtor post confirmation.

**Litigation.** Central to the Plan is the pursuit of an insurance claim, for $12,596,813.68. It is exceedingly probable—albeit not certain—this insurance claim will be pursued through litigation. The Debtor is in the process of interviewing counsel to represent CMHM's interests in connection with this claim. The Debtor reasonably believes some degree of success will be realized in connection with such litigation, though it would be speculative to suggest a precise sum of an

Case 24-80617    Doc 56    Filed 12/06/24    Entered 12/06/24 19:28:25    Desc Main
Document      Page 5 of 15

anticipated recovery. The Debtor is prepared to compromise this litigation claim for a certain sum of money that (i) is either equal to or greater than the funds requisite to pay all claims hereunder; and (ii) confidential and not shared herein for self-evident reasons.

## IV. Summary of the Plan and Treatment of Claims and Interests

The Plan provides for four separate sources of funding: (i) pursuit of the aforementioned insurance claim; (ii) ordinary business operations coupled with potential recoveries of stolen monies; (iii) the strategic sale of equipment and/or machinery, in defined sums, by defined dates; and (iv) repatriation, by Mr. Meadors, of funds paid by the Debtor, to third parties, for his personal benefit. The Plan contemplates that these funding mechanisms, taken in the aggregate, will prove sufficient to pay all claims in full. Should these mechanisms prove inadequate to pay all claims in full, the Plan contemplates conversion to Chapter 7 and ensuing liquidation of CMHM.

The Plan provides for the following classifications of creditors' claims:

**Class 1 – Secured Claims of Great Plains National Bank.** Class 1 consists of the secured Claim of Great Plains National Bank. The Debtor is assessing whether or not to object to the Claim of Great Plains National Bank and, if so, the subject Claim may become a Disputed Claim. Such a dispute, if filed, will likely be focused on the propriety, *vel non*, with which historic payments have been applied to this putative debt. Allowed Class 1 Claims shall be paid, in full, prior to the Claims of any other class, except for the Claim of Class 2. Allowed Class 1 Claims will accrue interest, at the rate of 8% per annum, until paid, with interest computed in accord with the timing of each such payment and the obligation reamortized following the making of each such payment. Class 1 claimants shall retain their liens until such time as their claims are satisfied in full.

**Class 2 – Secured Claim of Tuggle Duggins, P.A.** Class 2 consists solely of the secured portion of the Claim of Tuggle Duggins, P.A. This claim is bifurcated between Class 2 and Class 4, with the Class 2 portion being solely correlative to the retainer of $5,000.00 being held by Tuggle Duggins, P.A. The sole Class 2 claimant may apply the retainer, in its full amount, against the total debt owed by the Debtor, on the Confirmation Date.

**Class 3 – Lease Claim.** Class 3 consists solely of the lease claim of Barnhill Contracting Company. This class shall be paid, *pari passu*, with Class 4 and Class 5, after Class 1 is paid in full and after all Claims set forth in Article II hereof are paid in full.

**Class 4 – General Unsecured Creditors.** Class 4 consists of all general unsecured creditors whose claims do not arise on account of the lease of real property. This class shall be paid, *pari passu*, with Class 3 and Class 5, after Class 1 is paid in full and after all Claims set forth in Article II hereof are paid in full.

**Class 5 – Secured Claim of Holt Texas, Ltd.** Class 5 consists of the secured claim of Holt Texas, Ltd. Insofar as this Claim is deemed secured solely on account of a judgment being recorded within 90 days of the Petition Date, the Debtor regards the security interest as being avoidable under Section 547 of the Bankruptcy Code and will pay this Class, *pari passu*, with Classes 3 and 4, after Class 1 is paid in full and after all Claims set forth in Article II hereof are paid in full. No interest shall accrue on the Claim of this Class 5. Should the Class 5 creditor object to confirmation

Case 24-80617   Doc 56   Filed 12/06/24   Entered 12/06/24 19:28:25   Desc Main
Document    Page 6 of 15

of this Plan on the basis that avoidance of a preference must be achieved through an adversary proceeding, the Debtor will file such an adversary proceeding within thirty (30) days of the Effective Date and regard the Claim of this class as being a Disputed Claim, pursuant to Section 5.5 hereof, until such time as a final judgment is entered in the adversary proceeding. Should the Class 5 claimant succeed in the adversary proceeding, then, and only then, the underlying Claim shall be treated as fully secured and will accrue interest (*nunc pro tunc* to the Petition Date), at the rate of 8% per annum, until paid, with interest computed in accord with the timing of each such payment and the obligation reamortized following the making of each such payment.

**Full Satisfaction and Release**. The payments, distributions and other treatment afforded to holders of allowed claims and interests under the Plan shall be in full and complete satisfaction, discharge and release of such allowed claims or interests against the Debtor.

## V. Designation and Treatment of Unclassified Claims

**Administrative Expense Claims**. On the Effective Date or at such time as otherwise agreed, the holder of an allowed Administrative Claim against the Debtor shall receive, in full and final satisfaction of such Holder's allowed Claim, cash in an amount equal to the unpaid portion of such allowed Claim. Upon information and belief, there will be two Administrative Claims herein (i) that of the U.S. Trustee for quarterly fees; and (ii) that of the Debtor's counsel. The Debtor's counsel agrees to be paid within eighteen (18) months of the Effective Date. Any fees due to the U.S. Trustee will be paid, in cash, on or before the Effective Date. It is not reasonably anticipated the U.S. Trustee fees will exceed $1,500.00 in the aggregate.

**Priority Tax Claims**. Unless a Final Order otherwise provides, each Holder of a Priority Tax Claim that is an allowed Claim against the Debtor shall receive, in full and final satisfaction of such Holder's allowed Claim cash in an amount equal to the unpaid portion of such allowed Claim, together with interest thereupon at the rate of 8% per annum or such other rate as may be fixed by law and applicable on the Effective Date. Said payments shall be made not later than August 7, 2029, with interest computed in accord with the timing of each such payment and the obligation reamortized following the making of each such payment. Notwithstanding the foregoing, any portion of a Claim correlative to the imposition of any penalty arising with respect to or in connection with the allowed Priority Tax Claim shall be treated as a general unsecured claim in Article III hereof. *A significant Priority Tax Claim, in the amount of $4,515,391.74 has been filed by the Internal Revenue Service in this case. This Priority Tax Claim is premised, in large part, upon the imposition of estimated taxes. Notwithstanding the definition afforded in Section 5.5 hereof, the whole Claim of the Internal Revenue Service shall be regarded as a "Disputed Claim" at all times until the earlier of (i) withdrawal of the Claim; (ii) entry of a final order adjudicating an objection to the Claim or a compromise of the Claim; or (iii) passage of the deadline to object to the Claim, as set forth in Section 5.5 hereof.*

## VI. Bar Date for Filing Claims

The bar date for filing a proof of claim in this case was October 26, 2024 for all creditors (except a governmental unit). The failure to file or deliver a proof of claim or a proof of interest by the applicable bar date constitutes a bar against the assertion, allowance or distribution on account of any such claim or interest.

7

## VII. Acceptance and Confirmation of Plan

Except as discussed below, a prerequisite to the confirmation of the Plan is the acceptance of the Plan by each impaired class. A class is impaired unless, with respect to each claim or interest in such class, the Plan: (1) leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder of such claim or interest; or (2) notwithstanding any contractual provision or applicable law that entitles the holder of such claim or interest to demand or receive accelerated payment of such claim or interest after the occurrence of a default, (a) cures any such default that occurred before or after the Petition Date (other than "ipso facto" defaults as specified in Section 365(b)(2) of the Bankruptcy Code); (b) reinstates the maturity of such claim or interest as such maturity existed before such default; (c) compensates the holder of such claim or interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder of such claim or interest.

In order to carry a designated class for purposes of confirmation of the Plan, the affirmative vote of holders of claims in each such class that hold at least two-thirds in dollar amount and more than one-half in number of the allowed claims in that class who actually vote on the Plan, other than a holder who has been designated by the Court as in bad faith having accepted or rejected the Plan, or whose acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of Chapter 11 of the Bankruptcy Code is required. If the requisite acceptances from holders of allowed claims in each class of claims are obtained, and the Plan is confirmed, the Plan will be binding on all holders of claims and interests, including those who did not vote or who voted to reject the Plan (or those who are deemed to reject the Plan).

The Plan Proponent reserves the right to seek to confirm the Plan pursuant to the cramdown provisions of Section 1129(b) of the Bankruptcy Code. As a condition to confirmation, the Bankruptcy Code generally requires that each impaired class of claims or interest accepts a plan of reorganization. In the event that an impaired class does not accept the Plan, the Bankruptcy Court may nonetheless confirm the Plan if (i) the Plan satisfies all other requirements of Section 1129(a) of the Bankruptcy Code, and (ii) the Plan does not "discriminate unfairly" and is "fair and equitable" with respect to each impaired class that has not accepted the Plan.

A plan of reorganization does not discriminate unfairly if (a) the legal rights of a non-accepting class are treated in a manner that is consistent with the treatment of other classes whose legal rights are identical with those of the non-accepting class, and (b) no class receives payments in excess of that which it is legally entitled to receive for its claims or interests. The Plan Proponent believes that the Plan satisfies these requirements with respect to each class.

The Bankruptcy Code establishes different tests for secured creditors, unsecured creditors and interest holders to determine if the Plan is "fair and equitable." The tests may be summarized as follows:

(a) Secured Creditors: either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred cash payments having a present value as of the Effective Date equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the

8

property securing the claim is sold free and clear of liens with such liens to attach to the proceeds, and the liens against such proceeds are treated in accordance with clause (i) or (ii), above.

(b) Unsecured Creditors: either (i) each impaired unsecured creditor receives or retains under the Plan property of a value equal to the amount of its allowed unsecured claim, or (ii) the holders of claims and equity interests that are junior to the claims of the non-accepting Class do not receive any property under the Plan on account of such claims and interests.

(c) Equity Interest Holders: either (i) each interest holder will receive or retain under the Plan property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any of its interest or (b) the value of its interest, or (ii) the holders of interests that are junior to the non-accepting class will not receive any property under the Plan.

The Plan Proponent believes that the Plan is "fair and equitable" to interest holders, unsecured creditors, and secured creditors.

The Plan Proponent reserves all rights to modify or withdraw the Plan at any time prior to the Effective Date.

## VIII. Alternatives to Confirmation and Consummation of the Plan

The alternatives to the confirmation and consummation of the Plan include (1) the preparation and presentation of an alternative plan of reorganization and (2) the liquidation of the Debtor under chapter 7 of the Bankruptcy Code. The Plan Proponent believes that neither alternative provides any greater return to its creditors.

**Alternative Plans of Reorganization.** While it is always possible to tweak a plan of reorganization slightly—or alter such a plan fundamentally—the Debtor does not believe an alternative plan would be in the best interests of creditors. The Plan in this case is a careful and thoughtful byproduct of the weighting of competing interests, moored to fundamental notions of fairness and equity. The Plan provides for all creditors to be paid, in full, over a period of time, while also maximizing the potential for the Debtor to emerge as a healthy business with a robust future.

**Liquidation Under Chapter 7 of the Bankruptcy Code.** If no plan can be confirmed, it is the Plan Proponent's firm belief that liquidation under chapter 7 would result in lesser distribution than proposed by the Plan. Specifically, a fire sale of the Debtor's hard assets would likely fetch grossly discounted values, as would a sale of the Debtor's real property holding. This would leave the insurance claim to be either litigated by a trustee or settled at a discount. While CMHM certainly does not question a trustee's ability to efficiently negotiate the resolution of litigation rights, the Debtor is doubtful that such efforts would prove as lucrative with a counterparty knowledgeable that CMHM has ceased operations and is liquidating. By contrast, the Debtor is in an optimal position to pursue the litigation, to the highest and best value ascertainable, under this Plan.

Case 24-80617   Doc 56   Filed 12/06/24   Entered 12/06/24 19:28:25   Desc Main
Document    Page 9 of 15

## IX. Risks

It is neither possible nor pragmatic to contemplate all risks occasioned by the Plan in this case or the plan of reorganization in almost any Chapter 11 case. The Debtor has, however, crafted this Plan in a manner that is aimed at mitigating potential risks, by establishing a framework to continue operating as a going concern whilst insuring assets against loss and applying best efforts to the realization of optimal values.

Nonetheless, should there exist a market-wide decline in demand for heavy machinery, such would have an adverse impact upon creditors during the life of the plan if insurance proceeds are ultimately insufficient to pay claims in full. Similarly, if Mr. Meadors were to become incapacitated or otherwise unavailable to continue in his efforts at the helm of the Debtor, such would have a likely-adverse implication for creditors. And, as evidenced by the past several years, normative global risks—ranging from pestilence to war—could certainly impact the forward-looking operations of CMHM in a profound manner.

## X. Distribution

**Delivery of Distributions**. Distributions and deliveries to holders of allowed claims shall be made at the addresses set forth on the proofs of claim filed by such holders (or at the last known addresses of such holders if no proof of claim is filed).

**No Interest Unless Otherwise Provided**. No interest shall be paid on any claim unless, and only to the extent permitted, under the terms of the Plan.

**Undistributed Property**. If any distribution remains unclaimed for a period of 90 days after it has been delivered (or attempted to be delivered) in accordance with the Plan to the holder entitled thereto, such unclaimed property shall be forfeited by such holder. Unclaimed property shall be (i) first paid to other members of the class of the claimant not claiming said distribution, until such a time as said class is paid in full; (ii) second paid to each other class, until all classes are paid in full; and (iii) then, if and when each class is paid in full, remaining funds shall be donated to the University of Miami School of Law Bankruptcy Clinic, to be administered by Patricia Redmond, Esq. in the charitable manner she sees most fit. The University of Miami School of Law Bankruptcy Clinic works with members of the South Florida legal community to provide *pro bono* services to persons in need of bankruptcy relief, while also furnishing law students with valuable pedagogical experience in the field of bankruptcy law.

## XI. Retention of Jurisdiction

Pursuant to Sections 1334 and 157 of Title 28 of the United States Code, the Bankruptcy Court shall retain jurisdiction of all matters arising in, arising under, and related to the Chapter 11 Cases and the Plan, for the purposes of Sections 105(a) and 1142 of the Bankruptcy Code, and for, among other things, the following purposes:

(a)     to hear and determine any and all adversary proceedings, applications, or contested matters, including avoidance actions, and any remands from any appeals;

10

(b)     to hear and to determine all controversies, disputes, and suits which may arise in connection with the execution, interpretation, implementation, consummation, or enforcement of the Plan;

(c)     to enable the Debtor to prosecute any and all Causes of Action and to recover any transfers, assets, properties or damages to which it may be entitled under applicable provisions of the Plan, the Bankruptcy Code or any federal, state or local laws, including avoidance actions;

(d)     to consider any modification of the Plan pursuant to section 1127 of the Bankruptcy Code, to cure any defect or omission or to reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(e)     to enter, enforce and implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement, consummate or enforce the terms and conditions of the Plan and the transactions contemplated hereunder;

(f)     to enter and to implement such orders (including orders entered prior to the Confirmation Date) as may be necessary or appropriate to execute, interpret, implement or enforce the terms and conditions of the Plan;

(g)     to hear and to determine any other matter not inconsistent with the Bankruptcy Code and title 28 of the United States Code that may arise in connection with or related to the Plan; and

(h)     to enter a final decree closing this Chapter 11 case.

## XII.     Certain Tax Consequences

The following discussion summarizes certain federal income tax consequences to the Debtor and Debtors' holders of claims and equity interests. This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions and published administrative rulings and pronouncements of the IRS, as in effect on the date hereof. Legislative, judicial or administrative changes or interpretations enacted or promulgated hereafter could alter or modify the analysis and conclusions set forth below. Any such changes or interpretations may be retroactive and could affect significantly the federal income tax consequences discussed below. This summary does not address foreign, state or local tax law, or any estate or gift tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special categories of taxpayers who are holders of claims (such as taxpayers who are not domestic corporations or citizens or residents of the United States, or are S corporations, banks, mutual funds, insurance companies, financial institutions, regulated investment companies, broker-dealers and tax-exempt organizations) and assumes that each creditor holds its claim directly.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Plan Proponent has not requested and will not request a ruling from the IRS with respect to any of the tax aspects of the Plan.

THE TAX CONSEQUENCES TO HOLDERS OF CLAIMS AND EQUITY INTERESTS MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER. MOREOVER, THE TAX CONSEQUENCES OF CERTAIN ASPECTS OF THE PLAN ARE UNCERTAIN DUE TO THE LACK OF APPLICABLE LEGAL PRECEDENT AND THE POSSIBILITY OF CHANGES IN THE APPLICABLE TAX LAW. THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OF THE TAX CONSEQUENCES DESCRIBED HEREIN, OR THAT SUCH A CHALLENGE, IF ASSERTED, WOULD NOT BE SUSTAINED. ACCORDINGLY, EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS STRONGLY URGED TO CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE FOREIGN, FEDERAL, STATE AND LOCAL TAX CONSEQUENCES OF THE PLAN.

**Certain Federal Income Tax Consequences to Debtor.** Upon information and belief, the Debtor is a pass-through entity for federal income tax purposes. Thus, the Debtor is not subject to taxes imposed under chapter 1 of the Tax Code. Accordingly, any net operating income or losses generated by the Debtor during a taxable year ("NOLs") will pass through to the equity interest.

Upon a sale of the Debtor' property any recognized gain or loss equal to the difference between the pre-distribution sale proceeds and Debtors' adjusted tax basis in the property that may be subject to capital gains tax will pass through to equity interest. The amount of gain recognized will include the full proceeds from any sale of property, including the amount of any indebtedness assumed by the buyer to which the property is subject. If the sale of the property results in a gain and such property was used in Debtors' trade or business, such gain would generally be treated as a "section 1231 gain." Such gain would be combined with other Tax Code § 1231 gains and losses. Generally, Tax Code § 1231 gains and losses are offset against each other on an annual basis, and net gain is treated as long-term capital gain, while net loss is treated as ordinary loss. Net § 1231 gains must, however, be treated as ordinary income to the extent of net § 1231 losses taken over the five most recent years, to the extent such losses have not been previously "recaptured."

**Certain Federal Income Tax Consequences to Creditors.** The federal income tax consequences of the Plan to a creditor will depend upon several factors, including but not limited to: (i) whether the creditor's claim (or portion thereof) constitutes a claim for principal or interest; (ii) whether the creditor is a resident of the United States for tax purposes (or falls into any of the special classes of taxpayers excluded from this discussion as noted above); and (iii) whether the creditor has taken a bad debt deduction with respect to its claim. In addition, if a claim is a "security" for tax purposes, different rules may apply.

CREDITORS ARE STRONGLY ADVISED TO CONSULT WITH THEIR TAX ADVISORS WITH RESPECT TO THE TAX TREATMENT UNDER THE PLAN OF THEIR PARTICULAR CLAIMS.

A creditor receiving solely cash in exchange for its claim will generally recognize taxable gain or loss in an amount equal to the difference between the amount realized and its adjusted tax basis in the allowed claim. The amount realized will equal the amount of cash to the extent that such consideration is not allocable to any portion of the allowed claim representing accrued and unpaid interest, as further discussed below.

12

The character of any recognized gain or loss (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the creditor, the nature of the allowed claim in the creditor's hands, the purpose and circumstances of its acquisition, the creditor's holding period of the allowed claim, and the extent to which the creditor previously claimed a deduction for the worthlessness of all or a portion of the allowed claim. A loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of a loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.

A portion of the consideration received by a creditor in satisfaction of an allowed claim may be allocated to the portion of such claim (if any) that represents accrued but unpaid interest. If any portion of the distribution were required to be allocated to accrued interest, such portion would be taxable to the creditor as interest income, except to the extent the creditor has previously reported such interest as income.

In the event that a creditor has not previously reported the interest income, only the balance of the distribution after the allocation of proceeds to accrued interest would be considered received by the creditor in respect of the principal amount of the allowed claim. Such an allocation would reduce the amount of the gain, or increase the amount of loss, realized by the creditor with respect to the allowed claim. If such loss were a capital loss, it would not offset any amount of the distribution that was treated as ordinary interest income (except, in the case of individuals, to the limited extent that capital losses may be deducted against ordinary income).

**Federal Income Tax Consequences to Holders of Equity Interests Receiving Distributions.** Holders of allowed equity interests receiving distributions will generally recognize loss or gain in the amount of each such holder's adjusted tax basis in the equity interest. The character of any recognized loss or gain (i.e., ordinary income, or short-term or long-term capital gain or loss) will depend upon the status of the holder, the nature of the equity interest in the holder's hands, the purpose and circumstances of its acquisition, the holder's holding period, and the extent to which the holder had previously claimed a deduction for the worthlessness of all or a portion of the equity interest.

A gain or loss generally is treated as sustained in the taxable year for which there has been a closed and completed transaction, and no portion of loss with respect to which there is a reasonable prospect of reimbursement may be deducted until it can be ascertained with reasonable certainty whether or not such reimbursement will be recovered.

**Importance of Obtaining Professional Tax Assistance. No holder of a claim or equity interest should rely on the tax discussion in this Disclosure Statement in lieu of consulting with one's own tax professional. The foregoing is intended to be a summary only and not a substitute for consultation with a tax professional. The federal, state, local and foreign tax consequences of the Plan are complex and, in some respects, uncertain. Such consequences may also vary based upon the individual circumstances of each holder of a claim or equity interest.**

Case 24-80617   Doc 56   Filed 12/06/24   Entered 12/06/24 19:28:25   Desc Main
Document      Page 13 of 15

**Accordingly, each holder of a claim or equity interest is strongly urged to consult with its own tax advisor regarding the federal, estate, local and foreign tax consequences of the Plan.**

## XIII.        Miscellaneous Provisions

**Severability.**  Should the Bankruptcy Court determine that any provision of the Plan is unenforceable either on its face or as applied to any claim or equity interest or transaction, the Plan Proponent may modify the Plan in accordance with the Plan, as applicable, so that such provision shall not be applicable to the holder of any claim or equity interest.

**Binding Effect.**  Upon the entry of the Confirmation Order, all provisions of the Plan shall be binding upon, and shall inure to the benefit of, the Debtor, the holders of claims and equity interests, and such persons' respective successors and assigns.

**Governing Law.**  Unless a rule of law or procedure supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, or a specific choice of law provision is provided, the laws of the State of Oklahoma shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan, without regard to conflicts of law.

**Timing of Distributions.**  Any distribution required to be made hereunder on a day other than a business day shall be due and payable on the next succeeding business day.

**Revocation or Withdrawal of Plan.**  The Plan Proponent reserves the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order. If the Plan is withdrawn or revoked, then the result shall be the same as if the Confirmation Order had not been entered and the Effective Date had not occurred.  If the Plan is revoked or withdrawn prior to the entry of the Confirmation Order, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor or any other person or to prejudice in any manner the rights of the such entity or any person in any further proceedings involving such entity.

**Nonmaterial Modifications.**  The Plan Proponent may, with the approval of the Bankruptcy Court and without notice to holders of claims and equity interests, correct any nonmaterial defect, omission, or inconsistency herein in such manner and to such extent as may be necessary or desirable.

**Material Modifications.**  Modifications of the Plan may be proposed in writing by the Plan Proponent at any time prior to confirmation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code, and the Plan Proponent shall have complied with Section 1125 of the Bankruptcy Code. The Plan may be modified at any time after confirmation and before substantial consummation, provided that the Plan, as modified, meets the requirements of Sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as modified, under Section 1129 of the Bankruptcy Code, and the circumstances warrant such modification.

**Notices.**  Any notice required or permitted to be provided hereunder shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) prepaid overnight delivery service and addressed as follows:

> C M Heavy Machinery, LLC
> 11097 Highway 27
> Okemah, Oklahoma 74859

**Successors and Assigns.**  The rights, benefits and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors and/or assigns of such person.

## XIV.       Confirmation Request

The Plan Proponent respectfully urges all parties entitled to vote on the Plan to do so in favor of the Plan, and respectfully pray this Honorable Court confirm the Plan.

Respectfully submitted,

Dated: December 6, 2024

By: /s/ Maurice B. VerStandig
    Maurice B. VerStandig, Esq.
    The VerStandig Law Firm, LLC
    9812 Falls Road, #114-160
    Potomac, Maryland 20854
    Phone: (301) 444-4600
    Facsimile: (301) 444-4600
    mac@mbvesq.com
    *Counsel for C M Heavy Machinery, LLC*

15