# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

IN RE:

C M HEAVY MACHINERY, LLC,

        Debtor.

Case No. 24-80617
Chapter 11

## CREDITOR GREAT PLAINS NATIONAL BANK'S
## MOTION TO DISMISS, OR ALTERNATIVELY, TO CONVERT THE BANKRUPTCY
## <u>CASE TO A CHAPTER 7 PROCEEDING AND BRIEF IN SUPPORT</u>

**HALL, ESTILL HARDWICK, GABLE, GOLDEN & NELSON, P.C.**

Steven W. Soulé, OBA No. 13781
Christopher J. Gnaedig, OBA No. 33892
521 East 2nd St., Suite 1200
Tulsa, OK 74120
Telephone: (918) 594-0400
Facsimile: (918) 594-0505
Email: ssoule@hallestill.com
Email: cgnaedig@hallestill.com

-and-

Daniel V. Carsey, OBA No. 21490
100 North Broadway, Suite 2900
Oklahoma City, OK 73102
Telephone: (405) 553-2828
Facsimile: (405) 553-2855
Email: dcarsey@hallestill.com

**ATTORNEYS FOR GREAT PLAINS NATIONAL BANK**

# TABLE OF CONTENTS

**PAGE**

INTRODUCTION ............................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

    I.       Relationship between the Debtor and GPNB.......................................................... 2

    II.      The Debtor's Bankruptcy and "Plan" of Reorganization ...................................... 5

    III.    The Debtor's Post-Petition "Operations"............................................................... 8

ARGUMENT AND AUTHORITY .................................................................................. 10

    I.       The facts provide sufficient "cause" for dismissing the Bankruptcy Case
          pursuant to 11 U.S.C. § 1112(b)(1)...................................................................... 10

          A.      The Bankruptcy Case is causing a "substantial or continuing loss"
                to the Debtor's estate and there is no "reasonable likelihood" of
                rehabilitation. ........................................................................................ 11

          B.      The Debtor's reliance on only Meadors to effectuate its
                reorganization constitutes a gross mismanagement of the estate.............. 13

          C.      The Debtor has inadequate financial records to reorganize under
                chapter 11.............................................................................................. 14

    II.      Dismissal, rather than conversion, is in the best interests of creditors and
          the Debtor's estate............................................................................................... 15

i

# TABLE OF AUTHORITIES

Page

**Cases**

*In re 15375 Mem'l Corp.*, 386 B.R. 548 (Bankr. D. Del. 2008) ................................................12

*In re Ameribuild Constr. Mgmt.*, 399 B.R. 129 n.3 (Bankr. S.D.N.Y. 2009) ..............................11

*In re Broad Creek Edgewater, LP*, 371 B.R. 752 (Bankr. D.S.C. 2007) .....................................13

*In re BTS, Inc.*, 247 B.R. 301 (Bankr. N.D. Okla. 2000) .................................................15

*In re Citi-Toledo Partners*, 170 B.R. 602 (Bankr. N.D. Ohio 1994) .........................................11

*In re Costa Bonita Beach Resort*, 513 B.R. 184 (Bankr. D.P.R. 2014) ........................................12

*In re Cont'l Holdings*, 170 B.R. 919 (Bankr. N.D. Ohio 1994) ...............................................12

*In re Gateway Access Sols., Inc.*, 374 B.R. 556 (Bankr. M.D. Pa. 2007) ..............................11, 13

*In re Horned Dorset Primavera, Inc.*, 606 B.R. 117, 157 (Bankr. D.P.R. 2019) ....................... 16

*In re Kanterman*, 88 B.R. 26 (S.D.N.Y. 1988) .................................................................12

*In re Larmar Estates, Inc.*, 6 B.R. 933 (Bankr. E.D.N.Y. 1980) ..........................................14, 15

*In re Paterno*, 511 B.R. 62 (Bankr. M.D.N.C. 2014) ......................................................10

*In re Photo Promotion Assocs., Inc.*, 47 B.R. 454 (Bankr. S.D.N.Y. 1985) ...............................11

*In re Sakon*, 617 B.R. 7 (Bankr. D. Conn. 2020) ..........................................................12

*In re TCR of Denver, LLC*, 338 B.R. 494 (Bankr. D. Colo. 2006) .............................................11

*In re Tirey Distrib. Co.*, 242 B.R. 717 (Bankr. E.D. Okla. 1999) .........................................11

*In re Woodbrook Assocs.*, 19 F.3d 312 (7th Cir. 1994) ....................................................10

*Hall v. Vance*, 887 F.2d 1041 (10th Cir. 1989) ...........................................................15

*Loop Corp. v. United States Tr.*, 379 F.3d 511 (8th Cir. 2004) .............................................12

*Quarles v. United States Trustee*, 194 B.R. 94 (W.D. Va. 1996) ..............................................12

*Taub v. Taub (In re Taub)*, 427 B.R. 208 (Bankr. E.D.N.Y. 2010) ...........................................12

Case 24-80617    Doc 82    Filed 01/30/25    Entered 01/30/25 16:22:28    Desc Main
Document    Page 3 of 21

**Statutes and Rules**

11 U.S.C. § 1104(a) ............................................................................................................10

11 U.S.C. § 1112(b) ...................................................................................................... *passim*

7 Collier on Bankruptcy ¶ 1112.04 (16th 2024) ...............................................10, 12, 16

Creditor Great Plains National Bank ("GPNB"), pursuant to 11 U.S.C. § 1112(b) and Local Rule 1017-2(B), respectfully moves the Court for an Order: (i) dismissing the above captioned chapter 11 bankruptcy case filed by the Debtor, C M Heavy Machinery, LLC ("Bankruptcy Case"); or, alternatively, (ii) converting the Bankruptcy Case to a case administered under chapter 7 of the Bankruptcy Code. In support of this Motion, GPNB provides the following:

## INTRODUCTION

The Debtor, C M Heavy Machinery, LLC ("Debtor"), filed this Bankruptcy Case very early on the morning of August 8, 2024 ("Petition Date"). The Debtor commenced the Bankruptcy Case mere hours before a state court hearing regarding the foreclosure of virtually all the Debtor's assets. As of the Petition Date, the Debtor was indebted to GPNB in the amount of $4,582,159.45. This amount is secured by all the Debtor's assets, including all the Debtor's real and personal property.

Plainly, this Bankruptcy Case is an inappropriate delay tactic. In August 2023, the Debtor lost a substantial amount of digging mats due to a fire. Since that time, the Debtor has asked GPNB to delay collection efforts for an indeterminate period because the Debtor believes the proceeds of an insurance claim due to this loss *might satisfy* the amount the Debtor owes to GPNB. However, after the Debtor failed to make the payments that it promised to make, GPNB opted to protect its interests and commenced collection efforts in Oklahoma state court.

The Bankruptcy Case was clearly a direct response to GPNB's collection efforts. Now the Debtor wants to significantly delay payment to GPNB and other creditors under the auspices of the plan of reorganization. However, the Debtor is taking no action to rehabilitate its business or make payments to its creditors. Since the Petition Date, the Debtor has made no efforts to recover accounts receivable in excess of $1 million and has engaged in minimal business operations with negligible net income. The Debtor has filed a plan of reorganization despite having no financial projections, no reliable financial records and no adequate sources of income moving forward.

1

GPNB is not without recourse for the Debtor's conduct. Section 1112(b) of the Bankruptcy Code directs the Court, for cause, to dismiss the Bankruptcy Case or convert the case to a chapter 7 liquidation. Sufficient "cause" exists to dismiss or otherwise convert the Bankruptcy Case if, among other things: (i) the Debtor's estate is suffering a continuing diminution in value and there is no reasonable likelihood that the Debtor's business will be rehabilitated, (ii) the Debtor has grossly mismanaged the estate, and (iii) the Debtor lacks reliable records on which creditors may rely during its reorganization.

As set forth below, the Debtor suffers from each of these inadequacies and more. GPNB therefore asks the Court to enter an order dismissing the Bankruptcy Case or, if it is in the best interest of creditors and the Debtor's estate, to convert the Bankruptcy Case to a proceeding under chapter 7 of the Bankruptcy Code.

## <u>STATEMENT OF FACTS</u>

In support of this Motion, GPNB submits the following Statement of Facts in support of the relief requested herein ("<u>SOF</u>"):

## I.     Relationship between the Debtor and GPNB

1.      GPNB is a national banking association that does business in Oklahoma and Texas. On or around December 16, 2019, GPNB, the Debtor, and the Debtor's principal and owner, Clint Meadors ("<u>Meadors</u>"), entered into that certain Business Loan Agreement for Loan No. 705244044 ("<u>Loan Agreement</u>") to effectuate the purchase of a large quantity of digging mats for the Debtor's business. Claim No. 13 at 11-14.

2.      The Debtor executed that certain Promissory Note dated December 16, 2019 ("<u>Prior Note</u>"), in connection with the Loan Agreement. Claim No. 13 at 15-17.

2

3.      On or about September 30, 2020, for good and valuable consideration, the Debtor executed and delivered to GPNB that certain Promissory Note payable to GPNB in the face amount of $5,786,839.90 (the "Note"), as a modification to the Prior Note. Claim No. 13 at 18-20.

4.      To secure payment on the Note, GPNB and the Debtor also entered into a Commercial Security Agreement ("Security Agreement") on September 30, 2020. Claim No. 13 at 30-35.

5.      The Security Agreement granted GPNB a security interest in all the Debtor's assets ("Business Assets"), including but not limited to equipment, accounts, inventory, instruments, general intangibles, investment property, chattel paper, titled vehicles, deposit accounts, whether then owned or thereafter acquired, and the proceeds thereof. Claim No. 13 at 30; **Exhibit 1**, Dep. of Meadors at 11:13-20. Notably, the Security Agreement expressly granted a security interest in any insurance proceeds received from the sale, destruction, loss, or other disposition of the Business Assets. Claim No. 13 at 30.

6.      The Business Assets, excluding proceeds from any contingent insurance claim, have an estimated value of approximately $1.2 million. Claim No. 30 at 5.

7.      GPNB's security interest in the Business Assets was duly perfected through the filing of UCC financing statements in Oklahoma and North Carolina. *See* Claim No. 13 at 37-38.

8.      Thereafter, on October 11, 2023, after default by the Debtor, GPNB and the Debtor entered into that certain Loan Modification Agreement, which modified the Loan, the Prior Note, and the Note. Claim No. 13 at 21-28.

9.      Additionally, pursuant to the Loan Modification Agreement, the Debtor entered into that certain Amended and Restated Commercial Real Estate Mortgage dated October 11, 2023 ("Mortgage"), wherein the Debtor granted GPNB a mortgage covering the Debtor's real property in Okfuskee County, Oklahoma, together with all improvements thereon. Claim No. 13 at 39-59. This includes the following real property (hereinafter, the "Business Real Property"):[1]

THAT PART OF THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER (SE/4 NE/4) OF SECTION TWENTY-FIVE (25), TOWNSHIP ELEVEN (11) NORTH, RANGE NINE (9) EAST OF THE INDIAN MERIDIAN, OKFUSKEE COUNTY, STATE OF OKLAHOMA, MORE PARTICULARLY DESCRIBED AS FOLLOWS: COMMENCING AT THE SOUTHEAST CORNER OF SAID SOUTHEAST QUARTER OF THE NORTHEAST QUARTER (SE/4 NE/4); THENCE ON A GRID BEARING OF N00 DEGREES 59'49"E ALONG THE EAST LINE OF SAID SOUTHEAST QUARTER OF THE NORTHWEST QUARTER (SE/4 NE/4) A DISTANCE OF 25.00 FEET; THENCE S89 DEGREES 20'31"W ON A LINE PARALLEL WITH THE SOUOTH LINE OF SAID SOUTHEAST QUARTER OF THE NORTHEAST QUARTER (SE/4 NE/4) A DISTANCE OF 50.00 FEET TO A POINT ON THE WEST RIGHT OF WAY LINE OF PRESENT STATE HIGHWAY NO. 27 AND THE POINT OF BEGINNING; THENCE CONTINUING S89 DEGREES 20'31"W A DISTANCE OF 330.51 FEET; THENCE N00 DEGREES 49'06"E A DISTANCE OF 681.44 FEET; THENCE N89 DEGREES 20'31"E A DISTANCE OF 308.92 FEET TO A POINT ON THE WEST RIGHT OF WAY LINE OF PRESENT STATE HIGHWAY NO. 27; THENCE S00 DEGREES 59'49"E ALONG SAID WEST RIGHT OF WAY LINE A DISTANCE OF 681.25 FEET TO THE POINT OF THE BEGINNING, CONTAINING 5.00 ACRES. AND

COMMENCING AT THE SE/C SE SW; THENCE S89DEG48'43"W 745' TO THE POB; THENCE N00DEG21'00"W 100'; THENCE N45DEG51'27"E 180.09'; THENCE N00DEG21'00"W 944.97'; THENCE N59DEG16'00"W 291.91'; THENCE S89DEG48'45"W 455.56'; THENCE S00DEG20'40"E 1319.98'; THENCE N89DEG48'43"E 575.69' TO THE POB & THAT PART OF THE SW SW LYING SOUTH OF THE NORTH CANADIAN RIVER & NW SW SOUTH OF THE RIVER, LESS AND EXCEPT A 10 ACRE TRACT 24-10-9 BEARDEN TWP 1969 MELODY 12X50 VIN #8958 OTC #601899054002 (STG VALUE) 19.24 Acres

10.     The Mortgage was recorded in the Office of the Okfuskee County Clerk as Document No. 2023-475391 in Book 001327 at Pages 0358-0378. Claim No. 13 at 39-59.

11.     The Business Real Property totals approximately 24.24 acres and is valued at $420,000.00. Claim No. 13.

12.     Combined, GPNB estimates that the value of the Business Real Property and the Business Assets is approximately $1,620,000.00. *See* SOF ¶¶ 6, 11.

13.     The Debtor failed and refused to pay the Note in accordance with the terms of the Loan and, therefore, GPNB accelerated the Note. The Debtor is in default under the terms of the

---

[1] Meadors, in addition to the Debtor, was a mortgagor under the Mortgage. The Mortgage also secures approximately 520 acres owned by Meadors individually. The real property owned by Meadors individually is not part of the Debtor's estate and is not impacted by the relief set forth in this Motion.

4

Note because the Debtor failed to make monthly installments under the Note when due and failed to pay the indebtedness owed under the Note. Additionally, the Debtor failed to provide monthly financial documentation as required by the terms of the Loan.

14. As of the Petition Date, the Debtor was indebted to GPNB in the amount of $4,582,159.45 (the "Claim"), which consists of $3,880,689.55 in principal, $563,566.91 in accrued interest, $129,510.28 in fees, and $8,392.71 in late charges. Claim No. 13 at 2.

15. Based on the foregoing, GPNB is undersecured in an amount totaling $2,962,159.45.[2] Claim No. 13 at 2.

## II. The Debtor's Bankruptcy and "Plan" of Reorganization

16. Due to the Debtor's default, on June 6, 2024, GPNB commenced an action in the District Court of Okfuskee County, Oklahoma, Case No. CJ-2024-00034, wherein GPNB sought to foreclose on the collateral secured by the Security Agreement and the Mortgage ("State Court Case").

17. The Debtor filed its voluntary petition under Chapter 11 of the Bankruptcy Code on August 8, 2024 (the "Petition Date"). Doc. No. 1. The Petition was filed the morning of a hearing in the State Court Case because, the Debtor admits, the Debtor stood to "lose most—if not all—of its property" to GPNB at the hearing. Doc. No. 56 at 3.

18. Contemporaneous to that filing, the Debtor submitted its Notes Accompanying Petition, Schedules, and Statement of Financial Affairs ("Schedules"). Doc. No. 1 at 5.

19. The Debtor's Schedules were revealing. At the outset, the Debtor disclosed that its "books and records" were not "reasonably current in nature" and that, even for the records that were current, the Debtor lacked "financial records of reliable quality." Doc. No. 1 at 5-6. The

---

[2] This calculation does not include Meadors' personal assets. However, GPNB is still undersecured when considering Meadors' personal assets.

Debtor stated that it would "shortly" engage with a third-party bookkeeper to rectify these issues. Doc. No. 1 at 6.

20.     Additionally, the Debtor admitted it has "not filed tax returns for the calendar years 2022 or 2023" but asserted that "[p]reparing and filing such returns" would be "prioritized post-petition" in an "expedient-but-deliberate manner." Doc. No. 1 at 6.

21.     The Debtor's Schedules grossly inflate the value of the Debtor's assets. Specifically:

    a.  The Debtor's Inventory is valued at $2,453,500.00. Doc. No. 1 at 17.

    b.  The Debtor's Equipment is valued at $749,500.00. Doc. No. 1 at 19.

    c.  The Business Real Property—approximately 24.24 acres in Okfuskee County, Oklahoma—is valued at $1,315,000.00. Doc. No. 1 at 19-20.

22.     The Debtor filed its Disclosure Statement for Chapter 11 Plan of Reorganization of C M Heavy Machinery, LLC ("Disclosure Statement") on December 6, 2024 and the Chapter 11 Plan or Reorganization of C M Heavy Machinery, LLC ("Plan") on December 9, 2024. Doc. No. 56; Doc. No. 58.

23.     The Plan relies on the Debtor's pursuit and successful recovery of an insurance claim stemming from a loss of inventory (GPNB's collateral) as a result of a fire in North Carolina in August 2023 ("Insurance Claim"). Doc. No. 58 at 8. Otherwise, it provides for distributions to creditors because of ordinary business income—after it is applied "to the ongoing operation of the Debtor's business in accord with the Debtor's business judgment"—and a prolonged liquidation of the Debtor's assets. Doc. No. 58 at 8.

24.     With respect to the Plan's proposed liquidation, the Debtor asks creditors, including GPNB, to sit idle for one (1) year prior to receiving any distributions. Doc. No. 58 at 8. After a

6

year has passed, the Debtor promises to liquidate enough assets to issue an initial payment of $250,000.00. Six (6) months following this initial payment, the Debtor promises to liquidate an additional $250,000.00 worth of assets to pay creditors. After the second payment, the Debtor promises to liquidate assets every six (6) months to provide $400,000.00 payments to its creditors. Doc. No. 58 at 8.

25. The Disclosure Statement admits what is self-evident from the Plan: the Debtor's reorganization is based on the mere hope that the Insurance Claim satisfies *all* its obligations at *some point* in the future. Doc. No. 56 at 4 ("Transparently, the Debtor is hopeful the proceeds of the [I]nsurance [C]laim will prove sufficient to retire all obligations."). However, based upon emails between the Debtor and his legal counsel, the Debtor's interest in the Insurance Claim is worth only approximately $1.4 million based on the insurer's computation of the actual cash value of the Debtor's digging mats. **Exhibit 2**, Correspondence.

26. The Disclosure Statement casts doubt on the Debtor's operational viability. Specifically, the Disclosure Statement provides little to no financial information regarding the Debtor because it cannot disclose "any recent statements of profit and loss" for creditors to evaluate its operations because there is an "abiding concern that such may prove inaccurate or misleading." Doc. No. 56 at 5.

27. The Debtor further acknowledges that "it has not realized a statistically-meaningful gross profit during the past several months of operations" and says it is "not realistic" to expect profits comparable to those obtained by the Debtor from 2019-2021, which are the most recent periods in which the Debtor possesses reliable financial records. Doc. No. 56 at 5.

28. The Plan also provides for "repatriation" of funds improperly used by Meadors. Specifically, Meadors used $10,491.75 of the Debtor's funds for his own purposes *in addition* to

a $5,000.00 per month "member draw." Doc. No. 58 at 9. The Debtor was aware that it needed approval for Meadors to use the Debtor's money for Meadors' personal benefit. Doc. No. 1 at 6. At the time, the Debtor indicated Meadors "will commence drawing an industry-appropriate salary insofar as he is no longer permitted to take equity draws and insofar as he is the Debtor's sole working employee." Doc. No. 1 at 6-7. However, the Debtor assured that "notice will be given— in advance—of the size and frequency of such payments." Doc. No. 1 at 6-7. No such notice was given in advance as promised by the Debtor. Nevertheless, the Plan provides Meadors with *eighteen months* to repay $10,491.75 to the Debtor despite his $5,000.00 monthly salary. Doc. No. 58 at 9.

### III.    The Debtor's Post-Petition "Operations"

29.    On December 16, 2024—over four (4) months after the Petition Date—GPNB examined representatives from the Debtor (Meadors and a bookkeeper) pursuant to Fed. R. Bankr. P. 2004 to investigate the Debtor's acts, conduct, and property, the debtor's liabilities and financial condition, and other matters that may affect the administration of the Debtor's estate.

30.    The examination confirmed that, since the Petition Date, Meadors is the Debtor's only employee. Ex. 1 at 7:13-17.

31.    Meadors further confirmed that the Debtor's books and records remain in poor condition and cannot be relied upon, despite having four (4) months to reconcile these records since the Petition Date. Ex. 1 at 26:1-12.

32.    Despite the Debtor's promise to expediently file tax returns in its Petition, the Debtor still has not filed tax returns for 2022 and 2023. Doc. No. 1 at 6; Ex. 1 at 27:5-28. Meadors *could not even identify* the tax professional working on the Debtor's tax returns. Ex. 1 at 26:7-25. Further, Meadors—the Debtor's sole employee—did not know how the Debtor is treated for the purposes of taxation. Ex. 1 at 28:9-19.

8

33.     Meadors also testified that, since the Petition Date, the Debtor has taken no action to recover outstanding accounts receivable in the amount of $1,343,190.00. Ex. 1 at 35:19-25. Meadors testified:

> Q. And if you see -- go to the next page, at the top, it says accounts receivable, $1,343,190.00.
>
> A. Yes.
>
> Q. Have you collected any accounts receivable since the bankruptcy was filed?
>
> A. No, I don't believe so.
>
> Q. Have you made any efforts to collect accounts receivable since the bankruptcy was filed?
>
> A. I'm not sure.
>
> Q. Well, you're the only employee. Who else would have done it if it wasn't you?
>
> A. Well, then, yeah, I haven't **made any efforts** since the bankruptcy was filed.

Ex. 1 at 35:19-36:7 (emphasis added).

34.     Meadors admitted that the longer collection efforts on the accounts receivable are delayed, the less likely the Debtor's accounts receivable will be recovered for the benefit of the Estate. Ex. 1 at 73:14-18.

35.     From the Petition Date through December 17, 2024, the Debtor only leased out or rented out a single Caterpillar 594. Ex. 1 at 44:22-25. The Debtor alleges it has tried to lease out its equipment but that it has been unsuccessful. Ex. 1 at 45:1-7.

36.     Meadors affirmed that the Debtor's intent with the Plan is "either to get a recovery on the insurance claim or sell equipment over time." Ex. 1 at 72:19-73:1. However, Meadors admitted that the Debtor does not have a reason for a delayed liquidation of its assets and

9

acknowledges that the value of the Debtor's equipment is decreasing as a result of depreciation. Ex. 1 at 73:2-10 and 84:1-11.

**ARGUMENT AND AUTHORITY**

The Court should dismiss or convert the Bankruptcy Case. Under the Bankruptcy Code, "the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."[3] The moving party must establish "cause" by a preponderance of the evidence and, if dismissal is requested, demonstrate why dismissal is in the best interests of creditors and the estate.[4]

The Court should dismiss or convert the Bankruptcy Case given the uncontroverted facts in this case. The Debtor has no likelihood of rehabilitating its business, has inadequate records from which creditors may discern the viability of the business and the Plan, and has an inadequate management team to successfully rehabilitate its business operations. Furthermore, dismissing the Bankruptcy Case is more equitable than conversion to chapter 7 because all the Debtor's assets are subject to GPNB's security interest under the Security Agreement and Mortgage.

**I.    The facts provide sufficient "cause" for dismissing the Bankruptcy Case pursuant to 11 U.S.C. § 1112(b)(1).**

The Bankruptcy Code lists grounds that constitute "cause" for dismissing the Bankruptcy

---

[3] 11 U.S.C. § 1112(b)(1) ("Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.").
[4] *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994) (citing 7 Colliers on Bankruptcy ¶ 1112.04); *In re Paterno*, 511 B.R. 62, 66 (Bankr. M.D.N.C. 2014).

10

Case.[5] However, the enumerated grounds for "cause" are not exclusive; indeed, courts may find "cause" on other facts that demonstrate that conversion or dismissal is equitable.[6]

In this case, the Court has cause for dismissing the Bankruptcy Case for three reasons. First, the Debtor's assets are continually decreasing in value and there is little hope that the Debtor's business will be rehabilitated. Second, the Debtor has grossly mismanaged its estate because it is being operated without an effective management team. And lastly, the Debtor has failed to maintain adequate books and records to allow creditors to evaluate the Debtor's Plan. Hence, dismissal or conversion of the Bankruptcy Case is appropriate.

A. **The Bankruptcy Case is causing a "substantial or continuing loss" to the Debtor's estate and there is no "reasonable likelihood" of rehabilitation.**

Under § 1112(b)(4)(A), sufficient cause exists for dismissal or conversion of a chapter 11 case if there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."[7] As the plain language suggests, this "contemplates a 'twofold' inquiry into whether there has been a 'continuing diminution of the estate and absence of a reasonable likelihood of rehabilitation.'"[8]

With respect to the first inquiry, the Debtor must either have had a negative cash flow or the value of the Debtor's asset values must be declining.[9] This burden is not steep. Courts have

---

[5] 11 U.S.C. § 1112(b)(4).

[6] *See In re Ameribuild Constr. Mgmt.*, 399 B.R. 129, 131 n.3 (Bankr. S.D.N.Y. 2009) ("The list contained in § 1112(b) is not exhaustive. The Court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." (quotation omitted)); *In re TCR of Denver, LLC*, 338 B.R. 494, 500 (Bankr. D. Colo. 2006) ("[T]he Court may dismiss a Chapter 11 case for reasons other than those specified in section 1112(b) as long as those reasons satisfy 'cause.'"); *In re Tirey Distrib. Co.*, 242 B.R. 717, 723 (Bankr. E.D. Okla. 1999) (The "grounds enumerated in § 1112(b) are not exhaustive.").

[7] *Id.* § 1112(b)(4)(A).

[8] *In re Citi-Toledo Partners*, 170 B.R. 602, 606 (Bankr. N.D. Ohio 1994) (quoting *In re Photo Promotion Assocs., Inc.*, 47 B.R. 454, 458 (Bankr. S.D.N.Y. 1985)).

[9] *In re Gateway Access Sols., Inc.*, 374 B.R. 556, 564 (Bankr. M.D. Pa. 2007).

Case 24-80617   Doc 82   Filed 01/30/25   Entered 01/30/25 16:22:28   Desc Main
Document   Page 15 of 21

consistently held that "[a]ll that need be found is that the estate is suffering *some diminution* in value."[10] This bankruptcy estate is clearly suffering a significant diminution in value.

The second inquiry hinges on whether the Debtor's business prospects justify its efforts to reorganize.[11] For instance, the court in *Quarles v. United States Trustee*, 194 B.R. 94, 97 (W.D. Va. 1996) determined that the debtor did not have a reasonable likelihood of rehabilitation because the debtor's chances of rehabilitation hinged on successful litigation "cur[ing]" the debtor's "financial ills."[12] Similarly, the debtor in *In re Cont'l Holdings*, 170 B.R. 919, 931 (Bankr. N.D. Ohio 1994) did not have a reasonable likelihood of rehabilitation because there was insufficient evidence that the debtor would receive income moving forward.[13] Put simply, "[c]ourts have consistently understood 'rehabilitation' to refer to the debtor's ability to restore the viability of its business."[14] Rehabilitation does not equate to liquidation.[15]

Here, the facts warrant dismissal or conversion pursuant to section 1112(b)(4)(A). To begin, the Debtor's estate is continually diminishing in value. The value of the Debtor's equipment has undoubtedly decreased over time and will continue to do so. SOF ¶ 36. Further, the Debtor has made no efforts to collect the approximately $1,343,190.00 of accounts receivable even though, the longer the delay, the less likely the Debtor will recover this value. SOF ¶¶ 33-34. The Debtor

---

[10] *Taub v. Taub (In re Taub)*, 427 B.R. 208, 231 (Bankr. E.D.N.Y. 2010) (quoting *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988)) (emphasis added); *see also In re Sakon*, 617 B.R. 7, 15 (Bankr. D. Conn. 2020) ("The losses to the estate need not be large—'[a]ll that need be found is that the estate is suffering some diminution in value.'").

[11] 7 Collier on Bankruptcy ¶ 1112.04[6][a][ii] (16th 2024) (collecting cases). *See also Quarles v. United States Trustee*, 194 B.R. 94, 97 (W.D. Va. 1996) (no likelihood of rehabilitation when only hope of reorganizing was based on the speculative outcome of pending litigation); *In re 15375 Mem'l Corp.*, 386 B.R. 548, 552 (Bankr. D. Del. 2008) (rehabilitation means making a business viable again—liquidation is not rehabilitation), *reversed on other grounds In re 15375 Mem'l Corp.*, 400 B.R. 420 (D. Del. 2009).

[12] *Quarles*, 194 B.R. at 97.

[13] *In re Cont'l Holdings*, 170 B.R. 919, 931 (Bankr. N.D. Ohio 1994).

[14] *Loop Corp. v. United States Tr.*, 379 F.3d 511, 516 (8th Cir. 2004).

[15] *Id.*; *In re Costa Bonita Beach Resort*, 513 B.R. 184, 197 (Bankr. D.P.R. 2014) ("Whereas confirmation of a plan could include a liquidation plan, rehabilitation does not include liquidation." (quoting 7 Collier on Bankruptcy ¶ 1112.04[6][a])).

Case 24-80617    Doc 82    Filed 01/30/25    Entered 01/30/25 16:22:28    Desc Main
Document      Page 16 of 21

also has no reasonable likelihood of rehabilitation. Just as in *Quarles*, the Debtor is hoping that a favorable outcome in litigation involving the Insurance Claim will cure its financial woes. SOF ¶¶ 25, 36. Additionally, the Debtor has no access to reasonably certain income and is making very little effort to generate income sufficient for a reorganization or to collect on its accounts receivable. *See* SOF ¶¶ 27, 34-35. The Debtor admits that it "has not realized a statistically-meaningful gross profit during the past several months of operations" and that it is unlikely to obtain the profits it garnered in years past. SOF ¶ 27.

The Debtor's business is not viable, and there is no indication that it will become viable moving forward. The Plan is a transparent attempt to hold off liquidating assets until—the Debtor hopes—the Insurance Claim resolves in the Debtor's favor and satisfies all the Debtor's obligations. For the Debtor's hope to come to fruition, the Debtor must increase its recovery from the Insurance Claim from $1.4 million to—based on a fifty percent (50%) contingency fee arrangement—approximately $11 million. *See* SOF ¶ 25. GPNB should not be required to wait any longer to protect its rights based on this hope. Accordingly, "cause" warrants dismissal or conversion of the Bankruptcy Case.

### B. The Debtor's reliance on only Meadors to effectuate its reorganization constitutes a gross mismanagement of the estate.

Section 1112(b)(4) acknowledges that "cause" for dismissal includes the "gross mismanagement of the estate."[16] Significantly, a Debtor grossly mismanages a bankruptcy estate when it fails to "maintain an effective corporate management team."[17] Here, Meadors is the sole employee of the Debtor. SOF ¶ 30. In the four (4) months following the Petition Date, Meadors

---

[16] 11 U.S.C. § 1112(b)(4).
[17] *In re Gateway Access Sols., Inc.*, 374 B.R. at 564; *In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759 (Bankr. D.S.C. 2007) ("[T]he Debtor has no 'corporate' management and this fact proves gross mismanagement of the estate and a breach of fiduciary obligation to the creditors.").

13

has made little to no attempt to generate revenue and no attempt to recoup the Debtor's assets by recovering accounts receivable. SOF ¶¶ 33-35. Meadors lacks any knowledge of the Debtor's tax status or the status of its financial records. SOF ¶ 32. Meadors has failed to file accurate monthly operating reports on a variety of occasions and has unilaterally used the Debtor's funds for his individual benefit. SOF ¶ 28. It is unreasonable that the Debtor expects its creditors to rely on Meadors to rehabilitate the Debtor's business or appropriately liquidate the Debtor's property. *See id.* ¶¶ 28, 31-36. This is especially true considering the Debtor's history of malfeasance and embezzlement. Dismissal or conversion of the Bankruptcy Case, therefore, is warranted.

### C. The Debtor has inadequate financial records to reorganize under chapter 11.

Under the Bankruptcy Code, "[w]hile a debtor may not be expected to keep a 'perfect' set of books and records, it should keep an adequate set of books and records to reflect its business transactions."[18] A failure to do so constitutes cause for dismissing a chapter 11 case.[19] The purpose of this requirement is clear:

> The law is not unqualified in imposing a requirement to keep books or records, and it does not require that if they are kept they shall be kept in any special form of accounts. It is a question in each instance of reasonableness in the particular circumstances; *but it is intended that there be available written evidence made and preserved from which the present financial condition of the bankrupt, and his business transactions for a reasonable period in the past may be ascertained.* Records of substantial completeness and accuracy are required so that they may be checked against the mere oral statement or explanations made by the bankrupt.[20]

Here, the Debtor's inadequate records make it impossible for creditors, such as GPNB, to evaluate the statements or contentions of the Debtor or evaluate the merits of the Plan. The Debtor admits it cannot provide financial statements or other records for the two years preceding the

---

[18] *In re Larmar Estates, Inc.*, 6 B.R. 933, 936 (Bankr. E.D.N.Y. 1980).
[19] *See id.*
[20] *Id.* (emphasis in original).

14

Petition Date because it cannot verify their accuracy. SOF ¶¶ 19, 26. In the four months since the Petition Date, the Debtor has not made any progress towards correcting erroneous financial records or filing past-due tax returns. SOF ¶¶ 31-32. The Debtor's records are simply unreliable and cannot be used to evaluate the Debtor's financial condition. *Id.* The most recent monthly operating reports filed by the Debtor contain errors and appear to contain personal asset and account information for Meadors.

In sum, records of "substantial completeness and accuracy" are necessary so that creditors can check the "mere oral statement[s] or explanations" of the Debtor.[21] The Debtor's creditors cannot evaluate the Debtor's assertions or financial status based on the records in this case. Accordingly, the Court should dismiss or convert the Bankruptcy Case for cause.

## II. Dismissal, rather than conversion, is in the best interests of creditors and the Debtor's estate.

As set forth above, a party in interest moving to dismiss a chapter 11 bankruptcy case must demonstrate that dismissal, rather than conversion, is in the best interests of creditors and the estate.[22] However, "the standard for choosing conversion or dismissal based on 'the best interest of creditors and the estate' implies a balancing test to be applied through case-by-case analysis."[23] Ultimately, the determination is a matter for sound judicial discretion.[24]

---

[21] *In re Larmar Estates, Inc.*, 6 B.R. at 936.

[22] 11 U.S.C. §1112(b)(1).

[23] *In re BTS, Inc.*, 247 B.R. 301, 309 (Bankr. N.D. Okla. 2000); *Hall v. Vance*, 887 F.2d 1041, 1044 (10th Cir. 1989) ("The bankruptcy court has broad discretion under § 1112(b).").

[24] *In re BTS, Inc.*, 247 B.R. at 309. Courts may also consider a broad variety of factors, including: "(1) whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal, (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted, (3) whether the debtor would simply file a further case upon dismissal, (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors, (5) in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise, (6) whether any remaining issues would be better resolved outside the bankruptcy forum, (7) whether the estate consists of a 'single asset,' (8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests, (9) whether a

15

GPNB respectfully submits that dismissal, rather than conversion, is in the best interest of the creditors and this case. Principally, the Debtor's assets are fully encumbered by GPNB. SOF ¶¶ 5, 9. As such, there are no assets available for distribution by a chapter 7 trustee. Additionally, there are no financial records upon which a chapter 7 trustee can rely to reach assets, including through avoidance actions, for the benefit of unsecured creditors. SOF ¶ 31. Therefore, GPNB respectfully submits that dismissal, rather than conversion, is appropriate in this case.[25] However, in the event the Court deems otherwise, sufficient cause exists to convert the Bankruptcy Case to a case filed under chapter 7 of the Bankruptcy Code.

## **CONCLUSION**

This is not a close call. Section 1112(b) of the Bankruptcy Code directs the Court to convert or dismiss the Debtor's Bankruptcy Case if there is cause to do so. The Debtor filed the Petition just hours before a hearing to stop GPNB from foreclosing and recovering the Debtor's assets to pay the debt owed to GPNB. The Debtor now asks GPNB to wait years for the Insurance Claim to be resolved in the hope that its value increases dramatically and, therefore, remedies all the Debtor's financial issues. In the meantime, the Debtor has inexplicably failed to take action to recover accounts receivable in excess of $1 million, has not corrected its financial records or filed tax returns, and has engaged in admittedly minimal business operations. Based on the foregoing, sufficient cause warrants the conversion or dismissal of the Bankruptcy Case.

**WHEREFORE**, premises considered, Great Plains National Bank respectfully requests that the Court enter an Order: (i) granting this Motion; (ii) dismissing the above captioned

---

plan has been confirmed and whether any property remains in the estate to be administered and (10) whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns." 7 Collier on Bankruptcy ¶ 1112.04 (16th 2024).

[25] *See, e.g.*, *In re Horned Dorset Primavera, Inc.*, 606 B.R. 117, 157 (Bankr. D.P.R. 2019) (dismissal was appropriate because the debtor lacked equity in property that may be administered for the benefit of unsecured creditors).

bankruptcy case pursuant to 11 U.S.C. § 1112(b) or, in the alternative, converting the above captioned bankruptcy case to a case under chapter 7 of the Bankruptcy Code, (iii) awarding GPNB such other relief as is just and equitable.

Dated: January 30, 2025.

Respectfully submitted,

**HALL, ESTILL HARDWICK, GABLE, GOLDEN & NELSON, P.C.**

_s/Steven W. Soulé_

Steven W. Soulé, OBA No. 13781
Christopher J. Gnaedig, OBA No. 33892
521 East 2nd St., Suite 1200
Tulsa, OK 74120
Telephone: (918) 594-0400
Facsimile: (918) 594-0505
Email: ssoule@hallestill.com
Email: cgnaedig@hallestill.com

-and-

Daniel V. Carsey, OBA No. 21490
100 North Broadway, Suite 2900
Oklahoma City, OK 73102
Telephone: (405) 553-2828
Facsimile: (405) 553-2855
Email: dcarsey@hallestill.com

**ATTORNEYS FOR GREAT PLAINS NATIONAL BANK**