# Exhibit 1

1          IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE EASTERN DISTRICT OF OKLAHOMA
2

3
      IN RE:                          )
4                                     )
      C M HEAVY MACHINERY, LLC,       ) Case No. 24-80617
5                                     ) Chapter 11
                  Debtor.            )
6

7              DEPOSITION OF CLINT MEADORS

8           TAKEN ON BEHALF OF THE CREDITOR

9       ON DECEMBER 16, 2024, BEGINNING AT 9:29 A.M.

10                  IN TULSA, OKLAHOMA

11

      APPEARANCES
12
      on behalf of the CREDITORS
13
      Mr. Steven Soule
14    Mr. Connor M. Andreen
      HALL ESTILL HARDWICK GABLE GOLDEN & NELSON
15    521 East 2nd Street
      Suite 1200
16    Tulsa, OK 74120
      918.54.0400
17    ssoule@hallestill.com
      candreen@hallestill.com
18

19    on behalf of the DEBTOR

20    Ms. Christianna Cathcart
      THE VerSTANDIG LAW FIRM, LLC
21    630 1st Avenue North
      Suite B
22    Fargo, North Dakota 58102
      701.394.3215
23    mac@mbvesq.com,

24

25    REPORTED BY:  Shannon S. Harwood, CSR, RPR, CRR

1                          I N D E X

2                                                          PAGE

3    Direct Examination by Mr. Soule                        5

4

5

6

7                          EXHIBITS

8    Exhibit          Description

9    1. Proof of claim                                      8

10   2. Voluntary Petition for Non-Individual Filing for

11   Bankruptcy                                            17

12   3. Monthly Operating Report ending 9/30/24            56

13   4. Monthly Operating Report ending 10-31-24           64

14   5. Disclosure Statement for Chapter 11 Plan           68

15   6. Affidavit of Clint Meadors to Plaintiff's Amended

16   Motion for Summary Judgment                           80

17

18

19

20

21

22

23

24

25

STIPULATIONS

It is hereby stipulated and agreed by and between the parties hereto, through their respective attorneys, that the deposition of CLINT MEADORS may be taken pursuant to agreement and notice and in accordance with the Oklahoma Rules of Civil Procedure on December 16, 2024, at the offices of Hall, Estill, Hardwick, Gable, Golden & Nelson, 521 East 2nd Street, Tulsa, Oklahoma, before Shannon S. Harwood, CSR, RPR, CRR.

```
 1    WHEREUPON,

 2                        CLINT MEADORS,

 3    after having been first duly sworn, deposes and says in

 4    reply to questions propounded as follows, to-wit;

 5                      DIRECT EXAMINATION

 6    BY MR. SOULE:

 7         Q.    Could you state your full name for the record,

 8    please, sir?

 9         A.    Clint Michael Meadors.

10         Q.    Mr. Meadors, my name is Steve Soule.  I

11    represent Great Plains National Bank.  Appreciate you

12    being here today.  This shouldn't take very -- a long

13    time, but if you need to ever take a break, just let me

14    know, and if you'll just answer whatever question is out

15    there, we'll take a break.  If you need to talk to your

16    attorney for any reason, same rules apply.

17              Have you ever been deposed before?

18         A.    I don't believe so.

19         Q.    Okay.  Well, the only real rules I have is to

20    make sure you understand what my question is before you

21    answer it, because she's getting it all down, and then

22    let's try not to talk at the same time.  You and I might

23    understand what we're -- what we're talking about, but

24    she has a hard time getting all that down if we're both

25    talking at the same time.  And then I need your answers
```

1    equipment you're leasing --

2         A.   Yes.

3         Q.   -- is that?  And we're going to talk also

4    about.  I think you had some mats that you had been

5    leasing that had been part of a fire; is that right?

6         A.   Yes.

7         Q.   So as we sit here today, what is the type --

8    what is the businesses where the revenue -- what streams

9    does the revenue have -- I mean, what revenue streams

10   does the business have today?

11        A.   We have parts, rentals, sales, service and

12   heavy haul trucking.

13        Q.   Okay.  And how many employees?

14        A.   Just myself at the moment.

15        Q.   Okay.  Since you filed bankruptcy, have you

16   been the only employee?

17        A.   Yes.

18        Q.   And you also have a bookkeeper?

19        A.   Yes.

20        Q.   And what's her name?

21        A.   Holly.

22        Q.   And Holly what?

23        A.   Holly Goodson.

24        Q.   And how long has she been the company's

25   bookkeeper?

1      Q.    Isn't that when it's dated?

2      A.    Yes.

3      Q.    Okay. And then the next document on Page 30

4 starts with a Commercial Security Agreement. Do you

5 recognize that document?

6      A.    On Page 30?

7      Q.    Yeah.

8      A.    Okay.

9      Q.    Do you remember signing that document?

10      A.    I remember signing a lot of things.

11      Q.    Look at Page 35.

12      A.    Yeah, that's my signature.

13      Q.    Okay. Do you remember that -- or do you agree

14 that the -- that CM Heavy Machinery, LLC pledged all of

15 its equipment and vehicles and receivables to Great

16 Plains National Bank?

17      A.    Yes, I guess so.

18      Q.    Is there anything that you're aware of that CM

19 Heavy Machinery has that is not secured to the bank?

20      A.    Not that I'm aware of.

21      Q.    And you also pledged some real estate; is that

22 correct?

23      A.    I think so.

24      Q.    So if we look at page -- starting on Page 39,

25 there's a copy of a mortgage. Do you recognize that

1    Q.   So as we sit here today, are the books and

2  records of the company still not in good condition?

3    A.   I wouldn't say so.  They're better than they

4  were.

5    Q.   But they're still not in good condition?

6    A.   No, sir.

7    Q.   And so when you say they lacked reliable

8  quality, is that still true?

9    A.   I would think so.  I mean, since Holly got

10  involved, they should be correct from the time she was

11  involved until today, but the things previous to that,

12  I'm going to say are still not fixed.

13         Then the third party bookkeeper or tax guy,

14  he's trying to get those fixed where we can get our

15  taxes paid and so on and so forth.

16    Q.   And who's that?

17    A.   Zach, I can't hardly remember his name.  He's

18  from Seminole.

19    Q.   And is he a CPA?

20    A.   I believe so.

21    Q.   Can you get me his name?

22    A.   Yes, I will.

23    Q.   And was he hired by the company?

24    A.   Yes, I believe so.

25    Q.   And what's he trying to do?

 1          A.   He's trying to go back and get everything

 2   straightened out from the -- in the books.

 3          Q.   Prior to the bankruptcy?

 4          A.   I believe so.

 5          Q.   When was the last time the company filed a tax

 6   return?

 7          A.   I think '21 or '2.  Was it -- I'm not sure

 8   exactly.

 9          Q.   Okay.  Your statement here, Paragraph 3 on

10   Page 6 says, "The debtor has not filed tax returns for

11   the calendars years 2022 or 2023."

12          A.   Yes, sir.

13          Q.   Does that help refresh your memory?  I'm not

14   trying to trick you.

15          A.   Yes, sir.

16          Q.   But you think the company filed for 2021 and

17   before?

18          A.   Yes, but I'm not sure that they were correct

19   after -- after getting -- after they started looking at

20   the books.

21          Q.   Do you have an intent to file tax returns on

22   behalf of the company?

23          A.   Yes.

24          Q.   When is that going to happen?

25          A.   As soon as he -- soon as he tells me I can, I

 1  guess.  I'm not sure when -- how that works.

 2      Q.   Do you know that the IRS has filed a claim in

 3  the company case for a little over $4.5 million?

 4      A.   That's what Mr. Mac was telling me, but I

 5  don't -- I don't think that that number is correct.

 6      Q.   It is an estimated claim probably, because you

 7  haven't filed -- the company has filed tax returns?

 8      A.   Yes, sir.

 9      Q.   Do you have -- do you have an educated

10  estimate of how much you do owe the IRS for those two

11  years?

12      A.   I have no idea.

13      Q.   Have you been filing personal tax returns?

14      A.   I'm not sure if we did or didn't on

15  personally.

16      Q.   Isn't this company a flow through?  Like for

17  tax treatment, doesn't the company's tax flow through to

18  you on your personal returns?

19      A.   I don't -- I'm not sure exactly.

20      Q.   Okay.  In this statement here and in your

21  bankruptcy schedules, there's a discussion of an

22  insurance claim in North Carolina.  So on Page 6 of this

23  exhibit you're looking at, Paragraph 4 talks about this

24  insurance claim.  Did you -- can you tell me about the

25  insurance claim?

1          A.    Well, we had -- I believe there was

2    approximately 16,000 mats catch fire and burned, so...

3          Q.    And where did that happen?

4          A.    In the Fayetteville yard.

5          Q.    Fayetteville, North Carolina?

6          A.    Yes, sir.

7          Q.    And that was a yard of the company's?

8          A.    No, sir.  It was a -- well, we were renting

9    it.

10          Q.    Okay.

11          A.    It was owned by Mr. Barnhill.

12          Q.    And did it destroy all the mats?

13          A.    I believe so for the most part.

14          Q.    And were these the mats that you purchased

15    with some of the proceeds that you borrowed from the

16    bank?

17          A.    Yes.

18          Q.    And they were insured?

19          A.    Yes.

20          Q.    Has a -- has there been a determination of

21    what started the fire?

22          A.    I'm not sure.

23          Q.    You're not sure if there's been a

24    determination?

25          A.    No, sir.

 1          Q.    Can we get a copy of it?

 2          A.    Yes.

 3          Q.    So in your mind, that claim is still being

 4    pursued by the company?

 5          A.    I believe I've sent you guys a copy as well

 6    for the policy.

 7          Q.    I think I got copies of your new insurance

 8    policy.

 9          A.    The pack policy.

10          Q.    Your new insurance policy.  Is that what you

11    sent through your counsel?

12          A.    I'm not sure.

13          Q.    Okay.  Speaking of the new insurance that

14    you've gotten since bankruptcy, is it still in place?

15          A.    Should be.

16          Q.    Okay.  And is the agent on that related to

17    you?

18          A.    The new policy, probably.

19          Q.    And who is that?

20          A.    It's my cousin.

21          Q.    Okay.  And are you paying that annually or

22    monthly or --

23          A.    I believe it's every six months.

24          Q.    And is that -- what type of insurance is that?

25          A.    I'm not sure exactly.

1      Q.   Does it cover the vehicles and machinery --

2      A.   I'm sure it does.

3      Q.   -- if they were to get destroyed or stolen?

4      A.   Yes.

5      Q.   Does it have a liability component to it?

6      A.   I'm not sure.

7      Q.   Okay.  But whatever your counsel sent to me is

8   what you have?

9      A.   I believe so.

10     Q.   Okay.  So let's look a little bit further into

11  these schedules.  If you look down at the bottom on Page

12  14 where the schedules of assets begin, and did you help

13  fill these out for your counsel?

14     A.   I believe so.

15     Q.   Okay.  And that's where right kind of in the

16  middle of the page, it shows that there's 114,000 and

17  change at Mabry Bank?

18     A.   Yes.

19     Q.   And if you see -- go to the next page, at the

20  top, it says accounts receivable 1,343,190; is that

21  correct?

22     A.   Yes.

23     Q.   Have you collected any accounts receivable

24  since the bankruptcy was filed?

25     A.   No, I don't believe so.

1        Q.    Have you made any efforts to collect accounts

2    receivable since the bankruptcy was filed?

3        A.    I'm not sure.

4        Q.    Well, you're the only employee.  Who else

5    would have done it if it wasn't you?

6        A.    Well, then, yeah, I haven't made any efforts

7    since the bankruptcy was filed.

8        Q.    And will you -- do you agree that the bank,

9    Great Plains, is a secured creditor against accounts

10   receivable?

11       A.    Yes.

12       Q.    And why haven't you made any efforts to

13   collect accounts receivable?

14       A.    I don't know.

15       Q.    Are they collectible?

16       A.    I'm not sure.  Should be.

17       Q.    But you don't know why you haven't made any

18   efforts to collect them?

19       A.    No.

20       Q.    Then if you look down towards the middle --

21   let me ask you another question --

22       A.    One thing is, I'm not sure that the -- that

23   the accounts receivable is exactly correct.

24       Q.    Well, this is what you filed with the

25   bankruptcy court under penalty of perjury, so are you

1       A.      Okay.

2       Q.      All right.  Let's turn to Page 18.  There's a

3  list starting on Page 18 continuing with Page 19 of some

4  vehicles.  See that, vehicles and trailers?  Are those

5  all located in Okemah?

6       A.      I believe so.

7       Q.      At the business address?

8       A.      Yes.

9       Q.      Do you still have -- does the debtor still

10 have all of this -- all of these items that are listed

11 here on Pages 18 and 19?

12      A.      I believe so.

13      Q.      And they're all insured?

14      A.      Should be.

15      Q.      And the equipment we talked about a minute ago

16 and these vehicles, are they all secured to the bank?

17      A.      I believe so.

18      Q.      Has the debtor tried to sell any of this --

19 the equipment or vehicles or trailers since the

20 bankruptcy was filed?

21      A.      Not really, no.

22      Q.      Other than the Caterpillar 594, has the debtor

23 leased out -- leased or rented out any of this equipment

24 since the bankruptcy was filed?

25      A.      I don't believe so.

 1          Q.    Have you been trying to lease out any

 2     equipment?

 3          A.    Yeah.

 4          Q.    Just haven't been successful?

 5          A.    No, sir.

 6          Q.    Why is that?

 7          A.    I'm not sure.

 8          Q.    Okay.  At the bottom of Page 19, there's --

 9     there's an identification of some real estate.  It says

10     no address, legal description at Block 1269, Page 782 in

11     Okfuskee County, 20 acres.  Is that the 20 acres you

12     were talking about a moment ago?

13          A.    Yes, sir.

14          Q.    So that is owned by the debtor, correct?

15          A.    I believe so.

16          Q.    And you valued that at $115,000?

17          A.    I guess so, yes, sir.

18          Q.    Is that correct?

19          A.    Yes.

20          Q.    And on the next page, there's a piece of real

21     estate at the top that's the address of the debtor.  Is

22     that the debtor's yard and building?

23          A.    Yes, sir.

24          Q.    And you valued that at 1.2 million; is that

25     correct?

1       A.    One piece was my equipment.

2       Q.    And some of it was somebody else's equipment?

3       A.    Yes.

4       Q.    So the money you're receiving from Smith has

5  to be paid to the person you're renting --

6       A.    Exactly.

7       Q.    -- the equipment from; is that correct?

8       A.    Exactly.

9       Q.    What about just renting out your equipment?

10  Is there not a market for that right now?

11      A.    It's getting better hopefully.

12      Q.    So has that improved in -- on November?

13      A.    The 594 is on rent, was on rent until

14  yesterday.

15      Q.    Okay.  Do you have any upcoming rentals of

16  your equipment?

17      A.    No, sir.

18      Q.    What -- in your words, what is the debtor's

19  plan to reorganize and come out of bankruptcy?  How are

20  you going to pay your creditors?

21      A.    Like this says, hopefully the insurance claim

22  will come through, and if it doesn't, then we'll sell

23  equipment.

24      Q.    So if the insurance claim doesn't come

25  through, you're going to sell equipment; is that

1   correct?

2           A.   Yes, sir.

3           Q.   But your plan is not to sell it now, your plan

4   is just to sell it over the next few years?

5           A.   Well, it says in here I think 250 or 200 in

6   the first 18 months and then 400 every six months after

7   that, I believe.  Not sure if that's exactly correct,

8   but it's pretty close I think.

9           Q.   Okay.  So how long will that take you to --

10  over what period of time would that be for you to repay

11  the bank what you owe them?

12          A.   What period of time?

13          Q.   Based on your plan, how long will it take you

14  to repay what you owe the bank?

15          A.   Five years, I assume, going off this.

16          Q.   Okay.  And that's just selling equipment,

17  you're not -- there's no revenue being generated?

18          A.   That's worst case scenario.

19          Q.   Okay.  I don't see any -- any projections in

20  here for generation of revenue other than through the

21  sale of equipment or did I miss that somewhere?

22          A.   No, sir, not that I know of.

23          Q.   So as we sit here today, the debtor's intent

24  is either to get a recovery on the insurance claim or

25  sell equipment over time.  That's your plan?

1          A.   Yes, sir.

2          Q.   Is that equipment, does it depreciate over

3    time?  Does it go down in value?

4          A.   Somewhat.

5          Q.   If it's not being used, does it go down in

6    value?

7          A.   I'm sure.  The older it gets, I guess you

8    would say.

9          Q.   And as we sit here, you still don't have any

10   intention to try to collect any of the receivables?

11         A.   No, I do have intentions.

12         Q.   When is that going to begin?

13         A.   Any time.  Soon.

14         Q.   Based on your experience as a businessman,

15   wouldn't you say that the longer the time goes by

16   between trying to collect receivables that the harder it

17   is to collect them?

18         A.   Yeah, probably.

19         Q.   So why haven't you started that process?

20         A.   I'm not sure.

21         Q.   In your plan, it mentions that you may have a

22   dispute with the Great Plains National Bank claim.  Do

23   you have a dispute with the claim?

24         A.   I'm not sure.

25         Q.   Earlier you mentioned that you -- well, I'll

1    just read it here.  "Such a dispute, if filed, will

2    likely be focused on the proprietary, vel non, with

3    which historic payments have been applied to this

4    putative debt."  Is that a sentence you wrote?

5         A.   I don't think I wrote that, no.

6         Q.   Is that what the debtor's position is with

7    regards to Great Plains?

8         A.   What page are you on?

9         Q.   6.

10        A.   Where does it say that?

11        Q.   Under Class 1, Secured Claims of Great Plains

12   National Bank, the second sentence.

13        A.   I'm not sure what that means exactly.

14        Q.   So you -- that's not your -- that's not your

15   words?

16        A.   I can't say if it is or isn't.

17        Q.   As the owner and principal of the debtor, what

18   is -- what is your dispute with the claim of Great

19   Plains?

20        A.   I'm not sure at the moment.

21        Q.   So this is more your lawyer?

22        A.   Well, I need to -- I guess I need to speak

23   with him to find out exactly what all this is.

24        Q.   But you're unaware as we sit here today what

25   the debtor's dispute with the Great Plains claim is, if

1    Q.   (By Mr. Soule)  So just a couple more

2  questions, Mr. Meadors.  Back on the liquidation of

3  collateral, of the bank's collateral under your proposed

4  plan, is there any reason not to start liquidating now?

5    A.   I can if you would like.

6    Q.   I mean, I think -- I mean, I'm not telling you

7  what we would like or not.  I'm just asking you if

8  there's a reason why you need to wait 12 to 18 months to

9  start selling the equipment?

10    A.   No, I don't guess so.

11    Q.   Okay.

12         MR. SOULE:  That's all I have.  Do you want to

13  -- do you have any questions?

14         MS. CATHCART:  No.

15         MR. SOULE:  Do you want to tell him about his

16  read and sign rights or what you guys' position is on

17  that?  Under Oklahoma law, I mean, I assume you would

18  know this.  You have the right to read what she's

19  transcribed.  You can't change your testimony, but if

20  she mistakenly understood you, you can -- you can make

21  changes to that.

22         Do you want to do that before you -- before

23  you get it approved?

24         MS. CATHCART:  It's up to you.

25         THE WITNESS:  I'm sorry?