IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| In re: | ) | Case No. 24-80617 |
| | ) | (Chapter 11) |
| C M HEAVY MACHINERY, LLC | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |

**OPPOSITION TO (I) UNITED STATES TRUSTEE'S
MOTION TO CONVERT CASE TO CHAPTER 7; AND (II) CREDITOR GREAT
PLAINS NATIONAL BANK'S MOTION TO DISMISS, OR ALTERNATIVELY,
TO CONVERT THE BANKRUPTCY CASE TO A CHAPTER 7 PROCEEDING**

Maurice B. VerStandig, Esq.
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
mac@mbvesq.com

*and*

Christianna A. Cathcart, Esq.
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
christianna@dakotabankruptcy.com

*Counsel for the Debtor*

*Table of Contents*

| | | |
|---|---|---|
| I. | Introduction | 1 |
| II. | Standard | 4 |
| III. | Argument: The UST Motion Should be Denied | 5 |
| | a. The United States Trustee's Guidelines are Not Law | 5 |
| | b. The Violation of Section 345 was Promptly Cured and the Debtor has Opened a DIP Account | 7 |
| | c. Evidence Will Show Personal Financial Transactions to Have Ceased and to be Reimbursable Under the Proposed Chapter 11 Plan | 9 |
| IV. | Argument: The Great Plains Motion Should be Denied | 11 |
| | a. The Debtor's Estate Has Been Profitable and Does Not Evidence a Substantial or Continuing Loss | 11 |
| | b. Mr. Meadors is Well Qualified to Reorganize the Business He Built | 13 |
| | c. The Debtor's Financial Records Have Improved and are Not an Impediment to Reorganization | 14 |
| V. | Conclusion | 15 |

*Table of Authorities*

**Cases**

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984)................................................................................................ 6

*In re FRGR Managing Member LLC*,
  419 B.R. 576 (Bankr.S.D.N.Y.2009)........................................................................ 4

*In re Gateway Access Solutions, Inc.*,
  374 B.R. 556 (Bankr. M.D. Pa. 2007) ...................................................................... 4

*In re McTiernan*,
  519 B.R. 860 (Bankr. D. Wyo. 2014) .................................................................... 8, 9

*In re Robinson*,
  628 B.R. 168 (Bankr. D. Kan. 2021) ...................................................................... 8, 9

*In re Sakon*,
  617 B.R. 7 (Bankr. D. Conn. 2020) ......................................................................... 12

*In re Whetten*,
  473 B.R. 380 (Bankr. D. Colo. 2012) ....................................................................... 4

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024).............................................................................................. 5, 7

*Macco Props., Inc. v. Deeba (In re Macco Props.)*,
  2011 Bankr. LEXIS 5755 (Bankr. W.D. Okla. Sep. 7, 2011).................................... 4

*Taub v. Taub (In re Taub)*,
  427 B.R. 208 (Bankr. E.D.N.Y. 2010).................................................................... 12

**Statutes**
5 U.S.C. § 551........................................................................................................... 7

11 U.S.C. § 308......................................................................................................... 6

11 U.S.C. § 345.................................................................................................... 6, 7

11 U.S.C. § 363....................................................................................................... 10

11 U.S.C. § 1112.............................................................................................. *passim*

11 U.S.C. § 1129..................................................................................................... 10

12 U.S.C. § 1811 ............................................................................................................... 6

12 U.S.C. § 1821 ............................................................................................................... 6

28 U.S.C. § 501 ................................................................................................................. 5

28 U.S.C. § 581 ................................................................................................................. 5

28 U.S.C. § 2071 ............................................................................................................... 6

28 U.S.C. § 1930 ............................................................................................................... 5

**Other Authorities**
Your Dictionary, http://www.yourdictionary.com/gross ................................................. 8

**Rules**
Federal Rule of Bankruptcy Procedure 2015 ................................................................... 6

Comes now C M Heavy Machinery, LLC ("CMHM" or the "Debtor"), by and through undersigned counsel, in opposition to the United States Trustee's Motion to Convert Case to Chapter 7 (the "UST Motion," as found at DE #79, with the proponent thereof being known as the "UST") and Creditor Great Plains National Bank's Motion to Dismiss, or Alternatively, to Convert the Bankruptcy Case to a Chapter 7 Proceeding (the "Great Plains Motion," as found at DE #82, with the proponent thereof being known as "Great Plains"), and states as follows:

## I. Introduction

Through times good and bad, Clint Meadors ("Mr. Meadors") operated CMHM—a heavy machinery company based in Okemah—without much issue. Some months were more profitable than others, some deals were paid more expediently than others, and some parcels of equipment proved more reliable than others. There were, no doubt, moments of difficulty along the way; a very large receivable found its way into receivership in Minnesota with a companion bankruptcy in North Dakota, a couple of bookkeeping employees helped themselves to company funds, and the market fluctuated in manners far more palpable than might be discerned from the tickertape scrolling at the foot of CNBC programming. But Mr. Meadors and CMHM persisted and survived.

Then a fire wiped out more than $12.5 million of oil mats CMHM was storing in North Carolina. And, despite premiums having been paid punctually and without issue, an insurance provider opted to not pay the resulting claim. CMHM was suddenly left with more than $4.5 million in bank debt whilst being without the assets acquired with the underlying loan and otherwise-destined for sale to satisfy the underlying loan. Great Plains, acting well within its legal rights, sought to replevin other collateral, so as to satisfy CMHM's debt. And this case was thusly commenced, in an effort to reorganize a proud small business and allow time for the insurance recovery process to play out.

1

The foregoing matters not because the Debtor has befallen a Dickensian fate uniquely meritorious of equitable sympathy and not because Great Plains has done anything other than act as one might expect of a financial institution. The foregoing matters, rather, because CMHM now confronts dual motions to cut short the entity's stay in Chapter 11, each pegged to notions of operational nonfeasance or misfeasance. Yet CMHM is not a debtor that found its way to this Honorable Court as years of mismanagement invited lagging sales or as operational ineptitude begat overspending. CMHM is, rather, a small business—replete with all the imperfections and foibles of a small business—that can readily show a near-absolute correlation between the ignition of a fire in North Carolina and the commencement of a bankruptcy proceeding in Oklahoma. And while that correlation most certainly does not excuse the Debtor from the rigors attendant to operating in Chapter 11, such does well reveal the potential and vitality of CMHM's business.

The UST Motion is premised upon four arguments: (i) the Debtor has failed to close a pre-petition bank account; (ii) the Debtor has persisted in using a debit card; (iii) the pre-petition bank account—briefly and fleetingly—bore a balance in excess of the Federal Deposit Insurance Corporation ("FDIC") limit, some four months ago; and (iv) Mr. Meadors has used estate monies for personal purposes. The former two contentions, while no doubt accurate, do not give rise to grounds for dismissal or conversion; the UST's Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "UST Guidelines"), though a thorough and oft-helpful treatise, has neither the force nor effect of controlling law. The third contention, while certainly emblematic of an operating error of the Debtor, does not give rise to cause for dismissal. And the fourth contention, while also well demanding of explanation and reconciliation on CMHM's part, is similarly shy of constituting cause for dismissal in the *sui generis* construct of this case.

The Great Plains Motion adopts a harsher tone, not merely questioning Mr. Meadors' competency but also counterfactually urging the Debtor's estate to be suffering an ongoing loss or diminution, whilst also taking issue with the condition of financial records tattered pre-petition by an unscrupulous bookkeeper. The assault upon Mr. Meadors is, at irreducible minimum, suspect. Great Plains elected to loan a large sum of money to CMHM; assuredly the bank investigated the business to which the loan was being made and the individual whose initials eponymously grace that business. Equally, the contention of an ongoing loss or diminution is simply misplaced; the Debtor has operated at a healthy net profit whilst in Chapter 11. Moreover, a core tension sits between the bank's contentions that (i) the Debtor's equipment is not garnering sufficient utilization; and (ii) the Debtor's equipment is depreciating through ongoing utilization. And the issues with CMHM's financial records are of a chiefly historic variety; as evidenced by the UST Motion itself, the Debtor's reporting during the pendency of this case has been so thoroughly accurate as to allow not merely the tracking of account balances but, too, challenges to line item-specific expenditures.

Few are the Chapter 11 debtors destined to win popularity contests, and CMHM suffers no delusions of donning a sash and tiara anytime soon. But Chapter 11 is well constructed to permit debtors an opportunity to reorganize—with the rigors attendant to plan confirmation well exceeding those requisite to survive a motion to convert or dismiss—and CMHM stands at the precipice of being able to do just that. A plan is on file and, upon information and belief, it is one that will find support amongst the ranks of creditors other than Great Plains. Neither the bank nor the UST establish cause sufficient to terminate this case before that plan may be properly considered, and it is thusly urged both motions be denied.

3

## II. Standard

The Bankruptcy Code provides that matters under Chapter 11 may be converted or dismissed, after notice and a hearing, for "cause." 11 U.S.C. § 1112(b)(1). The same statutory provision then goes on to non-exhaustively delineate what may constitute such cause, including, *inter alia*, "(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," 11 U.S.C. § 1112(b)(4), and "(B) gross mismanagement of the estate. . ." *id*.

"The list is illustrative, not exhaustive. Courts may find cause for other equitable reasons." *In re Whetten*, 473 B.R. 380, 382 (Bankr. D. Colo. 2012) (citing 11 U.S.C. § 1112(b)(4); *In re FRGR Managing Member LLC*, 419 B.R. 576, 582–83 (Bankr. S.D.N.Y. 2009)).

As noted by a sister court within this state, "[p]ursuant to § 1112(b), the initial burden lies with the movant to establish cause for dismissal." *Macco Props., Inc. v. Deeba (In re Macco Props.)*, 2011 Bankr. LEXIS 5755, at *52 (Bankr. W.D. Okla. Sep. 7, 2011) (citing *In re Gateway Access Solutions, Inc.*, 374 B.R. 556, 561 (Bankr. M.D. Pa. 2007)).

If a party in interest files such a motion, and is able to establish "cause" under Section 1112(b)(4), then (and only then) the burden shifts to the Debtor to demonstrate the satisfaction of four criteria:

> The court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that-- (A) there is a reasonable likelihood that a plan will be confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and (B) the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)-- (i) for which there exists a reasonable justification for the act or omission; and (ii) that will be cured within a reasonable period of time fixed by the court.

11 U.S.C. § 1112(b)(2).

4

Thus, upon the establishment of "cause," the Debtor must then establish (i) unusual circumstances giving rise to the underlying cause; (ii) a reasonable likelihood of timely plan confirmation; (iii) reasonable justification for the cause giving rise to the underlying motion; and (iv) imminent cure of the subject deficiency.

### III. Argument: The UST Motion Should be Denied

#### a. The United States Trustee's Guidelines are Not Law

The UST plays an oft-essential role in the American bankruptcy system, not merely performing the various tasks statutorily charged to the office but, too, very often being a critical voice of reason and impartial participant. The Chapter 11 system, as presently constituted, would not work but for the UST (and analogous bankruptcy administrators in certain districts). And the UST Guidelines are appropriately regarded as an enormously beneficial compendium of knowledge. But those guidelines do not equate to binding law and a violation thereof is not cause upon which a bankruptcy case may be dismissed or converted.

The UST is subsumed within the United States Department of Justice, 28 U.S.C. § 581, and thusly a part of the Executive Branch, 28 U.S.C. § 501. As the Supreme Court has recently held of interpretive guidelines issued by Executive Branch agencies and departments:

> . . . delegating ultimate interpretive authority to agencies is simply not necessary to ensure that the resolution of statutory ambiguities is well informed by subject matter expertise. The better presumption is therefore that Congress expects courts to do their ordinary job of interpreting statutes, with due respect for the views of the Executive Branch. And to the extent that Congress and the Executive Branch may disagree with how the courts have performed that job in a particular case, they are of course always free to act by revising the statute.

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402-03 (2024).

To be sure, much of what may be found in the UST Guidelines is, too, manifest in governing law. The publication provides that debtors must pay quarterly fees and such an obligation is well enshrined in Section 1930 of Title 28 of the United States Code. So, too, does

5

the publication speak to the filing of monthly operating reports in small business cases, with a correlative codified obligation being present in Section 308 of Title 11 of the United States Code and expounded upon in Federal Rule of Bankruptcy Procedure 2015(a)(6).

Yet portions of the UST Guidelines do not have an apparent foundation in Title 11 of the United States Code (the "Bankruptcy Code"), any other congressional enactment, or the rules promulgated by the Supreme Court as authorized by Congress, 28 U.S.C. § 2071. And two such provisions are relevant here, with the UST seeking dismissal or conversion of this case because the Debtor (i) has failed to close a pre-petition bank account, Motion, DE #79, at ¶¶ 6-7; and (ii) has utilized a debit card while in Chapter 11, *id*. at ¶¶ 11-13.

There does not appear to be any statutory basis for compelling a debtor to close a pre-petition bank account. To the contrary, and as not-coincidentally relevant to a separate section of the UST Motion, the Bankruptcy Code actually expressly permits a debtor to maintain a depository account ". . . that is insured or guaranteed by the United States or by a department, agency, or instrumentality of the United States. . ." 11 U.S.C. § 345(b). The FDIC, in turn, is created pursuant to a separate act of Congress, 12 U.S.C. § 1811(a), and provides insurance for ordinary bank depository accounts up to $250,000.00, 12 U.S.C. § 1821(a)(1)(E).

There is, similarly, no statutory—or rules-centric—basis for mandating debtors cease utilizing debit cards while in Chapter 11. No doubt, the use of debit cards can occasion certain risks (not the least of which being that pre-petition debts may be inadvertently paid prematurely if a debit card number is automatically run by a creditor). But neither the Bankruptcy Code, nor the Federal Rules of Bankruptcy Procedure, speak to a prohibition on the use of debit cards.

To be sure, it is not clear the UST Guidelines have ever been regarded as necessitating deference under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). The

6

UST Guidelines do not feign compliance with the Administrative Procedures Act, 5 U.S.C. § 551, *et seq.*, and have rarely—if ever—been utilized in a manner directly comparable to the variety of agency regulations that normally invoked so-called *Chevron* deference. Yet such is also immaterial, with *Loper Bright Enterprises* having now not merely overturned *Chevron* but, too, made clear that courts are to eschew Executive Branch enactments purporting to interpret codified law since such interpretive efforts are the sole province of the Judicial Branch.

    **b. The Violation of Section 345 was Promptly Cured and the Debtor has Opened a DIP Account**

The UST urges conversion or dismissal is appropriate because the Debtor, for a fleeting period of three days, some four months ago, allowed its bank account to carry a balance in excess of the aforementioned FDIC insurance threshold. This contention is accurate and the Debtor certainly acknowledges that the subject account was as much as $7,796.78 over the insurance threshold on October 8, 2024, remaining above the threshold (in marginally lower sums) for the ensuing two days. The Debtor, equally, acknowledges these balances to have contravened the above-cited provisions of Section 345 of the Bankruptcy Code. The question, accordingly, is two-fold: (i) whether a fleeting violation of Section 345 amounts to "gross mismanagement of the estate" under Section 1112; and (ii) if so, whether or not unusual circumstances gave rise to the violation.

The UST contends the three day violation of Section 345—during which a total of less than $8,000.00 in monies was without government insurance—constitutes "gross mismanagement" of the estate. UST Motion, DE #79, at ¶ 23. Importantly, the UST Motion does not urge a violation of Section 345 to furnish independent "cause" under Section 1112 (with it being acknowledged the delineation of "cause" therein is non-exhaustive); the motion, rather, pegs the violation to gross

7

mismanagement of the estate, which is an enumerated ground for conversion or dismissal. 11 U.S.C. § 1112(b)(4)(B).

As noted by the United States Bankruptcy Court for the District of Wyoming, "[g]ross mismanagement is not defined in the Bankruptcy Code. Mismanagement is defined as 'ineptly, incompetently or dishonestly' managing. Gross is defined as 'glaring, flagrant, very bad.'" *In re McTiernan*, 519 B.R. 860, 867 (Bankr. D. Wyo. 2014) (quoting Your Dictionary, http://www.yourdictionary.com/gross).

Another court within the Tenth Circuit has confronted allegations of gross mismanagement where a debtor gambled with estate funds, post-petition, while in Oklahoma. *In re Robinson*, 628 B.R. 168, 172 (Bankr. D. Kan. 2021). Though there was some dispute as to the precise sum, it was clear the debtor lost at least $4,000.00 while gambling post-petition. *Id.* at 174. He thereafter ceased the offending conduct. *Id.*

The *Robinson* Court found gambling—and losing—estate monies did *not* constitute "gross mismanagement." In so holding, the court focused on the debtor's honesty and disclosure, together with the *de minimis* risk of repetition in light of the debtor's pledge to not again gamble:

> No evidence was presented that Robinson lied about his post-petition gambling. He disclosed it in his December operating report and promptly responded to the UST's inquiry about the Ramona casino transactions on the bank statement attached to the operating report. Robinson has not engaged in post-petition gambling since December of 2020. He has pledged not to gamble while in bankruptcy and he has offered to increase the unsecured creditor class distribution by the $4,000 lost gambling in December.
>
> Importantly, there was no showing that the alleged cause for dismissal was in fact material. There was no showing of adverse impact to the estate or its creditors.

*In re Robinson*, 628 B.R. at 177-78.

Here, it necessarily bears mention that (i) CMHM has since opened a DIP account, which is now being utilized; and (ii) Mabrey Bank did not fail during the three days in October 2024

8

Case 24-80617   Doc 104   Filed 02/13/25   Entered 02/13/25 19:46:39   Desc Main
Document      Page 12 of 19

when the Debtor's account balance exceeded $250,000.00. So absolutely no economic loss has been occasioned by CMHM's estate on account of funds not being fully insured for three days, and there is no risk of a forward-looking loss correlative to funds again being without complete insurance.

The transgression spoken to by the *Robinson* Court certainly seems more pronounced than that at issue *sub judice*. While depositing funds over the FDIC insurance limit, with a single bank, may well be analogous to a form of gambling, it is also no doubt a wager far more conservative than any available upon a roulette wheel or a blackjack table. In *Robinson*, monies were actually lost; here, not so much as a penny was depleted. And, just like the *Robinson* debtor, CMHM made the transgression open for public inspection by appending a bank statement to the ensuing monthly operating report.

In short, CMHM was most certainly not "dishonest," and while no doubt a judgment call, it would equally seem that allowing a bank balance to briefly glide above $250,000.00 does not amount to being "inept" or "incompetent." *McTiernan*, 519 B.R. at 867. Yet even if so, such assuredly does not rise to the level of gross ineptitude or gross incompetence, being neither "glaring," nor "flagrant," nor "very bad." *Id.* And it is thusly urged that such does not amount to "cause" upon which to dismiss or convert this case.

    **c. Evidence Will Show Personal Financial Transactions to Have Ceased and to be Reimbursable Under the Proposed Chapter 11 Plan**

During the course of this case, the Debtor has paid $10,491.75 in personal expenses for Mr. Meadors. The UST is able to recite this figure, *see* UST Motion, DE #79, at ¶ 17 n. 1, because the Debtor itself has disclosed the issue, *see* Plan of Reorganization, DE #58, at § 4.4, p. 10. The Debtor has also proposed to have Mr. Meadors repay the funds and gone so far as to note that a

9

Case 24-80617   Doc 104   Filed 02/13/25   Entered 02/13/25 19:46:39   Desc Main
Document      Page 13 of 19

failure of such repayment shall constitute a default under the plan, even though the obligation is technically that of Mr. Meadors and not the Debtor. *Id.*

The UST suggests the payment of these personal expenses, notwithstanding the promise to repay the same, also constitutes gross mismanagement of the estate and, as such, is cause for conversion or dismissal under Section 1112. CMHM respectfully urges otherwise, acknowledging the expenses to have been improper but equally urging the expenses to be comparable to the monies expended gambling in the *Robinson* case. While no doubt a significant sum of money, $10,491.75 is also a sum of less material relative to this case than it might be to many others.

Alternatively, however, CMHM equally believes that even if these expenditures did constitute gross mismanagement, testimony adduced at a hearing on the UST Motion will reveal such to have been attributable to the non-malicious imperfections of a small business operator, to have abated well prior to the UST Motion being filed, and to be in the prism of a case where a plan is likely to be confirmed within the statutory timeframes. 11 U.S.C. § 1112(b)(2). Equally, evidence will show that neither conversion nor dismissal is in the best interests of creditors.

The latter point merits brief attention: though Great Plains plays a properly outsized role in this case, as the largest creditor, Great Plains is also a secured creditor that is bound to be repaid—in full—without regard to the disposition of either pending motion. If a plan is confirmed, Great Plains will be repaid thereunder, 11 U.S.C. § 1129(b)(2)(A); if the case is converted, a trustee will not be able to sell assets subject to Great Plains' lien without paying the correlative claim, 11 U.S.C. § 363(f); and if the case is dismissed, Great Plains will be free to resume state court replevin litigation. Yet there exist, too, a significant number of unsecured creditors in this case. These are parties that are unlikely to recover their full claims in Chapter 7 and that will confront scant—if any—remaining assets of the Debtor to pursue should a dismissal ensue and should Great Plains

replevin equipment. These parties do stand, however, to benefit greatly from confirmation of a 100% plan in Chapter 11.

So while the Debtor respectfully submits that the use of estate monies on personal obligations is not gross mismanagement (especially where the funds will be repatriated), the Debtor also urges such ought not give rise to conversion or dismissal even if found to be gross mismanagement. Section 1112 of the Bankruptcy Code expressly recognizes there will be circumstances where cause for conversion or dismissal may arise in a case yet where prudence will dictate such a fate ought not befall a debtor and its respective creditors. To the extent there is cause *sub judice*, this is precisely one such case.

### IV. Argument: The Great Plains Motion Should be Denied

The Great Plains Motion is, paradoxically, both lengthier and pithier than that of the UST. As noted above, the bank essentially urges that (i) there is a continuing loss or diminution; (ii) Mr. Meadors is not fit to operate the Debtor; and (iii) an absence of certain financial documentation renders confirmation infeasible. Yet the first contention is belied by the very operating reports that inform so much of the UST Motion. The second argument is little more than a broadside against Mr. Meadors, premised upon sporadic hyperbole. And the third point is a red herring in the prism of this case.

#### a. The Debtor's Estate Has Been Profitable and Does Not Evidence a Substantial or Continuing Loss

Great Plains first urges this case ought to be dismissed because of a "substantial or continuing loss" to the estate. Great Plains Motion, DE #82, at § I(A), pp. 11-13. This contention, however, is thinly—if at all—supported. The bank appears to peg the argument on the notion that property is depreciating and that accounts receivable become more difficult to collect with time. Yet there is no foundation for the depreciation contention, which seems to run directly contra to

11

Great Plain's larger gripe about equipment *not* being put into use. And the quality of accounts receivable is a fact-specific inquiry only addressed by the bank in the broadest of terms.

As a starting point, the law on a "substantial or continuing loss" is, as titularly suggested, such that an ongoing loss must be material in nature. Great Plains relies upon *Taub v. Taub (In re Taub)*, 427 B.R. 208 (Bankr. E.D.N.Y. 2010) in its motion, but that is a case where administrative solvency was in question after an estate incurred more than $320,000.00 in professional fees, operated at a burn rate of $11,000.00 per month, and "reported negative cash flow since this case began." *Id.* at 232. The bank also cites to *In re Sakon*, 617 B.R. 7 (Bankr. D. Conn. 2020), but that is similarly a case where the debtor incurred a constant post-petition loss of monies. *Id.* at 13.

Here, CMHM has been in Chapter 11 since August 8, 2024. As memorialized in monthly operating reports, the Debtor's post-petition net income (or loss) each month has been as follows:

| Month | Docket Entry | Profit (Loss) |
|---|---|---|
| Aug-24 | 46 | -$23,602.00 |
| Sep-24 | 49 | $67,567.00 |
| Oct-24 | 52 | $9,170.00 |
| Nov-24 | 63 | $76,251.00 |
| Dec-24 | 77 | $12,086.00 |
| | | |
| Total | | $141,472.00 |
| Average | | $28,294.40 |

The Debtor has a net post-petition profit of $141,472.00, with average monthly net revenues of $28,294.40. Extrapolated over a twelve month period, this would amount to annualized net profits of $339,532.80 or a return on investment of 7.5% against the Debtor's $4,543,000 in tangible assets. There may well be an argument this number could be even more robust if CMHM were able to expand staffing, just as there may well be a very real discussion to be engaged about the best utilization of equipment that has been partially sitting idle, or even a discussion as to what

12

steps may be taken to more efficiently and expediently collect accounts receivable. But those are assuredly not topics engaged in the prism of a Section 1112 motion; they are, if anything, fodder for a confirmation hearing. And it is genuinely somewhat bewildering to see Great Plains allege that an estate with a net post-petition profit of $141,472.00 is experiencing an ongoing loss or diminution.

### b. Mr. Meadors is Well Qualified to Reorganize the Business He Built

Great Plains' next contention, reduced to a scant single paragraph, is that Mr. Meadors ought not be relied upon to operate the Debtor. Great Plains Motion, DE #82, at § I(B), pp. 13-14. In support of this contention, the bank urges, *inter alia*, that Mr. Meadors ". . . has made little to no attempt to generate revenue," *id.*, while also noting the absence of post-petition collection efforts vis a vis pre-petition accounts receivable.

The foregoing analysis of the Debtor's post-petition profitability undermines the contention about an absence of revenue generation efforts. If anything, the notion that Mr. Meadors—as the Debtor's sole employee—is managing to produce healthy revenues is, in turn, a testament to Mr. Meadors' qualification to remain at the helm of the business that bears his name.

Similarly, while the bank protests that Mr. Meadors is naïve to certain financial matters, evidence adduced at a hearing on the Great Plains Motion will show (i) such a generalization to be overly broad while rather often inaccurate; and (ii) a bookkeeper to be performing work, on a regular basis, for the Debtor, so as to keep post-petition records in good form. Mr. Meadors has never feigned to hold a degree in accounting or to bear extensive familiarity with the sort of tax-centric issues so many small businesses outsource to third parties. But nor does Mr. Meadors need such qualifications to ably and astutely operate the business he built.

The last observation is of some articulable relevance, as well: Mr. Meadors built this business himself. While the bank suggests creditors ought not rely upon Mr. Meadors to continue operating CMHM or to oversee a partial liquidation of the entity's equipment, the same bank also saw fit to lend Mr. Meadors' business monies in the first instance. It is difficult to fathom anyone could be more familiar with the entity's operational workings than Mr. Meadors, or more familiar with the equipment than Mr. Meadors.

### c. The Debtor's Financial Records Have Improved and are Not an Impediment to Reorganization

Finally, Great Plains argues that issues with historic financial records are grounds for dismissal or conversion. As is evident from the Great Plains Motion, the bank has had an opportunity to examine Mr. Meadors and CMHM's bookkeeper, as well as occasion to review monthly operating reports and the bank statements appended thereto. The Debtor remains willing to provide any documents reasonably requested—whether to Great Plains, the UST, or any other party in interest—and remains willing to also offer explanations to accompany any perceptive eccentricities.

The evidence at a hearing will show that CMHM was victimized by a corrupt bookkeeper, pre-petition, and is thusly in a position of needing to catch up on tax filings. Yet such has no material bearing on the Debtor's day-to-day finances. Nor does such negatively impact the ability of the Debtor to pay the claim of Great Plains, in full, under a plan of reorganization.

There is a large Internal Revenue Service claim that will need to be addressed in this case, which is discussed in the pending plan. *See* Plan of Reorganization, DE #58, at § 2.3. Yet such is precisely the sort of thing that can—and should—be accomplished through the Chapter 11 process. The Debtor has identified an issue, identified a need for professional help, and appropriately treated

14

the situation in a plan. This is not cause for conversion; this is cause to continue through reorganization.

V. Conclusion

WHEREFORE, the Debtor respectfully prays this Honorable Court (i) deny the UST Motion; (ii) deny the Great Plains Motion; and (iii) afford such other and further relief as may be just and proper.

Respectfully Submitted,

Dated: February 13, 2025   By:   /s/ Maurice B. VerStandig
Maurice B. VerStandig, Esq.
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
mac@mbvesq.com

Christianna A. Cathcart, Esq.
The VerStandig Law Firm, LLC
9812 Falls Road, #114-160
Potomac, Maryland 20854
Phone: (301) 444-4600
christianna@dakotabankruptcy.com

*Counsel for the Debtor*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 13th day of February, 2025, a copy of the foregoing was served electronically upon filing via the ECF system.

/s/ Maurice B. VerStandig
Maurice B. VerStandig