**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

IN RE:

**C M HEAVY MACHINERY, LLC,**

        Debtor.

**Case No. 24-80617
Chapter 11**

**GREAT PLAINS NATIONAL BANK'S CLOSING BRIEF
IN SUPPORT OF MOTION TO DISMISS, OR ALTERNATIVELY,
<u>TO CONVERT THE BANKRUPTCY CASE TO CHAPTER 7 PROCEEDING</u>**

**HALL, ESTILL HARDWICK, GABLE,
GOLDEN & NELSON, P.C.**

Steven W. Soulé, OBA No. 13781
Christopher J. Gnaedig, OBA No. 33892
Connor M. Andreen, OBA No. 35047
521 East 2nd St., Suite 1200
Tulsa, OK 74120
Telephone: (918) 594-0400
Facsimile: (918) 594-0505
Email: ssoule@hallestill.com
Email: cgnaedig@hallestill.com
Email: candreen@hallestill.com

-and-

Daniel V. Carsey, OBA No. 21490
100 North Broadway, Suite 2900
Oklahoma City, OK 73102
Telephone: (405) 553-2828
Facsimile: (405) 553-2855
Email: dcarsey@hallestill.com

**ATTORNEYS FOR GREAT PLAINS
NATIONAL BANK**

# TABLE OF CONTENTS

**PAGE**

ARGUMENTS AND AUTHORITIES ........................................................................................ 1

  I. The Debtor has grossly mismanaged the Bankruptcy Estate ................................................. 2

    A. Meadors has inaccurately reported the Debtor's financial condition throughout this case and has failed to correct these inaccuracies ........................................................... 2

    B. Neither Meadors nor Holly Goodson are effective at managing the Debtor ................. 6

    C. Meadors used the Debtor's funds post-petition and failed to repay these amounts despite taking a $5,000.00 monthly salary from the Debtor .......................................... 8

  II. The Debtor is suffering a diminution in value and has no reasonable likelihood for rehabilitation ....................................................................................................................... 10

    A. The Debtor's business is floundering while the value of its assets decreases ............. 10

    B. The Debtor's argument that Meadors can rehabilitate "the business he built" rests on untenable evidentiary grounds ..................................................................................... 11

  III. The Court should find cause for conversion on equitable grounds ................................... 13

    A. An independent chapter 7 trustee should oversee the Debtor's insurance claim because Meadors has breached his fiduciary duty to creditors ................................................. 14

    B. The Debtor's potential interest in an array of heavy equipment not identified on the bankruptcy schedules needs to be investigated by a disinterested party ...................... 15

CONCLUSION ..................................................................................................................... 17

i

# TABLE OF AUTHORITIES

**PAGE**

**Cases**

*Commodity Futures Trading Com v. Weintraub*, 471 U.S. 343 (1985)..........................................14

*In re 15375 Mem'l Corp.*, 386 B.R. 548 (Bankr. D. Del. 2008)..................................................10

*In re 15375 Mem'l Corp.*, 400 B.R. 420 (D. Del. 2009).............................................................10

*In re Ameribuild Constr. Mgmt.*, 399 B.R. 129 (Bankr. S.D.N.Y. 2009) .................................1, 13

*In re Broad Creek Edgewater, LP*, 371 B.R. 752 (Bankr. D.S.C. 2007).........................................6

*In re BTS, Inc.*, 247 B.R. 301 (Bankr. N.D. Okla. 2000)..............................................................15

*In re Combined Metals Reduction Co.*, 557 F.2d 179 (9th Cir. 1977)....................................14, 15

*In re Gateway Access Sols., Inc.*, 374 B.R. 556 (Bankr. M.D. Pa. 2007)............................ *passim*

*In re Kanterman*, 88 B.R. 26 (S.D.N.Y. 1988) ............................................................................10

*In re M.A.R. Designs & Construction, Inc.,* 653 B.R. 843 (Bankr. S.D. Tex. 2023)...............3, 5, 6

*In re Paterno*, 511 B.R. 62 (Bankr. M.D.N.C. 2014) .....................................................................2

*In re Sakon*, 617 B.R. 7 (Bankr. D. Conn. 2020).........................................................................10

*In re Taub*, 427 B.R. 208 (Bankr. E.D.N.Y. 2010)........................................................................10

*In re TCR of Denver, LLC*, 338 B.R. 494 (Bankr. D. Colo. 2006) .....................................1, 13, 14

*In re Woodbrook Assocs.*, 19 F.3d 312 (7th Cir. 1994) .................................................................2

*Quarles v. United States Trustee*, 194 B.R. 94 (W.D. Va. 1996) ................................................10

*Wolf v. Weinstein*, 372 U.S. 633 (1963)......................................................................................14

**Statutes and Rules**

11 U.S.C. § 1104(a) ........................................................................................................................1

Case 24-80617   Doc 166   Filed 04/28/25   Entered 04/28/25 16:46:57   Desc Main
Document   Page 3 of 22

**PAGE**

11 U.S.C. § 1112.................................................................................................................. *passim*

7 Colliers on Bankruptcy ¶ 1112.04 .......................................................................1, 10

iii

Great Plains National Bank ("GPNB") submits this Closing Brief in Support of its Motion to Dismiss, or Alternatively, to Convert the Bankruptcy Case to Chapter 7 Proceeding (the "Motion") filed on January 30, 2025 [Doc. No. 82] pursuant to the Court's directive at the Evidentiary Hearing held April 9, 2025 and the Minute Entry [Doc. No. 159] dated April 10, 2025. Debtor C M Heavy Machinery, LLC ("Debtor") filed its Opposition to the Motion on February 13, 2025, and testimony has been heard from Clint Meadors, Holly Goodson, Larry Perdue, Justin Perdue and Blake Johnson. Based on the briefing and the evidence before the Court, GPNB respectfully asks the Court to enter an order converting the above-captioned bankruptcy case ("Bankruptcy Case") to a case under chapter 7 of the Bankruptcy Code.

## ARGUMENTS AND AUTHORITIES

Under section 1112(b) of the Bankruptcy Code, the Court "shall convert a case under this chapter to a case under chapter 7 . . . for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate."[1] Grounds for "cause" include, among other things, a debtor's "gross mismanagement of the estate" and a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."[2] However, the Court may find "cause" on other facts if they demonstrate that conversion is equitable.[3] And "cause" need only be established by a

---

[1] 11 U.S.C. § 1112(b)(1) ("Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate.").

[2] *Id.* § 1112(b)(4)(A).

[3] *See In re Ameribuild Constr. Mgmt.*, 399 B.R. 129, 131 n.3 (Bankr. S.D.N.Y. 2009) ("The list contained in § 1112(b) "is not exhaustive. The Court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." (quotation omitted)); *In re TCR of Denver, LLC*, 338 B.R. 494, 500 (Bankr. D. Colo. 2006) ("[T]he Court may dismiss a Chapter 11 case for reasons other than those specified in section 1112(b) as long as those reasons satisfy 'cause.'").

Case 24-80617   Doc 166   Filed 04/28/25   Entered 04/28/25 16:46:57   Desc Main
Document   Page 5 of 22

preponderance of the evidence.[4]

Here, there is cause to convert the Bankruptcy Case to a chapter 7 case for at least three reasons. First, the evidence established that Clint Meadors ("Meadors"), the owner and sole employee of Debtor, is grossly mismanaging the bankruptcy estate. Second, the Debtor's bankruptcy estate is suffering a continued diminution in value—despite paying no administrative expenses or professional fees to date—and does not have a reasonable likelihood of rehabilitation. Third, the Court should find cause exists on equitable grounds because of Meadors' continued breach of his fiduciary duty to the bankruptcy estate and the Debtor's potential interest in forty-four (44) pieces of heavy equipment that were not disclosed in its bankruptcy schedules.

## I.     The Debtor has grossly mismanaged the Bankruptcy Estate.

### A.     Meadors has inaccurately reported the Debtor's financial condition throughout this case and has failed to correct these inaccuracies.

"A debtor-in-possession is vested with significant powers under the provision of the Bankruptcy Code."[5] Thus, debtors-in-possession must "keep the Court and its creditors informed about the status and condition of its business."[6]

Hence, a debtor must file accurate financial reports. For instance, in *In re Gateway Access Sols., Inc*, the debtor filed monthly reports that did not accurately reflect the Debtor's obligations.[7] The debtor's manager "was not closely monitoring the monthly operating reports" and was unjustifiably deferring to the company's accountants involving the same.[8] This provided grounds to convert the case to chapter 7 because of the role "accurate reporting and financial transparency"

---

[4] *In re Woodbrook Assocs.*, 19 F.3d 312, 317 (7th Cir. 1994) (citing 7 Colliers on Bankruptcy ¶ 1112.04); *In re Paterno*, 511 B.R. 62, 66 (Bankr. M.D.N.C. 2014).
[5] *In re Gateway Access Sols., Inc.*, 374 B.R. 556, 565 (Bankr. M.D. Pa. 2007).
[6] *Id.*
[7] *Id.*
[8] *Id.*

2

plays "in the management of a debtor-in-possession."[9] Similarly, in *In re M.A.R. Designs & Construction, Inc.*, the debtor's manager testified that "information on some of" the debtor's "reports were inaccurate due to his mistakes."[10] The court acknowledged that the debtor was required "to provide the [c]ourt and parties in interest with an accurate financial picture of the debtor-in-possession."[11] Accordingly, "numerous inaccuracies in Debtor's MORs can demonstrate gross mismanagement when paired [with] misconduct that leaves the Court and all parties in interest with an inaccurate picture of [the d]ebtor's financial condition."[12]

The same situation exists in this case. The Debtor, through Meadors, has completely neglected its duty to provide the Court and parties-in-interest with an accurate financial picture of its operations. Specifically:

*The Debtor's Schedule A/B:*

- Meadors now contends he personally owns several pieces of valuable equipment that are listed as the Debtor's in its Schedule A/B. Transcript at 18:1-21. Meadors contends that *he personally owns* a 2021 McCormick X6 470 that the Debtor values at $105,000.00 in Schedule A/B, an Attachment-Loader valued at $15,000.00 in Schedule A/B, and a 2021 Maschino roller/tiller attachment valued at $18,000.00 in Schedule A/B. *Id.* at 19:16-20:22, 30:22-31:20; Ex. 23.001-2.

- The Debtor's Schedule A/B requires the Debtor to provide the "[c]urrent value of debtor's interest" in its assets. Ex. 1.015-19 at Item 22 and Item 47. But the Debtor valued its property as of the date it took the loan from the bank, which was 2019. Transcript at 21:3-25, 43:16-44:12, 46:19-47:13. Meadors testified he did not do any independent investigation regarding the value of the Debtor's assets before filing for bankruptcy. *Id.* at 44:9-12.

- In Schedule A/B, the Debtor falsely certified that assets had not been appraised by a professional within the past year. Ex. 1.019 at Item 53. At the hearing, Meadors testified that the Debtor's property was appraised by Ritchie Bros. and that the date that establishes "when the appraisal was" is "[w]henever the Debtor put some equipment in a Ritchie Brothers' auction." Transcript at 44:13-45:20. This auction took place in June 2024, which was less than three (3) months preceding the

---

[9] *Id.*
[10] 653 B.R. 843, 858-59 (Bankr. S.D. Tex. 2023).
[11] *Id.*
[12] *Id.*

bankruptcy filing. *Id.* at 207:8-208:13.

- The Debtor's Schedule A/B includes a 2005 Dodge 2500 truck that Meadors asserts was his personal truck and, evidently, was sold pre-petition. *Id.* at 36:24-37:6.

*The Debtor's Initial Report and Monthly Operating Reports:*

- In its September Monthly Operating Report, the Debtor reports that it had a profit of $67,566.88. Ex. 4.002 at Part 4, Item k. This is incorrect. The Debtor's profit and loss statement shows that it had a gross profit of $10,374.00 in September 2024, with $108,078.33 of expenses, resulting in a net operating *loss* of $97,704.33 for September 2024. Ex. 4 at 4.013 at Net Operating Income. Meadors also testified that the operating income for September 2024 was -$97,000.00. Transcript at 73:4-16.

- The Debtor's Initial Report identifies many of Meadors' personal assets and liabilities. Ex. 2.010; Transcript at 56:18-58:15, 60:10-61:3. The Debtor's operating reports continue to intermingle the Debtor's assets and liabilities with Meadors' personal assets and liabilities. Ex. 5.015; Ex. 7.013-14; Ex. 8.013-14; Ex. 9.013; Ex. 21.013. Meadors admits in his testimony that certain errors like these "need[] to be changed." Transcript at 81:16-25. The Debtor has not corrected any of these errors.

- The Debtor's financial records—throughout the pendency of this case—indicate the Debtor owns a $1,000,000 interest in digging mats located in North Carolina. *E.g.*, Ex. 9.013. However, the Debtor has not had any such interest since the beginning of this case, and this has not been corrected in the Debtor's submissions—which are filed under penalty of perjury—even though such inaccuracy "has been noticed" by Meadors. Transcript at 80:12-81:15.

- The Debtor accounted for the exact same $35,000.00 of income for providing services in both the December and January monthly operating reports. *Compare* Ex. 8.017 (calculating $35,000.00 of Service Dept. Income into its income for December 2024), *with* Ex. 9.017 (calculating $35,000.00 of Service Dept. Income into its income for January 2025). *See also* Transcript at 148:5-150:3 (testifying that this income is counted as income twice in the Debtor's monthly operating reports).

These errors are not inconsequential. For instance, the Debtor's incorrect reporting of income—through double reporting $35,000.00 of income in December 2024 and January 2025 and by presenting a net operating income of $67,567 rather than a net *loss* of $97,704.33 in September 2024—is seriously misleading to the Court and the parties in interest in this case. The

4

Debtor's Supplement to the Disclosure Statement incorporates these financial errors and overstates the profit and loss from September 2024 and January 2025 by $165,567 and $35,000.00, respectively. *See* Ex. 12.003. The Debtor's monthly representations are materially incorrect and are misleading the Court and creditors in this case.[13] Further, the post-petition expenses do not include any professional fees, which Ms. Goodson acknowledged in her testimony have not been paid post-petition, and thus the Debtor is not operating at a "healthy net profit" as it contends. Transcript at 160:16-161:13; Doc. No. 104 at 6 (asserting the Debtor has "operated at a healthy net profit").

Simply put, the numerous, significant inaccuracies in the Debtor's filings demonstrate the Debtor's gross mismanagement of the bankruptcy estate. Just as in *In re Gateway Access Sols., Inc.*, Meadors is clearly "not closely monitoring the monthly operating reports" and is unjustifiably deferring to Ms. Goodson regarding the same.[14] Similarly, like the debtor's manager in *In re M.A.R. Designs & Construction, Inc.*, Meadors has testified that "information on some of" the debtor's "reports were inaccurate due to his mistakes."[15] Meadors must provide parties-in-interest with a true and accurate financial picture of the debtor-in-possession. But he has chosen not to do so. None of the Debtor's false submissions have been amended.

Meadors has admitted to wrongfully taking over $10,000.00 of the Debtor's funds during the pendency of this case and he has not repaid one cent of those funds to the bankruptcy estate. Meadors is driving around in his Corvette which has been paid for—at least partially—with the Debtor's funds. Additionally, the Debtor possesses substantial heavy equipment of which it

---

[13] Removing these errors, the correct average monthly profit of the Debtor equals $3,513.50. This "correct" calculation assumes the accuracy of the Profit and Loss Statements for September 2024 and January 2025, less the errors discussed above. But GPNB does not trust the accuracy of the financial statements—which is part and parcel of the Debtor's gross mismanagement. GPNB therefore submits this calculation without conceding the accuracy of the Debtor's Monthly Operating Reports.

[14] 473 B.R. at 565.

[15] 653 B.R. 843, 858-59 (Bankr. S.D. Tex. 2023).

recently denied ownership. *See generally* Ex. 22 (evidencing forty-four (44) pieces of valuable heavy equipment possessed by the Debtor for which it denies ownership). When you combine all of these facts, more than sufficient cause exists to convert this case and appoint a chapter 7 trustee to manage the bankruptcy estate. *In re M.A.R. Designs & Construction, Inc.*, 374 B.R. at 565 (inaccuracies, "when paired with misconduct," constitutes gross mismanagement of the estate). Once this case is converted, all parties-in-interest and the Court will be able to evaluate the Debtor's true financial condition for the first time.

**B.** **Neither Meadors nor Holly Goodson are effective at managing the Debtor.**

A debtor's "[f]ailure to maintain an effective corporate management team" constitutes gross mismanagement of the bankruptcy estate.[16] GPNB respectfully submits that the evidence in the record demonstrates that the Debtor has effectively ***no*** corporate management.

Since the Debtor commenced this case, it has acknowledged the importance of correcting its financial records. The Debtor asserts that alleged malfeasance and nonfeasance by a former employee "resulted in books and records not being reasonably current in nature" and rendered the Debtor's records unreliable. Ex. 1.005-6. The Debtor also acknowledged that it had "not filed tax returns" for 2022 and 2023 but assured it would be "prioritized post-petition" in an "expedient-but-deliberate manner." Ex. 1.006. The importance of this issue has been enhanced by the Internal Revenue Service's filed proof of claim estimating that the Debtor owes $4,517,997.54 in taxes for 2022 and 2023. Ex. 15.002, Item 7.

However, the Debtor's management is doing little to nothing to address these issues. Meadors—the sole employee of the Debtor—knows very little about the Debtor's finances. He

---

[16] *In re Gateway Access Sols., Inc.*, 374 B.R. at 564; *In re Broad Creek Edgewater, LP*, 371 B.R. 752, 759 (Bankr. D.S.C. 2007) ("[T]he Debtor has no 'corporate' management and this fact proves gross mismanagement of the estate and a breach of fiduciary obligation to the creditors.").

testified that he plays no role in the debtor's books, records, or financials at all. Transcript at 16:1-8. During his testimony, Meadors repeatedly deferred to Ms. Goodson and asserted that she is in charge of overseeing and correcting the Debtor's finances. *Id.* at 13:22-14:13, 32:4-8, 54:11-15, 55:21-56:8. But Ms. Goodson is a volunteer bookkeeper. *Id.* at 14:6-12. She is not obligated to continue working for the Debtor and is doing so solely at her goodwill. *Id.* at 161:5-13. Even so, Ms. Goodson testified that she has done nothing to correct pre-petition financial records other than "input the bank statements into his QuickBooks." *Id.* at 129:17-130:18. Thus, Ms. Goodson is not doing anything "relating to the [Debtor's] taxes" or "anything relating to prior financials." *Id.* at 130:8-18. She also does not understand the Debtor's current financial records. For instance, she testified that she does not know what the Debtor's "sales product income" or "rental department income" constitutes on the financial statements she created. *Id.* at 146:14-25, 147:19-25. She also testified that she has "*not even tried* to figure out" why Meadors' personal assets and liabilities are listed on the balance sheet of the Debtor submitted to the Court each month. *Id.* at 143:19-144:11 (emphasis added).

The Debtor continues to hide behind its unreliable pre-petition books and records as an excuse for all of its financial shortcomings post-petition. This is not acceptable in a chapter 11 proceeding. This case has been pending for eight (8) months and these excuses are not valid and should not be tolerated by the Court. The Debtor has not hired an accountant or financial professional to help correct the accounting and reporting problems that exist in this case both pre- and post-petition. The Debtor has not hired a tax professional to file several years of past due tax returns or analyze the proof of claim filed by the Internal Revenue Service in excess of $4.5 million.

Lastly, the Debtor has not taken basic steps to recover a valuable asset: its accounts

7

receivable in excess of $1 million. Ms. Goodson testified that the Debtor has taken no action (other than submit and subsequently withdraw an application to employ a collection agency) to collect accounts receivable, which are allegedly worth more than $1 million. *Id.* at 138:24-139:23. Ms. Goodson testified that the Debtor ***has not even sent invoices or reminder statements*** for these accounts receivable. *Id.* at 129:20-23.

In sum, the Debtor must have an effective corporate management team to fulfill its fiduciary obligation to creditors. Neither Meadors nor Ms. Goodson are doing anything to correct past or current financial records or to file taxes, and the Debtor has not sought to employ a tax professional or an accountant to correct these financial records. *Id.* at 16:17-17:20 (stipulating that "there is no employment application on file" and acknowledging the Debtor "is well-aware of the need to emplo[y] professionals"). Apparently, nobody is undertaking the tasks essential to evaluating the Internal Revenue Service's claim of $4,517,997.54 in this case. *See* Ex. 15.002.

Based on the foregoing, GPNB respectfully submits that the Debtor lacks an effective corporate management team and that the Court has cause to convert the case to a chapter 7 proceeding.

### C.    Meadors used the Debtor's funds post-petition and failed to repay these amounts despite taking a $5,000.00 monthly salary from the Debtor.

At the commencement of this case, Meadors certified that he read and understood the United States Trustee Chapter 11 operating guidelines and agreed to conduct himself accordingly. Transcript at 52:4-53:5. Meadors then proceeded to use at least $10,491.75 of the Debtor's funds for his own personal purposes. Ex. 11.024 at Section 4.4. Meadors claims he spent this money because he did not "understand it or" or "didn't understand [what] was personal" when the case commenced. Transcript at 53:23-54:10.

Meadors' justification is inconsistent with his acknowledgment that he read and understood

8

the guidelines for operating a debtor in possession. *See id.* at 52:4-53:5. It is also inconsistent with the facts of his personal expenditures, specifically:

- Meadors made monthly payments for his Corvette of $2,136.02 through November, 2024, which is four months into this case. Ex. 4.016 at Loan 482237; Ex. 5.019 at Loan 482237; Ex. 7.017 at Loan 482237; Transcript at 74:10-19, 76:4-24; 82:1-15.

- Meadors spent $661.00 at Harbors View Marina on October 24, 2024, *Id.* at 77:17-78:4.

- Meadors spent $737.81 at a Western Outfitters store on November 20, 2024. Ex. 7.023. Meadors testified that this $737.81 expense accounted for the purchase of "a pair of jeans and a shirt." Transcript at 82:16-25.

These personal expenses are likely the tip of the iceberg. The Debtor's financial records are littered with food expenditures,[17] Amazon orders,[18] and other confounding purchases.[19] Meadors has declined to pay back any of his personal expenditures—despite taking $5,000.00 monthly as a salary from the Debtor. He testified that he "was planning on paying it back" but blamed his failure to do so on garnishments of his personal accounts. Transcript at 53:6-16. However, a garnishment of Meadors' accounts is not to blame; GPNB only received approximately $900.00 from the garnishment. *Id.* at 219:16-220:4.

At bottom, Meadors has used the Debtor's accounts as his personal piggy bank while also drawing a salary from the Debtor. Meadors cannot be trusted with the funds of the Debtor based on his history. The Court should stop this conduct by converting the case to a chapter 7 liquidation under the Bankruptcy Code.

---

[17] *See, e.g.'s*, Ex. 9.023 (debit card payment of $29.69 and $123.18 at Loves in Okemah, Oklahoma); Ex. 7.022 ($84.81 at Pepino S. Mexican Restaurant on November 12, 2024); Ex. 7.020 ($27.34 charge at San Marcos Mexican Restaurant in Newcastle, Oklahoma); Ex. 6.004 (spending $48.98 at Dairy Queen in Billings, Oklahoma).

[18] *See, e.g.'s*, Ex. 7.024 at November 22, 2024; Ex. 8.020 at December 24, 2025; Ex. 9.025 at January 23, 2025.

[19] *See, e.g.'s*, Transcript at 76:25-77:5 (debtor purchased a new phone from the Apple store for himself for $1,989.14); Ex. 9.024 ($93.49 debit card expense at Wal-Mart in Oklahoma City on January 21, 2025); Ex. 8.025 (two payments for Starlink internet—presumably one for personal home—in December 2024); Ex. 4.016 ($334.77 at SHM Harbors View on September 9, 2024).

## II. The Debtor is suffering a diminution in value and has no reasonable likelihood for rehabilitation.

### A. The Debtor's business is floundering while the value of its assets decreases.

Under § 1112(b)(4)(A), sufficient cause exists for dismissal or conversion of a chapter 11 case if there is a "substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation."[20] To prevail, the Debtor must either have a negative cash flow or the value of the Debtor's assets should be declining.[21] GPNB need only demonstrate that "the estate is suffering *some diminution* in value."[22] Further, a Debtor's ability to rehabilitate cannot rely on the outcome of speculative litigation.[23]

To the first issue, the record demonstrates that the estate is suffering a diminution in value. The Debtor has admitted that the value of the Debtor's equipment goes down "[t]he older it gets." Ex. 18.072:23-18.073:8. The Debtor has also admitted that the value of outstanding receivables decreases over time because it becomes more difficult to collect on the same. Ex. 18.073:9-20. Yet, according to Ms. Goodson, the Debtor has taken no action to collect the accounts worth more than $1 million. Transcript at 138:24-139:23. The value of the accounts receivable is necessarily diminishing, as is the value of the Debtor's equipment. *See id.*

Further, the Debtor is unlikely to rehabilitate its business. The Debtor has engaged in minimal business operations. Meadors testified that he has only used the Debtor's equipment two (2) times to gain income in the eight (8) months the case has progressed. Transcript at 92:16-25.

---

[20] *Id.* § 1112(b)(4)(A).

[21] *In re Gateway Access Sols., Inc.*, 374 B.R. at 564.

[22] *In re Taub*, 427 B.R. 208, 231 (Bankr. E.D.N.Y. 2010) (quoting *In re Kanterman*, 88 B.R. 26, 29 (S.D.N.Y. 1988)) (emphasis added); *see also In re Sakon*, 617 B.R. 7, 15 (Bankr. D. Conn. 2020) ("The losses to the estate need not be large—'[a]ll that need be found is that the estate is suffering some diminution in value.'").

[23] 7 Collier on Bankruptcy ¶ 1112.04 (16th 2024) (collecting cases). *See also Quarles v. United States Trustee*, 194 B.R. 94, 97 (W.D. Va. 1996) (no likelihood of rehabilitation when only hope of reorganizing was based on the speculative outcome of pending litigation; *In re 15375 Mem'l Corp.*, 386 B.R. 548, 552 (Bankr. D. Del. 2008) (rehabilitation means making a business viable again—liquidation is not rehabilitation), *reversed on other grounds In re 15375 Mem'l Corp.*, 400 B.R. 420 (D. Del. 2009).

This is consistent with the fact that the Debtor has historically not used its equipment. *Id.* at 215:2-216:4. In fact, according to the tracking devices on certain of the Debtor's equipment, major pieces of the Debtor's equipment *had not even moved*, in many instances, for hundreds of days preceding March 1, 2025. *Id.* at 217:12-218:20; Ex. 17. This reflects the fact that, as Meadors testified, the Debtor's business "has been pretty difficult" since the bankruptcy case began. Transcript at 16:12-16. Lastly, the Debtor admitted in its disclosure statement that "it has not realized a statistically-meaningful gross profit during the past several months of operations" and says it is "not realistic" to expect profits comparable to those obtained by the Debtor from 2019-2021, which are the most recent periods in which the Debtor possesses reliable financial records. Ex. 11.005.

At bottom, the Debtor's business is not viable, and it will not become viable by continuing in chapter 11. The Debtor wants to delay liquidating assets in the hope that an insurance claim payout, as a result of litigation, might satisfy all of the Debtor's debts. The Debtor has admitted as much. Ex. 18.072:19-18.073:1. The outcome of this speculative litigation claim does not provide a sufficient basis for the Debtor to rehabilitate. As set forth below in more detail, a chapter 7 trustee can pursue the litigation claim for the benefit of the creditors in this case without the fiduciary issues attributable to Meadors. This provides cause for converting the Bankruptcy Case into a chapter 7 case.

**B.  The Debtor's argument that Meadors can rehabilitate "the business he built" rests on untenable evidentiary grounds.**

The Debtor makes two arguments in response to GPNB's motion. First, the Debtor argues that it would have remained profitable if a fire in August 2023 did not destroy his digging mats. Transcript at 109:24-110:2. Further, the Debtor contends that it has been operating at healthy profits. Doc. No. 104 at 11-13. Both arguments are wrong.

Foremost, the Debtor's financial distress was not caused by a fire in August 2023. The

11

Debtor executed the first promissory note with GPNB on December 16, 2019. Ex. 14.015-16. The note was due on September 16, 2020, which is a nine (9) month term. *Id.* This short-term reflects the underlying purpose of the loan which, according to GPNB's Market President, Mr. Blake Johnson, hinged on the understanding that the loan was a "short-term deal" because the digging "mats were going to be flipped in a very short amount of time." Transcript at 201:19-202:7. The Debtor did not repay the loan by September 16, 2020, which is almost **three years** before the fire that the Debtor contends caused his inability to repay GPNB. *Id.* at 202:8-23. The second promissory note, which amended the original loan "to give the [Debtor] more time to sell" the mats, was due six months thereafter, on March 16, 2021. *Id.* at 202:24-203:20. The second note went unpaid repeatedly, despite being extended **six more times**. *Id.* at 203:19-204:8. Simply put, the Debtor's inability to repay its debts was not caused by a Dickensian chain of events—it was caused by the Debtor's own conduct in the three (3) years preceding the fire. *See id.*

Likewise, the Debtor has not been operating at a healthy profit post-petition. As detailed above, the Debtor's contention relies on a flawed profit and loss analysis. The Debtor overstates the profit and loss from September 2024 and January 2025 by $165,567 and $35,000.00, respectively. After rectifying these errors, the Debtor's "healthy net profit" falls to a meager $3,513.50 per month. Furthermore, these figures do not even include accrued and accruing professional fees or any payments to secured creditors, such as the more than $30,000 per month owed to GPNB under the current loan agreement.

Perhaps realizing this fact, Meadors testified that the Debtor's financial status has improved because it had more cash on hand as of the hearing date than it did on the Petition Date. He testified that the account "is up approximately a hundred thousand dollars and change." Transcript at 107:23-25. This is a red herring. The Debtor had a cash balance of $114,331.61 at the

commencement of the bankruptcy case according to the Debtor's Schedule A/B. Ex. 1.014 at Item 5; Transcript at 106:13-107:25. The balance as of the end of February 2025 was $211,849.00. Ex. 21.002 at Part 1, Item (d); Transcript at 106:24-107:3, 152:5-11. However, the Debtor received $110,891.00 of insurance proceeds (**which is the collateral of GPNB**) on September 9, 2024. Ex. 4.014; Transcript at 119:5-120:1. Both Meadors and Ms. Goodson testified that this $110,000.00 was included in the $211,489 the Debtor currently possesses. Transcript at 120:13-17, 152:5-11.

The evidence is clear: The Debtor is not operating a viable business, and the value of its assets is declining. Additionally, Meadors now claims that several valuable items of equipment on the Debtor's bankruptcy schedules are his personal property. Since $110,891.00 of the Debtor's cash balance of $211,849.00 is attributable to insurance proceeds, which are subject to GPNB's security interest, the true balance of the Debtor's available cash is approximately $100,958.00. *See id.* But for the insurance proceeds, the Debtor's cash balance would be $13,373.61 *less* than the Debtor's cash balance on the Petition Date. Accordingly, the Debtor's operations appear to have brought in $13,373.61 less than the Debtor has spent.[24] The Debtor has provided no credible evidence that it has the ability to rehabilitate its business and pay its secured and unsecured creditors, let alone its professional fees. The Court should thus find cause for converting this case under section 1112(b) of the Bankruptcy Code.

III.    **The Court should find cause for conversion on equitable grounds.**

As noted above, the Court need not rely on the factors set forth in section 1112(b).[25] The

---

[24] Note: The data related to the cash balance does not match up with an analysis of the Debtor's monthly operating reports. Based on the monthly reports, as discussed above, the Debtor has had an average monthly profit of $3,513.50. Thus, the cash balance should have increased. But it evidently has not. This demonstrates a key problem with the Debtor. It is impossible to evaluate the Debtor's true financial condition based on the Debtor's books and records. Conversion is warranted on those grounds. *See* section I.A., *supra*, and its accompanying discussion.

[25] *In re Ameribuild Constr. Mgmt.*, 399 B.R. at 131 n.3 ("The list contained in § 1112(b) is not exhaustive. The Court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases." (quotation omitted)); *In re TCR of Denver, LLC*, 338 B.R. at 500 ("[T]he Court may dismiss a Chapter 11 case for reasons other than those specified in section 1112(b) as long as those reasons satisfy 'cause.'").

13

Court may may find "cause" on other facts if it renders conversion equitable and appropriate.[26] GPNB respectfully submits that the Court should do so here.

### A. An independent chapter 7 trustee should oversee the Debtor's insurance claim because Meadors has breached his fiduciary duty to creditors.

Managers of a debtor-in-possession "bear essentially the same fiduciary obligation to creditors and shareholders as would the trustee for a debtor out of possession."[27] The chapter 11 process "is premised upon the assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee."[28] Accordingly, the duty of loyalty owed by a debtor-in-possession requires Meadors to avoid "even the appearance of impropriety, in all of his fiduciary dealings."[29]

Here, Meadors has violated his duty of loyalty to the Debtor and its creditors. The supposed lynchpin of the Debtor's Chapter 11 Plan of Reorganization is the "Debtor's pursuit of an insurance claim, for $12,596,813.68" against its insurance carrier. Ex. 11.005 at "Litigation." Yet, without disclosing it to this Court, Meadors retained the same counsel and pursued recovery *as an individual* for the same breach of contract and bad faith claims asserted by the Debtor. Ex. 13 ¶¶ 2, 22, 25, 26, 28, 32. Meadors seeks actual damages for the same claims asserted by the Debtor. Ex. 13.023 at "Prayer for Relief." Meadors admits it "appears" that counsel for the Debtor is representing him individually and that he is individually seeking damages. Transcript at 98:2-99:6.

Clearly, this is a problem. At the hearing, Meadors was asked about how he would determine what money should be apportioned to him and the Debtor from the insurance claim. *Id.* at 98:25-99:6. Meadors did not deny that he would seek recovery for himself rather than the

---

[26] *See In re TCR of Denver, LLC*, 338 B.R. at 500 ("[T]he Court may dismiss a Chapter 11 case for reasons other than those specified in section 1112(b) as long as those reasons satisfy 'cause.'").
[27] *Commodity Futures Trading Com v. Weintraub*, 471 U.S. 343, 355 (1985).
[28] *Id.* (quoting *Wolf v. Weinstein*, 372 U.S. 633, 651 (1963)).
[29] *See In re Combined Metals Reduction Co.*, 557 F.2d 179, 197 (9th Cir. 1977).

Debtor. *See id.* Instead, he deflected, stating: "I don't know that I am or that I was. I don't know." *Id.* Meadors had an opportunity to set the record straight and testify that he would not seek the Debtor's insurance proceeds. He did not.

At its core, Meadors' active pursuit of the insurance proceeds for himself breaches his fiduciary duty to the Debtor and creditors in this case. This litigation is the crux of the Debtor's chapter 11 plan. The fact that Meadors is personally seeking proceeds from the Debtor's insurance policy is a breach of fiduciary issue. So too is Meadors' lack of any knowledge regarding the litigation and his refusal to testify that he would not personally seek damages that belonged to the Debtor. Creditors should not be required to trust that Meadors will act in the Debtor's best interests when he is personally seeking damages under the Debtor's insurance policy. Indeed, Meadors has already used the Debtor's assets to pay for personal expenses and inaccurately reported the Debtor's financial information.

GPNB respectfully submits that the individual at the helm of the Debtor should not have an interest in the Debtor's insurance claim. The litigation should be free from "even the appearance" of self-interest.[30] Hence, as acknowledged by the United States Bankruptcy Court for the Northern District of Oklahoma in *In re BTS, Inc.*, conversion is appropriate when litigation claims are "colorable and worthy of further investigation" by an independent chapter 7 trustee.[31] Thus, equity demands that the claim be placed in the hands of a disinterested chapter 7 trustee. Conversion of the case is proper.

**B.   The Debtor's potential interest in an array of heavy equipment not identified on the bankruptcy schedules needs to be investigated by a disinterested party.**

Meadors and inspectors retained by GPNB, Larry Perdue and Justin Perdue of Asset

---

[30] *See In re Combined Metals Reduction Co.*, 557 F.2d at 197.
[31] *In re BTS, Inc.*, 247 B.R. 301, 309-10 (Bankr. N.D. Okla. 2000) (discussing the benefits of conversion of a chapter 11 case to chapter 7 rather than dismissal).

15

Appraisal Corp., met for an inspection of the Debtor's equipment on March 21, 2025, and March 24, 2025. Justin Perdue and Larry Perdue both testified that there appeared to be a substantial amount of equipment on the Debtor's property owned by the Debtor—with the Debtor's decal prominently displayed thereon—despite the fact that such property was not listed on the Debtor's Schedule A/B. Transcript at 166:18-167:24, 193:7-194:4. Larry Perdue found this "strange." *Id.* at 166:13-167:9.

The inspection was originally supposed to conclude on the first day, March 21. When asked why that did not happen, Larry Perdue testified that "there was confusion as to what equipment" was to be inspected because "there was so much equipment in the yard." *Id.* at 168:1-15. Meadors was "[v]ery unhappy" about this situation and "[u]pset." *Id.* at 169:7-24; 170:12-25. As a result, the inspection was rescheduled for March 24, 2025, so Meadors "could mark the equipment that was actually to be inspected" because Meadors told Larry Perdue "there was no reason to inspect the rest of the equipment with the exception of what was on the list." *Id.* at 168:1-25.

But something did not add up. Larry Perdue—"having done what [he's] been doing for the last forty years"—went ahead that Monday and inspected other "major items just in case." *Id.* He identified 44 pieces of heavy equipment, including 4 trenchers, a back hoe, a crawler tractor, and 27 pipe layers.[32] Ex. 22, Entry #1-19. Notably, the Debtor's Schedules do not list ***any leased*** equipment, and the Debtor's only explanation for the equipment was that he is storing it for third parties for free and occasionally rents the equipment from these third parties. Ex. 1.035 at Items 1 - 2.2 (no leases listed); Transcript at 41:1-42:15.

GPNB respectfully submits that the Debtor's potential interest in 44 pieces of valuable equipment—which visually appear to be owned by the Debtor—provides cause for converting the

---

[32] The Debtor valued the two (2) pipe layers on his schedules at $75,000.00 and $175,000.00, respectively. Ex. 1.016.

case to chapter 7. As discussed above, the Debtor has repeatedly provided false and incorrect information to the Court, and Meadors has very recently claimed personal ownership of some of the Debtor's valuable equipment. Given the circumstances, a chapter 7 trustee should be given the opportunity to investigate the ownership of the property located on the yard and elsewhere.

## <u>CONCLUSION</u>

The Court should convert this case to a proceeding under chapter 7 of the Bankruptcy Code. GPNB need only show "cause" for conversion by a preponderance of the evidence. The Debtor has operated as a debtor-in-possession for over eight (8) months. During this time, it has not filed its tax returns (or even hired a tax professional), corrected its financial records (or even hired an accounting professional), or engaged in viable business operations. The Debtor has repeatedly provided false information to the Court and demonstrated its unwillingness to correct its false submissions. GPNB's collateral has been deteriorating in the Debtor's lot alongside property— labeled as the Debtor's—which the Debtor insists it does not own. GPNB's collateral is not being used to generate revenue for the benefit of the estate. Current management of the Debtor has a conflict of interest, has breached (and continues to breach) his fiduciary duty to the Debtor and is (and has) grossly mismanaging the Debtor. Altogether, the Court has ample cause to convert this case. As such, GPNB respectfully asks the Court to grant the Motion and provide the relief requested therein.

17

Dated: April 28, 2025.

Respectfully submitted,

**HALL, ESTILL HARDWICK, GABLE, GOLDEN & NELSON, P.C.**

*s/Connor M. Andreen*
Steven W. Soulé, OBA No. 13781
Christopher J. Gnaedig, OBA No. 33892
Connor M. Andreen, OBA No. 35047
521 East 2nd St., Suite 1200
Tulsa, OK 74120
Telephone: (918) 594-0400
Facsimile: (918) 594-0505
Email: ssoule@hallestill.com
Email: cgnaedig@hallestill.com
Email: candreen@hallestill.com

-and-

Daniel V. Carsey, OBA No. 21490
100 North Broadway, Suite 2900
Oklahoma City, OK 73102
Telephone: (405) 553-2828
Facsimile: (405) 553-2855
Email: dcarsey@hallestill.com

**ATTORNEYS FOR GREAT PLAINS NATIONAL BANK**

**CERTIFICATE OF SERVICE**

I certify that on this 28 day of April, 2025, a true and correct copy of the foregoing document was served electronically upon the parties registered to receive electronic notice via this Court's electronic case filing system.

*/s/Connor M. Andreen*
Connor M. Andreen

18