United States Bankruptcy Court

Eastern District of Oklahoma

In re:                                                                              Case No. 24-80617-PRT

C M Heavy Machinery, LLC                                                            Chapter 11

      Debtor

# CERTIFICATE OF NOTICE

| District/off: 1086-7 | User: admin | Page 1 of 2 |
|---|---|---|
| Date Rcvd: Jun 27, 2025 | Form ID: pdfpo | Total Noticed: 3 |

The following symbols are used throughout this certificate:

**Symbol**       **Definition**

+        Addresses marked '+' were corrected by inserting the ZIP, adding the last four digits to complete the zip +4, or replacing an incorrect ZIP. USPS regulations require that automation-compatible mail display the correct ZIP.

**Notice by first class mail was sent to the following persons/entities by the Bankruptcy Noticing Center on Jun 29, 2025:**

| Recip ID | | Recipient Name and Address |
|---|---|---|
| db | | C M Heavy Machinery, LLC, 11097 Highway 27, Okemah, OK 74859 |
| cr | + | Gregory Poole Equipment Company, 4807 Beryl Road, Raleigh, NC 27606-1406 |

TOTAL: 2

**Notice by electronic transmission was sent to the following persons/entities by the Bankruptcy Noticing Center.**
Electronic transmission includes sending notices via email (Email/text and Email/PDF), and electronic data interchange (EDI). Electronic transmission is in Eastern Standard Time.

| Recip ID | Notice Type: Email Address | Date/Time | Recipient Name and Address |
|---|---|---|---|
| cr | Email/Text: ssoule@hallestill.com | Jun 27 2025 19:06:00 | Great Plains National Bank, c/o Steven W. Soule, Hall, Estill, et al., 521 East 2nd Street, Suite 1200, Tulsa, OK 74120-1855 |

TOTAL: 1

# BYPASSED RECIPIENTS

The following addresses were not sent this bankruptcy notice due to an undeliverable address, *duplicate of an address listed above, *P duplicate of a preferred address, or ## out of date forwarding orders with USPS.

| Recip ID | Bypass Reason | Name and Address |
|---|---|---|
| tr | | No Trustee |
| cr | | Caterpillar Financial Services Corporation |
| cr | | Komatsu Financial Limited Partnership |
| cr | | Recovery Logistics, Inc. |

TOTAL: 4 Undeliverable, 0 Duplicate, 0 Out of date forwarding address

# NOTICE CERTIFICATION

**I, Gustava Winters, declare under the penalty of perjury that I have sent the attached document to the above listed entities in the manner shown, and prepared the Certificate of Notice and that it is true and correct to the best of my information and belief.**

**Meeting of Creditor Notices only (Official Form 309): Pursuant to Fed .R. Bank. P.2002(a)(1), a notice containing the complete Social Security Number (SSN) of the debtor(s) was furnished to all parties listed. This official court copy contains the redacted SSN as required by the bankruptcy rules and the Judiciary's privacy policies.**

Date: Jun 29, 2025             Signature:      /s/Gustava Winters

---

# CM/ECF NOTICE OF ELECTRONIC FILING

**The following persons/entities were sent notice through the court's CM/ECF electronic mail (Email) system on June 27, 2025 at the address(es) listed below:**

| Name | Email Address |
|---|---|
| Alexander Sokolosky | |

on behalf of Creditor Gregory Poole Equipment Company alex.sokolosky@crowedunlevy.com
lisa.baker@crowedunlevy.com;ecft@crowedunlevy.com

Blake Sonne

on behalf of Debtor C M Heavy Machinery  LLC bsonne@whittenburragelaw.com, kstratton@whittenburragelaw.com

Brandon Craig Bickle

on behalf of Creditor Komatsu Financial Limited Partnership bbickle@gablelaw.com  bhornbeak@gablelaw.com

Christianna Annette Cathcart

on behalf of Debtor C M Heavy Machinery  LLC christianna@dakotabankruptcy.com

Christopher Gnaedig

on behalf of Creditor Great Plains National Bank cgnaedig@hallestill.com

Connor Andreen

on behalf of Creditor Great Plains National Bank candreen@hallestill.com

Daniel Vaughn Carsey

on behalf of Creditor Great Plains National Bank dcarsey@hallestill.com  kjanke@hallestill.com

Gary M. McDonald

on behalf of Creditor Recovery Logistics  Inc. gmcdonald@mmmsk.com, hdowell@mmmsk.com

Karen Carden Walsh

on behalf of U.S. Trustee Office of the United States Trustee karen.walsh@usdoj.gov

Mary Kindelt

on behalf of U.S. Trustee Office of the United States Trustee mary.kindelt@usdoj.gov

Maurice VerStandig

on behalf of Debtor C M Heavy Machinery  LLC mac@mbvesq.com, verstandiglaw@recap.email

Office of the United States Trustee

USTPRegion20.TU.ECF@usdoj.gov

Steven William Soule

on behalf of Creditor Great Plains National Bank ssoule@hallestill.com  smccormick@hallestill.com

Steven William Soule'

on behalf of Creditor Great Plains National Bank ssoule@hallestill.com  ssouleOKE@ecf.axosfs.com


TOTAL: 14

**Dated: June 27, 2025**

**The following is ORDERED:**



*Paul R. Thomas*
PAUL R. THOMAS
UNITED STATES BANKRUPTCY JUDGE

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

In re:

C M HEAVY MACHINERY, LLC        Case No. 24-80617-PRT
                                        Chapter 11

         Debtor.

### ORDER OF CONVERSION

Before the Court is the Motion to Dismiss, or Alternatively, to Convert the Bankruptcy

case to a Chapter 7 Proceeding with Brief in Support filed by Great Plains National Bank

pursuant to 11 U.S.C. § 1112(b).[1] After review of the record and based on the evidence presented

to the Court, the Court finds that good cause exists to convert this case to chapter 7.

### Introduction

The cornerstone of all bankruptcy cases, but especially in debtor-in-possession chapter 11

reorganizations, is reliable financial information. Without it, the court and parties-in-interest are

left to guess and speculate on how best to protect their respective interests. While this Court

recognizes that few businesses come into bankruptcy with pristine financial records, after more

_____

[1] ECF No. 82.

than eight months of promises to do so, we are no closer to having reliable financial information than where we were when the case was filed. Simply put – that is unacceptable.

## Jurisdiction

This Court has jurisdiction pursuant to 28 U.S.C. § 157(a) and § 1334(a). A motion to dismiss is a core proceeding which this Court may hear and determine as provided in 28 U.S.C. § 157(b)(2)(A). This Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 9014.

## Findings of Fact

Debtor is an Oklahoma limited liability corporation formed in 2007 and located in Okemah, Oklahoma. It furnishes heavy machinery and equipment to job sites nationwide, primarily servicing the oil industry. Clint Meadors is Debtor's sole owner and president ("Meadors"). Debtor filed a chapter 11 bankruptcy petition in this Court on August 8, 2024, just before a state court hearing where it "stood to potentially lose most—if not all—of its property to a collection action."[2] This state court action was filed on June 6, 2024, in Okfuskee County, Oklahoma by Great Plains National Bank ("Great Plains") to foreclose on a promissory note and security agreement entered in December of 2019 between Great Plains, Debtor and Meadors. The purpose of the loan was to provide funds for Debtor to purchase a large quantity of digging mats. Great Plains was granted a security interest in all the Debtor's assets, including any insurance proceeds received from the sale, destruction, loss or other disposition of the Debtor's assets. Debtor also mortgaged its real estate to Great Plains. In its schedules, Debtor identified

---

[2] ECF No. 1; ECF No. 56, p. 3.

Great Plains as its primary secured creditor with a debt of $4,574,359.20 secured by most of its assets.[3]

In addition to the pending state court foreclosure action, Debtor identified two other issues that led to its bankruptcy filing.[4] One was a large fire that destroyed the digging mats (stored in North Carolina) and Debtor's large insurance claim stemming from that fire, estimated at over $10,000,000. The other issue was a dispute with an individual who failed to maintain current and reliable financial records for Debtor.[5] Debtor disclosed that its books and records were not "reasonably current in nature" and that it lacked "financial records of reliable quality."[6] Debtor also disclosed that it had not filed tax returns for 2022 or 2023. However, it stated that it would engage a third-party bookkeeper "shortly" to ensure its financial records were up-to-date and properly maintained and would prioritize the preparation and filing of tax returns in an "expedient-but-deliberate manner."[7]

Debtor's Summary of Assets and Liabilities lists total assets of $19,152,335.55, and total liabilities of $5,491,300.85, including secured claims totaling $4,619,481.56 and unsecured claims totaling $871,819.29.[8] Schedule A/B lists one checking account of $114,331.61, and Accounts receivable (90 days or less) of $1,343,190.26.[9] Inventory is valued at $2,453,500.00, consisting of dozers, excavators, tractors and other equipment. Automobiles, trailers, and miscellaneous vehicles are valued at $749,500.00. Office furniture is valued at $25,000.00.

---

[3] ECF No. 1, Schedule D. Meadors is listed as a codebtor of Great Plains, Schedule G, p. 36.
[4] ECF No. 1, pp. 5-7.
[5] In its Disclosure Statement, Debtor further explained that corporate funds had been stolen by two individuals with access to its books and records. ECF 56.
[6] ECF No. 1, pp. 5-6.
[7] ECF No. 1, p. 6.
[8] ECF No. 1, p. 13.
[9] ECF No. 1, pp. 14-22. Debtor also lists a $5,000.00 retainer paid for legal services subject to setoff.

Debtor lists real estate consisting of 20 acres along the North Canadian River in Okfuskee County, valued at $115,000.00, and real estate in Okemah valued at $1,200,000.00. The pending insurance claim for mats lost to fire is valued at $12,596,813.68, and the claims against the two individuals for theft total $550,000.00. Schedule D includes Great Plains' claim of $4,574,35920, secured by most of Debtor's assets valued at $14,120,003.94.

Seventeen proofs of claim have been filed, totaling $9,566,961.42. Great Plains' proof of claim is for $4,582,159.45: $1,620,000.00 is secured and $2,962,159.45 is unsecured.[10] The IRS filed a proof of claim totaling $4,517,997.54, of which $4,515,391.74 is classified as an unsecured priority claim, and the remaining $2,605.80 is classified as a general unsecured claim.[11]

Debtor filed its Disclosure Statement on December 6, 2024,[12] and a Chapter 11 Plan of Reorganization was filed on December 9, 2024.[13] On February 28, 2025, Debtor filed a Supplement to its Disclosure Statement[14] and an Amended Plan.[15] The Disclosure Statement states that "[c]entral to the Plan is the pursuit of an insurance claim, for $12,596.813.68" and "reasonably believes some degree of success will be realized" on this claim.[16] Additional sources of funding are ordinary business operations, recovery of stolen monies, sale of equipment and machinery, and repayment of funds by Meadors of Debtor's funds he used for his personal expenses.[17] Unbilled attorney fees were estimated at $30,000.00. In Debtor's Supplement to the

---

[10] Claim 13.
[11] Claim 1.
[12] ECF No. 56.
[13] ECF No. 58.
[14] ECF No. 120.
[15] ECF No. 119.
[16] ECF No. 56, p. 5.
[17] ECF No. 56, p. 6.

Disclosure Statement, Debtor represented that it was working to hire a tax professional to file missing tax returns, and expressed confidence that the IRS' claim would be significantly reduced.[18] Debtor also stated that it was difficult to forecast future profits since it had not filed tax returns, but estimated average monthly profits of $36,941.33 for its first six months of postpetition operations.[19]

The U.S. Trustee filed a Motion to Convert to Chapter 7 based on Debtor's failure to close its prepetition bank account, failure to comply with 11 U.S.C. § 345 by maintaining funds in a bank account in excess of the amount insured by the FDIC, Meadors' use of a debit card for unauthorized purchases and failure to provide receipts for those purchases, and Meadors' use of estate funds for personal expenses.[20] The UST and Debtor entered a Stipulation, agreeing to defer a hearing on the UST's motion to the confirmation hearing. They also agreed that Debtor would open a separate Debtor-in-Possession ("DIP") bank account, cease utilizing Debtor's Mabrey Bank account and transfer monies in that account to its new DIP account, ensure that any account receivable deposited into the Mabrey Bank account would be swept into the DIP account, that Debtor would attach receipts to its Monthly Operating Report regarding debit card purchases, and immediately cease using estate funds for Meadors' personal purposes.[21]

Great Plains also filed a Motion to Dismiss Case, or Alternatively, to Convert to Chapter 7.[22] This Court held an evidentiary hearing on Great Plains' Motion. Meadors testified regarding the history of the Debtor, events leading to filing bankruptcy, information included in Debtor's petition and schedules, financial statements, and postpetition operations of the Debtor. Meadors

---

[18] ECF No. 120, pp. 1-2.
[19] ECF No. 120, pp. 2-3.
[20] ECF No. 79.
[21] ECF No. 153.
[22] ECF No. 82.

successfully operated Debtor for seventeen years, relying on outside bookkeepers and accountants to manage Debtor's financial records for most of that time. In 2019 and 2020, Debtor borrowed funds from Great Plains to purchase the digging mats, described as hardwood mats used in construction projects for traveling on rights of way. The mats were either obtained from or intended to be used on an Atlantic Coast pipeline project that was cancelled. Meadors' testimony on this was unclear. Meadors personally guaranteed the loan. Debtor intended to lease or sell the mats at a profit, as it had done for many years. It did sell some mats and remitted proceeds to Great Plains. However, the cancellation of the large pipeline project and other projects limited the market for these mats, and they went unused for three to four years. A fire in August of 2023 destroyed some of the mats. Meadors estimated that 16,000 to 20,000 mats were destroyed, resulting in lost net profit of $300 to $400 per mat. Debtor was unable to continue making payments to Great Plains, eventually leading to Great Plains' foreclosure action and Debtor's bankruptcy.

Meadors reviewed all schedules and statements prior to Debtor filing bankruptcy. Debtor's financial records were not up-to-date and were in disarray prior to filing bankruptcy. Postpetition, Meadors involved a bookkeeper, Holly Goodson ("Goodson"), in an unpaid position to assist him with Debtor's financial records. He also contacted Zach Richardson, believed to be a C.P.A., to assist with taxes, and coordinate with Goodson. No other financial advisors were contacted or employed to assist with updating Debtor's financial records, prepare tax returns or challenge the IRS' $4,517,997.54 proof of claim. Meadors stated that an attempt was made to hire a firm to assist in collecting Debtor's outstanding receivables. Debtor stipulated that no application to employee a professional to assist with financial matters had been submitted to the Court by the time of the evidentiary hearing.

Meadors reviewed Debtor's schedules and identified certain equipment erroneously listed as the Debtor's that was owned by him personally. He testified that he personally owns a 2021 McCormick X6 470 Tractor, valued on Schedule A/B at $105,000.00, an Attachment-Loader valued at $15,000.00, and a 2021 Maschino roller/tiller attachment valued at $18,000.00. Meadors discovered these items were owned by him rather than Debtor when an unknown creditor bank contacted him for payment postpetition. He stated that his personal funds were used to make payments on these items, but he did not know whether prepetition payments were made by himself or Debtor. Meadors did not dispute that Debtor listed these items as collateral pledged to Great Plains. A 2005 Dodge Truck, valued at $15,000.00, was erroneously listed on Schedule A/B despite being sold prior to bankruptcy.

Meadors stated that the valuations used in Debtor's schedules were from December 2019 and May 2020 when Debtor obtained loans from Great Plains. Debtor's assets were appraised by Ritchie Brothers in July of 2024 or possibly a year or two prior to filing bankruptcy, so that Debtor could sell certain equipment at auction and remit the proceeds to Great Plains. Debtor never received the appraisal, likely because it was unable to pay for it. Most of Debtor's equipment was stored in Okemah, Oklahoma. However, a 2020 Kubota skid steer was being stored at a private residence in North Carolina. A 2014 truck is currently in Arizona, having been recently driven there by a mechanic who worked for Meadors. During deposition testimony, Meadors admitted that Debtor's equipment depreciates over time as it ages and is not used.[23]

Meadors identified at least one piece of Debtor's equipment that was used to generate postpetition income. It was used for a job at New Life Church which generated $35,000.00 for

_____

[23] Ex. 8, p. 73:2-8.

Debtor. Debtor is currently using some equipment at Meador's sister's home for a job that will generate revenue.

Meadors testified that Debtor also generates income by "re-renting" machines owned by other companies, including Filsinger Equipment and Kirby-Smith, to Debtor's customers. These machines are stored on Debtor's property and are maintained by Debtor. Most postpetition income has been generated by re-rental of these machines, but Meadors admitted that Debtor had not re-rented machines a whole lot since filing bankruptcy. Meadors' father also stores equipment on Debtor's property but does not pay rent to do so. Other than income from the New Life Church job, work for his sister, and machine re-rentals, Meadors was unable to specifically identify postpetition income generated by Debtor.

Debtor's largest postpetition receipt was $110,891.00 collected September 9, 2024. This receipt was for insurance proceeds on a claim for vandalism of some of the digging mats. Great Plains claims these proceeds are subject to its security interest. Debtor includes this amount as available cash in its Monthly Operating Reports ("MORS").

Meadors confirmed that Debtor's accounts receivable totaled $1,343,190.26. Debtor tried to hire an attorney prepetition to collect on one large receivable. Other than that account, Meadors could not identify any efforts to collect monies owed to Debtor. He was aware that Filsinger Equipment owed Debtor $27,000.00. Other than these accounts, he was unable to identify or discuss the status of any other receivable.[24]

---

[24] *See also* Ex. 18, pp. 35:19-25; 73:9-20, Depo. of Meadors, December 16, 2024. When asked about accounts receivable, Meadors testified that no receivables had been collected nor had he made any efforts to collect receivables postpetition. When asked if he intended to collect these accounts, he responded that he had intentions to do so beginning "Any time. Soon." He also stated that the longer the delay in collections, the less likely these accounts would be recovered for the estate.

Debtor owns twenty acres of land on the North Canadian River, which Meadors supposed was mortgaged to Great Plains. Prior to bankruptcy, Debtor sold sand or clay soil from the property but had made no sales postpetition. Meadors did not know how the land valuation of $115,000.00 was calculated. Debtor's business operations are located on real estate on Highway 27, Okemah, and valued at $1,200,000.00. This valuation was made in 2019 and 2020 when Debtor obtained loans from Great Plains. As with the River property, Meadors supposed that the Okemah real estate was mortgaged to Great Plains, but he did not recall signing the mortgage.

Meadors admitted that he had used approximately $10,000.00 of estate funds to pay personal expenses, including two car payments on his Corvette, marina expenses, and clothing purchases. He plans to pay this back to the bankruptcy estate but has not been able to obtain funds to do so. He did not realize that the car payments were being automatically debited from Debtor's bank account.

Meadors reviewed Debtor's balance sheet filed with the bankruptcy petition. He could not explain the source of $56,730.00 listed as "undeposited funds." His personal real estate was listed on Debtor's balance sheet, as well as personal and business credit cards. He could not explain the tax liabilities listed. He was unsure what the "Vicky Loan Adjustment $94,393.90" was, but explained that "Vicky" was his mother. He assumed that loans listed as "Meadors Family Land and Minerals, LLC $376,000.00" represented loans made to Debtor to make equipment payments. He was unsure if there was paperwork for these loans and was unsure if Debtor had made payments on these loans. No postpetition payments had been made to Debtor's attorneys.

Debtor's MORS were prepared by Debtor's counsel, with Goodson's assistance. The MORS were reviewed and signed by Meadors as Debtor's "Responsible Party." He was unable

to provide details regarding items such as auto expense, maintenance, or "ask my accountant" expense of $165,962.98 in the August report. Income of $35,000.00 from Debtor's job at New Life Church was reported twice – once in the December MOR and again in the January MOR as "Service Dept. Income." Meadors was "pretty sure" that insurance was in place for Debtor, but did not know the name of the company that insured Debtor's assets or his personal assets. Some MORS attached a Balance Sheet that included Meador's personal assets as if they were assets of Debtor, such as Meadors' personal home and 520 acres, and his personal bank account. The Balance Sheet attached to the November 2024 MOR lists "NC Yard Mats" valued at $1,000,000.00, although Meadors stated Debtor did not have these mats. He noticed that the balance sheets were inaccurate and brought the errors to his attorney's and bookkeeper's attention but did not know if corrections had been made or why these inaccurate statements continued to be submitted as part of Debtor's MORS. Debtor stipulated that the balance sheets were facially inaccurate.

Debtor and Meadors have filed a lawsuit in Oklahoma County District Court against their insurance company and insurance agency alleging several causes of action related to Debtor's insurance claim for the digging mats destroyed in the 2023 fire. Meadors was aware that he is a plaintiff in the action but did not know whether he might personally recover monies in this lawsuit.

Debtor's bookkeeper, Goodson, testified regarding her involvement with Debtor since September 2024. Goodson has twenty years' experience working for a feed store, where she processed accounts receivable and accounts payable. Although she is not an accountant or C.P.A., she has worked the last two years at an accounting firm in Wewoka, Oklahoma, inputting financial data, reconciling bank statements, preparing balance sheets, and gathering clients' tax

information. Meadors and Debtor were clients of the accounting firm. In return for work performed at her home, Goodson volunteered to assist with Debtor's books and records. She works approximately ten to twenty hours a week for Debtor as needed. Her primary responsibilities are to review Debtor's financial records, update records in QuickBooks, reconcile bank statements, and issue invoices and rental agreements. Goodson uses QuickBooks to generate balance sheets, profit/loss statements, and assist in preparation of MORS by reviewing bank statements. Most of Debtor's financial information entered in QuickBooks is derived from Debtor's bank statements. In her limited role as Debtor's bookkeeper, Goodson was unable to change any of the information in QuickBooks entered prior to her engagement as bookkeeper. She acknowledged that balance sheets for Debtor erroneously include Meadors' personal financial information. Asset valuations have not been corrected as she only recently received a depreciation schedule. She believed that Debtor had not had an accountant since 2022. Debtor attempted to employ another accountant in 2023, but that person did not actually perform accounting services. Goodson was able to reconcile bank statements from 2023 and 2024. She does not prepare any tax-related information.

Goodson explained that the September MOR entry titled "Ask My Accountant" of -$165,962.98 was likely a deposit of insurance proceeds that she was unsure how to categorize. She consulted an accountant who advised her to record it as a separate item of income. Goodson testified that Debtor generated income from re-rental of equipment, shipping income for delivery of rented equipment, the New Life Church income of $35,000.00, and Smith Energy Services income of $83,162.76. She could not explain why the New Life Church and Smith Energy Services income was listed on both the December 2024 and January 2025 Reconciliation Reports attached to the MORS, or why the $35,000.00 amount was described as Service Department

Income on the December and January MORS. The February MOR did not include cost of goods sold so it appeared that gross profit for February was overstated. Goodson confirmed that insurance was in place. Since she began working as Debtor's bookkeeper, she believed that Debtor had made more money than it spent.

Goodson collected some monies on Debtor's accounts receivable, but no invoices or reminder statements had been sent by Debtor attempting to collect past due accounts. Goodson has no check-signing authority. She prepares checks on behalf of Debtor and submits to Meadors for his signature. At the time of the hearing, Debtor's bank accounts held approximately $220,000.00.

Inspectors Larry Perdue and Justin Perdue, of Asset Appraisal Corporation ("AAC"), testified regarding their inspection of equipment stored at the Okemah yard. AAC was hired by Great Plains to verify that the equipment listed on Debtor's schedules was located at the yard. No valuation of the equipment was performed. Larry Perdue is a certified machinery equipment appraiser with forty years' experience. He holds a master's degree in evaluation science. He is half owner and the executive director of AAC. Justin Perdue is a senior member of the American Society of Appraisers. Prior to his involvement with AAC, Justin Perdue operated a welding company and performed oil and gas and pipeline work.

The Perdues arrived at Debtor's Okemah yard on Friday, March 21, 2025, to physically inspect assets located in the yard. The Perdues had a list of equipment from Debtor's bankruptcy schedules that was believed to be in the Okemah yard. They observed that there was substantially more equipment in the yard than on the list they had been provided, including backhoes, trenchers, pipe layers, trailers, and an assortment of pipeline construction equipment. Meadors informed the Perdues that some of the items on the list were not owned by Debtor but were

owned by others. Justin Perdue noted Meadors' corrections to the list. The Perdues did a cursory inspection and count of equipment and noted that some equipment on the list was not in the yard. They advised Meadors to mark the equipment that was collateral of Great Plains and bring missing collateral to the yard for inspection by the following Monday when they would return to inspect and inventory the equipment.

The Perdues returned to the yard at 7:30 a.m., Monday, March 24, 2025, and spent approximately three and a half hours conducting an inventory and inspection of the equipment. Goodson and Meadors were on site at some point during the inspection. Meadors had marked some equipment with paint to indicate that the items should be inspected. Other equipment had CM Heavy Machinery decals, but Meadors testified those items were owned by Marvin Filsinger and were intended to be re-rented by Debtor. Larry Perdue prepared a summary of the inventory of equipment located in the yard. He identified forty-five pieces of equipment in the yard that were not on the list provided to him, some marked with a CM Heavy Machinery decal. Justin Perdue stated that Meadors advised that some items were not his. The equipment appeared to have been stored in the yard for a long time and in average or poor condition.

Great Plains' Senior Credit Officer Blake Johnson testified regarding the history of Meadors' and Debtor's relationship with the bank. Debtor borrowed funds from Great Plains to purchase digging mats in 2019. The original loan was for $8,250,000.00, designated as a commercial line of credit. The parties expected that the digging mats would be sold in a short period of time, so the loan term was nine months, with monthly interest payments and payment in full at maturity. Debtor was unable to repay the loan so Great Plains granted seven extensions of six months each. Great Plains filed a foreclosure action against Debtor in March of 2023. The parties settled this lawsuit in October of 2023 by restructuring the loan for a fifteen-year term

with monthly principal and interest payments of approximately $31,000.00. Additionally, because Great Plains had experienced difficulties in receiving financial information from Debtor, the settlement required Debtor to provide monthly financial reports. Initially, Debtor was able to make some payments on the modified loan but made no payments after February of 2024. Some of Debtor's equipment was sold at auction conducted by Ritchie Brothers, and Great Plains received approximately $57,000.00 directly from Ritchie Brothers. As of the petition date, Great Plains' claim against Debtor was $4,582,159.45.

As part of the loan modification settlement, the parties also agreed that Great Plains would place tracking devices on some of Debtors' equipment so the bank could determine the location of its collateral. These trackers were installed in February of 2024. Johnson reviewed information provided through the tracking devices on a weekly or bi-weekly basis. The GPS trackers showed no movement of most of the equipment for over 200 to almost 400 days, leading Johnson to conclude that the equipment was not being utilized or generating income for Debtor.

At the conclusion of this evidence, Debtor moved for judgment in its favor on Great Plains' motion to dismiss or convert. The Court denied that motion. Great Plains urged the Court to convert this case to Chapter 7.

Approximately two months after the evidentiary hearing, Debtor amended its Schedule A/B, and filed applications to employ an accountant and a commercial collection agency.[25]

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," they are incorporated herein by reference.

---

[25] ECF Nos. 176, 182 & 183.

**Conclusions of Law**

Section 1112(b)(1) provides in relevant part that "on request of a party in interest, and after notice and a hearing, the court *shall* convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause . . . ."[26] Section 1112(b)(4) includes a list of examples that may constitute "cause" to convert or dismiss, but the list is illustrative, not exhaustive.[27] It is the movant's burden to prove by a preponderance of the evidence that cause for dismissal or conversion exists.[28] If cause is established, the burden shifts to the opposing party to establish that "unusual circumstances" exist that establish that dismissal or conversion is not in the best interests of creditors and the estate.[29] "The bankruptcy court has broad discretion under § 1112(b)."[30] Determining whether cause exists to dismiss or convert requires a fact-specific inquiry into debtor's postpetition circumstances.[31]

Great Plains asserts that cause exists for conversion pursuant to § 1112(b)(4)(A) and (D) for gross mismanagement of the estate, continuing diminution of the estate and the absence of a reasonable likelihood of rehabilitation. It also alleges that Meadors has breached his fiduciary duty to the estate which constitutes equitable grounds to convert.

**Gross Mismanagement of the Estate**

---

[26] 11 U.S.C. § 1112(b)(1) (emphasis added). Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 et seq.

[27] *In re Whetten,* 473 B.R. 380, 382 (Bankr. D. Colo. 2012).

[28] *See In re Vista Foods, U.S.A. Inc.,* 226 B.R. 284 (Table) (B.A.P. 10th Cir. 1997) *citing In re Woodbrook Assocs.,* 19 F.3d 312 (7th Cir. 1994).

[29] § 1112(b)(2).

[30] *Hall v. Vance,* 887 F.2d 1041, 1044 (10th Cir. 1989).

[31] *In re Paterno,* 511 B.R. 62, 66 (Bankr. M.D.N.C. 2014).

The Bankruptcy Code vests a debtor-in-possession with significant powers and assigns significant responsibilities. A debtor-in-possession is required to perform the duties of a trustee, including operating the business of the debtor, preserving assets and providing accurate financial reports to "keep the Court and its creditors informed about the status and condition of its business."[32] Lack of an effective and focused management team may constitute gross mismanagement.[33] A debtor-in-possession owes a fiduciary duty to its creditors.[34] Gross mismanagement is a breach of that duty.[35]

Debtor's bookkeeper, Holly Goodson, testified that Debtor's business records include Meadors' personal finances. Meadors reviewed and signed the MORS as Debtor's "Responsible Party" under penalty of perjury knowing that they were facially inaccurate. His explanation for the inaccurate financial records was that his previous accountant must have improperly recorded ownership of equipment and combined his personal assets with those of the Debtor. He notified his attorney of the inaccuracies and assumed someone would make corrections. He seemed to believe that his only responsibility was to alert someone else of the inaccurate financial records and schedules.

Meadors also admitted that Debtor's schedules were inaccurate. He discovered this a few months after Debtors filed bankruptcy when contacted by a creditor for payment. He also noted inaccuracies in March of 2025 when the Perdues presented him with a list of equipment from Debtor's Schedule A/B. He contends that he personally owns several pieces of valuable equipment listed on Schedule A/B, including a 2021 McCormick X6 470 Debtor valued at

---

[32] *In re Gateway Access Sols., Inc.,* 374 B.R. 556, 565 (Bankr. M.D. Pa. 2007). *See also* 11 U.S.C. §§ 704(a), 1106(a).
[33] *Gateway Access Sols., Inc.,* 374 B.R. at 564-65 (citations omitted).
[34] *In re M.A.R. Designs & Constr., Inc.,* 653 B.R. 843, 857-58 (Bankr. S.D. Tex. 2023).
[35] *Id.*

$105,000.00, an Attachment-Loader valued at $15,000.00, and a 2021 Maschino roller/tiller attachment valued at $18,000.00. If correct, Debtor's equipment should be valued at $629,500.00 rather than $749,500.00, nearly a 20% reduction in what is being reported to creditors. Debtor's Schedule A/B valuations are listed as current values, but Meadors testified the values are based on 2019 or 2020 values when Debtor first borrowed funds from Great Plains.[36] Meadors also noted that a 2005 Dodge 2500 truck listed on Schedule A/B had been owned by him, not Debtor, and that it had been sold prepetition. Meadors signed Debtor's bankruptcy petition and schedules under penalty of perjury. Moreover, Debtor made no attempt to correct these errors until well after the evidentiary hearing on Great Plains' Motion to Dismiss or Convert. Failure to promptly correct schedules indicates poor management and a lack of concern for accurate reporting to the Court and to Debtor's creditors.

Meadors could not advise the Court how much income Debtor generated postpetition other than work at a church, his sister's home, and undetermined amounts of re-rental income. He alluded to jobs Debtor may have had but he gave no specific details.

Meadors also seemed unconcerned that Debtor had over $1,000,000.00 in accounts receivable that have gone uncollected for over a year. No good faith effort had been undertaken to recover this asset except for the withdrawn application to employ a collection agency. According to Goodson, Debtor had not even made the effort to send invoices or statements to collect these accounts. No reason was given for Debtor's failure to pursue this estate asset. The longer Debtor waits to attempt to collect its receivables, the less likely it is that Debtor can recover monies due the estate. Similarly, Meadors seemed unconcerned that Debtor had not filed tax returns for several years, that it faces a $4,500,000.00 claim from the IRS, and that it had

---

[36] *See* Ex. 18

taken no action to reduce the amount owed to the IRS. This inaction and failure to acknowledge responsibility to pursue collection of these funds and address the IRS' large claim is evidence of gross mismanagement.

Meadors' use of estate funds for personal expenses is further evidence of gross mismanagement. He said that he did not realize for several months after Debtor filed bankruptcy that payments on his Corvette were being made from Debtor's bank account. He admitted that he used Debtor's funds to pay personal expenses and pledged to pay back the funds as soon as he could. Despite his testimony that he was unaware that personal expenses were paid by Debtor, Meadors failed in his duty to appropriately direct Debtor's financial operations. He is the sole employee of Debtor. He draws a monthly salary of $5,000.00. He was not aware of automatic payments being made from Debtor's operating account and DIP bank account and whether they were Debtor's responsibility or his. Goodson has no check-signing authority; she prepares checks for Meadors' signature. It is his responsibility as sole owner and president of a debtor-in-possession to know the status of Debtor's assets, know its ongoing expenses, and ensure that accurate information is provided to this Court and creditors.

Debtor has emphasized to this Court that the focus of a motion to dismiss or convert is on postpetition, not prepetition, conduct. This case was pending over eight months at the time of the hearing. From the outset, Debtor insisted it would engage a third-party bookkeeper "shortly" to ensure its financial records were up-to-date and properly maintained and would prioritize the preparation and filing of tax returns in an "expedient-but-deliberate manner."[37] Debtor stipulated that its balance sheets – which are attached to its MORS – are facially inaccurate. It also stipulated that it had not employed a financial professional to correct its books and records,

_____

[37] ECF 1, p. 6.

prepare tax returns, or perform other accounting functions, despite repeated assurances to the Court and creditors that it would do so soon. Postpetition, Debtor made promises but took no action to fulfill those promises until months after the hearing. The fact that Debtor amended schedules and filed applications to employ an accountant and collection agency after the hearing does not cure the problem of mismanagement or explain or excuse Debtor's failure to satisfy it duties as a chapter 11 debtor.[38]

The Court strongly disagrees with Debtor's position that the quality of bookkeeping is not a question properly considered for a motion to dismiss or convert. In this Court's view, the quality of record keeping and financial reporting during the case goes to the heart of the issue of cause to dismiss or convert based on gross mismanagement. Providing accurate financial reports is a critical and essential function of a debtor-in-possession so that the court and creditors are kept informed about the status and condition of its business. Proper management would be exhibited by taking prompt action to employ an accountant who would be able to restore order to Debtor's financial operations. Debtor's financial records do not provide an accurate picture of Debtor's postpetition financial position.[39] Debtor's failure to take prompt action to correct financial records and schedules, Meador's revelations that he, not Debtor, is the actual owner of valuable equipment listed on Debtor's schedules, as well as other evidence of mismanagement cited herein, give the Court and creditors no confidence that Debtor is accurately reporting income and expenses, that it will be able to maintain proper accounting practices throughout the case, or will be able to properly manage distributions under a confirmed plan.

---

[38] *See Whetten,* 473 B.R. at 383 (citation omitted).
[39] *See M.A.R. Designs & Constr., Inc.,* 653 B.R. at 859.

Debtor lacks an effective manager. Collectively, Debtors inaccurate schedules, MORS, misconduct regarding Meadors' use of estate funds to pay personal expenses, Debtor's failure to collect accounts receivable, filing inaccurate schedules and failing to correct schedules in a timely manner, failure to correct its financial records and reports, lack of proper oversight of financial activities, and inability to provide basic information regarding postpetition income and expenses, establish Debtor's gross mismanagement of the bankruptcy estate.[40] It is not in the best interest of creditors to allow these practices to continue. The Court finds that Great Plains established cause for dismissal or conversion by a preponderance of the evidence due to gross mismanagement.

**<u>Continuing Diminution of the Estate and Absence of Reasonable Likelihood of Rehabilitation</u>**

Great Plains argues that cause to convert also exists pursuant to § 1112(b)(4)(A) because of a continuing diminution of the estate and Debtor's inability to show a reasonable likelihood of rehabilitation. The first part of this two-part test – continuing diminution or loss to the estate – may be indicated by negative cash flow or declining asset values.[41] It is not necessary that losses to the estate be large. "All that need be found is that the estate is suffering some diminution in value."[42] The Court must focus on the Debtor's financial history and determine whether a pattern of decline exists.

Goodson stated that since she has been managing Debtor's finances, Debtor has collected more than it spends each month. However, neither she nor Meadors offered details of the income

---

[40] *See In re Ozcelebi,* 639 B.R. 365, 385 (Bankr. S.D. Tex. 2022); *In re Fall,* 405 B.R. 863, 869 (Bankr. N.D. Ohio 2009).
[41] *Gateway Access Sols., Inc.,* 374 B.R. at 564.
[42] *In re Taub,* 427 B.R. 208, 231 (Bankr. E.D.N.Y. 2010), quoting *In re Kanterman,* 88 B.R. 26, 29 (S.D. N.Y. 1988).

generated each month, with Goodson stating she did not know what some of the entries on financial statements referred to, including income reported from sales products or rental department. Debtor has paid no administrative expenses. Debtor cites the fact its bank account balance has increased from $114,331.61 at the date of filing bankruptcy to $211,849.00 by the end of February, the last MOR filed prior to the hearing regarding dismissal or conversion. The increase in cash is primarily from insurance proceeds of $110,891.00 deposited September 9, 2024. These funds are claimed to be the collateral of Great Plains. When this payment is deducted from Debtor's bank account balance, Debtor's available cash is $100,958.00, which is $13,373.61 less than Debtor's cash balance on the Petition date, indicating a decrease in cash. The cash balance does not appear to match the information in Debtor's MORS. Debtor reports that it has generated an average monthly net profit of $35,678.14, over seven months— a total of $249,747.00. But if that were accurate, the Court would expect to see an increase in its DIP account, not a decrease. Moreover, Meadors testified that the profit of $67,567.00 reported in Debtor's September MOR[43] is incorrect. Debtor actually suffered a $97,000.00 loss. The "profit" reported was likely due to Goodson's reporting insurance proceeds as a negative expense item, which she listed as "ask my accountant."

Meadors also testified that the receipt of $35,000.00 from the New Life Church job was added to both the December and January MOR, meaning Debtor's profit was overstated by $35,000.00. When Debtor's total net profit is reduced by the duplicated receipt of $35,000.00, and September's profit is corrected to reflect a loss of $97,704.33, the Court calculates that total net profits from filing to the end of February 2025 are $49,180.00, not $249,747.00. The Court does not consider these errors to be "*de minimis.*" However, the evidence reflects that Debtor's

---

[43] ECF No. 49.

losses occurred during the first two months of the case. Since October, it has reported a net profit each month, although it is unclear if Debtor generated a profit in February 2025 since cost of goods sold was not included.

As Great Plains notes, the discrepancy between Debtor's representation that it has generated $249,747.00 in net profit since filing this case and Debtor's cash balance in its DIP account and Mabrey Bank operational account demonstrates the key problem with this case: it is impossible to evaluate Debtor's true financial condition by reviewing its MORS, Balance Sheets, Profit/Loss Statements and bank statements. Goodson's testimony that Debtor is generating more income than it is spending postpetition may be correct, but the Court is unable to verify the accuracy of her testimony with Debtor's financial reports. As previously discussed, when the deposit of insurance proceeds is excluded, Debtor's postpetition cash position has decreased. It appears that Debtor is able to meet basic operating expenses, but its operations are lean, it is paying nothing for Goodson's bookkeeping services, and it has paid no administrative expenses.

Great Plains also argues that Debtor's assets are declining in value. Debtor did not dispute that contention. Meadors agreed that failing to use the equipment and its increasing age contribute to a reduction in value. He also agreed that failing to take any action to collect accounts receivable reduces the probability the accounts will be collected and reduces the value of that estate asset. There is no question that these assets are declining in value as Debtor's case continues.

The second part of the test is whether there is any reasonable likelihood that the debtor's estate may be rehabilitated. Generally, a debtor must be able to stem its losses, and reestablish its

financial affairs "on a firm, sound basis" within a reasonable period of time.[44] This means that the debtor must generate sufficient funds to service debt plus interest, pay administrative costs, and pay fixed costs and expenses. The prospect that a "potentially meritorious litigation will bring funds into the estate" is an insufficient basis to conclude that rehabilitation is possible.[45]

Meadors presented no plan to increase revenues, admitted that most of Debtor's equipment sits idle and is not being used to generate revenue, admitted that generating business and income postpetition has been difficult, and has made no effort to collect receivables or liquidate assets. In other words, the Court observes that very few actions have been taken to rehabilitate the estate. The Court believes that eight months is a reasonable amount of time for Debtor to begin to turn around its business. The Court heard no evidence regarding the merits or expected timeline of its litigation to collect insurance on the digging mats. Debtor's Disclosure Statement and Plan express hope that the litigation will provide sufficient funds to pay its creditors at some point in the future, predicting "some degree of success." The Court believes that this avenue in insufficiently reliable and certainly offers no hope of rehabilitation in a reasonable period of time.

The record shows by a preponderance of the evidence that Debtor's estate is suffering a continuing diminution since filing bankruptcy and that rehabilitation is unlikely. Excluding the insurance proceeds received in September 2024, its cash balance is decreasing. Debtors' receivables are decreasing in value with each month they remain uncollected. Most of Debtor's equipment is not being used to generate income and is depreciating. Debtor has not paid any administrative expenses. It has no accounting professional to correct its records and assist

---

[44] *Taub,* 427 B.R. at 231, quoting *In re D & F Meat Corp.,* 68 B.R. 39, 41 (Bankr. S.D.N.Y. 1986).
[45] *Id.*

Meadors in returning it to solid financial footing. Therefore, the Court finds cause to dismiss or convert this case pursuant to § 1112(b)(4)(A).

**<u>Unusual Circumstances</u>**

Once cause to dismiss or convert is established, the burden shifts to the debtor to specifically identify unusual circumstances which demonstrate that dismissal or conversion is not in the best interests of creditors and the estate. Courts have significant discretion to determine whether unusual circumstances exist.[46] "[U]nusual circumstances" is not defined in the Code, but is intended to include "conditions that are not common in chapter 11 cases."[47] The objecting party must also establish under § 1112(b)(2)(A) and (B), that there is a reasonable likelihood that (1) a plan will be confirmed within a reasonable time, (2) "cause" for dismissal includes grounds other than a continuing loss or diminution of the estate, (3) there is a reasonable justification for the act or omission that establishes grounds for dismissal, and (4) such actions will be cured within a reasonable period of time.[48]

Debtor filed this case claiming that the destruction of digging mats in a fire in August of 2023 as well as theft of funds by former employees led it to seek protection through the bankruptcy process. Despite these events, the evidence established that Debtor's difficulties actually preceded these events. The Great Plains' loan was originally intended to be for a short-term. Sale of the digging mats did not go as hoped. Debtor had to modify its loan seven times to

---

[46] *In re Prods.Int'l Co.,* 395 B.R. 101, 109 (Bankr. D. Ariz. 2008).

[47] *Id.*

[48] *Whetten,*473 B.R. at 384, citing 7 Collier on Bankruptcy ¶ 1112.05[2], 16th Ed. *See also In re Picacho Hills Utility Co., Inc.,* 518 B.R. 75, 81 (Bankr. D.N.M. 2014) ("To remain in Chapter 11, debtors are generally expected to 'point to a reasonable plan of reorganization….'" (citations omitted).

extend the term due to its inability to sell the mats and make the required payments on the loan. Ultimately, the Debtor was unable to service its debt and faced foreclosure.

Debtor identified no unusual circumstances that exist postpetition that demonstrate dismissal or conversion is not in the best interest of creditors. Although it has initiated legal action to recover insurance proceeds for the loss of the digging mats, there was no information regarding its merits or likelihood of success which might convince the Court to continue the case. Similarly, it was unclear from Meadors' testimony whether any action has been taken to recover funds that may have been stolen by Debtor's former employees and whether Debtor may realize any recovery of funds within a reasonable time.

Debtor's position is that no cause exists to dismiss or convert, therefore it presented no evidence at the hearing addressing the requirements set forth in § 1112(b)(2). Debtor did not address whether there is a reasonable likelihood that a plan will be confirmed within a reasonable time frame. Its Plan proposes to pay all claims in full using the recovery from its insurance claim for the digging mats, ongoing business operations, and liquidation of equipment and machinery. Its Disclosure Statement and Supplement admit that it can only expect some recovery from its insurance litigation and recovery is not certain. It offered no timeline or prediction regarding how long the litigation would last. Debtor never explained how it would generate income to fund a plan other than its insurance claim and sale of its equipment. Instead, Meadors testified that keeping Debtor's business operations going has been difficult and that it has not had sufficient business to make use of its equipment. Therefore, it is not reasonably likely that Debtor can successfully reorganize and confirm a plan within a reasonable time. Debtor failed to satisfy the first part of the test.

Debtor may be able to meet the second part of the test since the cause for dismissal or conversion includes grounds other than continuing loss or diminution to the estate. However, it has provided no reasonable justification for its acts or omissions that constitute gross mismanagement. The evidence offered by Debtor was simply that it knew its financial records were in disarray, but that problem existed before it filed bankruptcy, and it had taken no concrete steps to rectify these errors other than accepting Goodson's offer to assist in balancing bank statements and generating reports from QuickBooks without correcting the inaccurate information. Although Debtor promised to take corrective action by hiring a financial professional, it offered no justification for why that had not occurred by the evidentiary hearing nor did it promise to take corrective actions within a reasonable time, as required by the third and fourth part of the test. Therefore, the Court finds that Debtor has failed to satisfy its burden under §1112(b)(2).

**<u>Conversion or Dismissal</u>**

It is within this Court's discretion to decide whether dismissal or conversion is in the best interest of creditors and the bankruptcy estate.[49] At the hearing, Great Plains urged the Court to convert the case to chapter 7 rather than dismiss. Debtor has identified a substantial amount of accounts receivable, has initiated a lawsuit to recover insurance placed on its digging mats which has been joined by Meadors, has equipment located at its Okemah yard, on other job sites, and perhaps in other states, and may have an interest in additional equipment that is not listed on its schedules. Additionally, Meadors claims ownership of some assets originally listed as Debtor's on its schedules.  Given that there may be assets available for liquidation and distribution by a chapter 7 trustee, there is pending litigation that could be managed by a chapter 7 trustee, and

---

[49] *See In re Exigent Landscaping, LLC,* 656 B.R. 757, 774 (Bankr. E.D. Mich. 2024).

that an investigation into the ownership of certain property may be necessary, the Court concludes that conversion to chapter 7 is in the best interests of creditors and the estate.

### **<u>Order of the Court</u>**

For the reasons stated herein,

IT IS HEREBY ORDERED that Great Plains Bank's Motion to Dismiss, or Alternatively, to Convert the Bankruptcy case to a Chapter 7 Proceeding (ECF No. 82) is **granted.** This case is hereby **converted to chapter 7.**

# # #